1
2
3
4
5
6                           IN THE UNITED STATES DISTRICT COURT

7                          FOR THE NORTHERN DISTRICT OF CALIFORNIA

8
9
10   ANDREW LANCASTER, JEFFERY MILLS,
     DEXTER WILLIAMS, WILLIAM DENNIS,
11   STEVE LIVADITIS, JIMMY VAN PELT,              No. C 79-01630 WHA
     H. LEE HEISHMAN III AND JOHNATON
12   GEORGE,

13                 Plaintiffs,                     **ORDER:  (1) GRANTING
                                                   MOTION TO SUBSTITUTE
14        v.                                       PLAINTIFFS, (2) GRANTING
                                                   CLASS CERTIFICATION,
15   JAMES E. TILTON, Acting Secretary,            AND (3) DENYING
     California Department of Corrections and      MOTION TO MODIFY
16   Rehabilitation, and EDDIE YLST, Acting        CONSENT DECREE**
     Warden, San Quentin State Prison,
17
                   Defendants.
18   _____/

19
20                                  **INTRODUCTION**

21        In this 27-year old prisoner-rights case on behalf of condemned inmates, plaintiffs have

22   filed several motions.  In one, eight prospective class representatives request to be substituted

23   as plaintiffs.  None of the previous plaintiffs remains on Death Row.  The motion to add new

24   plaintiffs will be **GRANTED**.  Additionally, plaintiffs request class certification for their claims

25   under FRCP 23.  The proposed class meets the requisites of FRCP 23 at least with respect to

26   issues pertaining to the existing consent decree.  With limitations, this motion will be

27   **GRANTED**.  Finally, plaintiffs move to request approval of the modification to the existing

28   consent decree.  The proposed modification is impermissible under the Prison Litigation

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

1  Reform Act of 1996 ("PLRA"), 18 U.S.C. 3626, as well as inadvisable under FRCP 23(e).

2  The motion to modify will be **DENIED**, all for reasons that now follow.

**STATEMENT**

In 1979, condemned inmates brought a civil action against the director of the California Department of Corrections and the warden of San Quentin State Prison, home of Death Row. Plaintiffs alleged that defendants violated state and federal prohibitions on cruel and unusual punishment by automatically classifying all condemned inmates as violent and high-escape risks and by holding them in inhumane conditions.

Specifically, plaintiffs alleged that prisoners were kept in their cells except for administrative hearings once every ninety days, five-minute showers twice per week, hospital visits, two non-attorney visits per week, and one three-hour exercise period every four days. The cells allegedly measured 4.5 feet wide, ten feet, nine inches deep, and eight feet high. Prison officials allegedly gave out filthy, thin mattresses.  The food was often handled in an unsanitary manner.  Cells had almost no natural light.  The floors of common areas immediately outside the cells were rarely cleaned.  No religious services were permitted.  Prisoners could not seek educational or vocational training available to general-population inmates. These conditions allegedly violated prisoners' procedural and substantive due-process rights under both state and federal law, and their First Amendment right to worship.  Plaintiffs sought to maintain the action on behalf of the condemned prisoners then on Death Row, plus any future condemned prisoners at San Quentin (Compl. ¶¶ 4, 21, 32, 34, 36–37, 39–40, 44–45, 52–59). Since the original complaint, the number of condemned inmates has skyrocketed — to 619 — as of May 9, 2006 (Fama Decl. ¶ 23, Exh. D).

**1.     THE 1980 CONSENT DECREE.**

Counsel agreed to a consent decree that was approved by Judge Stanley Weigel on October 23, 1980.  The consent decree, as amended, has governed certain rights and privileges of condemned prisoners for over a quarter century.  Essentially, the decree required prison officials to separate inmates into low- and high-security risks (Consent Decree 4–8). The decree classified condemned inmates into two grades:  A and B (Consent Decree 4).

United States District Court

For the Northern District of California

Grade A inmates generally include inmates without a high violence or escape potential, who have demonstrated a good disciplinary-free adjustment, and are able to get along safely and peaceably with other inmates and staff.  Grade B inmates generally include inmates with a high escape or violence potential or who are serious disciplinary or management cases.  Included are those inmates with a history of escape, in-prison assault, gang affiliation, introduction of contraband, or weapons possession.  Administrators have been required to consider certain factors in making classification determinations.  Additionally, the decree has given most inmates a minimum of nine hours outdoors per week.  It has allowed low-risk prisoners to spend about six hours per day in common areas.  San Quentin has agreed to provide particular athletic equipment and to meet minimum standards for lighting, sanitation, furniture, religious freedom and access to correspondence courses, among other things (Consent Decree 8–19).

      **2.**        **EVENTS FOLLOWING THE 1980 CONSENT DECREE.**

As stated, the consent decree has been modified several times (Jt. Resp. to Ct. Order (July 21, 2006), Exh. A (list of modifications)).  On January 20, 1982, the district court approved modifications providing individual shower controls, bench and clothing hooks, and barber services.  On December 29, 1986, a provision was added to recognize that the warden or a defendant could suspend the decree during a riot or other emergency.  On March 17, 1988, the district court approved modifications by which prison officials agreed to provide free weights for outside exercising, and inmates agreed to afford prison officials greater latitude in the security of prisoner movement.

By June 1982, defendants had failed to satisfy the decree's provisions.  Judge Weigel, however, refused to hold the prison officials in contempt.  Instead, the district court granted a six-month extension to give prison administrators time to come into compliance, finding that defendants had been reasonably diligent and an increase in inmates had been the cause of the prison's failure to satisfy the decree.  Additionally, Judge Weigel directed the parties to negotiate to modify the decree.  *Thompson v. Enomoto*, 542 F. Supp. 768, 769–80 (N.D. Cal. 1982) (*Thompson I*).

**United States District Court**
For the Northern District of California

The parties failed to agree on modifications. Plaintiffs filed a motion requesting appointment of a special master to ensure compliance with the decree. On March 25, 1985, after finding that "exceptional conditions" warranted the appointment of a special master, the court entered an order appointing Robert R. Riggs as special master, referred to by the court as a "monitor." The warden appealed. The Ninth Circuit held that the order appointing a monitor was not an appealable interlocutory order. *Thompson v. Enomoto*, 815 F.2d 1323, 1325, 1327 (9th Cir. 1987) (*Thompson II*). From October 1985 to November 1988, the monitor issued three reports reviewing the prison's compliance with the consent decree. The district court adopted all three of these reports. Over the following decade, the monitor filed three additional reports, resulting in a total of six reports. The monitor's final report was filed on November 21, 1995.

In 1989, the district court adopted the monitor's fourth report, ordering prison officials to comply with terms of the consent decree and also recommending that dangerous prisoners be denied certain privileges. *Thompson v. Enomoto*, 915 F.2d 1383, 1387 (9th Cir. 1990) (*Thompson III*). The order adopted modifications that limited the amount of noise in five-tier cell blocks and withdrew certain equipment and privileges from Grade B condemned inmates. In the fourth report, the monitor also determined that the prison officials' failure to comply with the decree was not justified. Cross appeals were taken to the Ninth Circuit. In October 1990, the Ninth Circuit held that the district court had retained jurisdiction to modify the decree. The circuit also found that: (1) the decree could be expanded to cover Death Row prisoners regardless of where they were housed in the prison and (2) the withdrawal of privileges to dangerous prisoners was warranted. *Thompson III*, 915 F.2d at 1387–91. Following the Ninth Circuit's approval of the adopted fourth report, the monitor issued two additional reports regarding the prison's compliance with the consent decree.

### A.    Attempted Termination of the Consent Decree.

Despite objection from defendants, the district court adopted the sixth and final report issued by the monitor. The report stated that prison officials were violating a number of decree provisions. In response, defendants moved for termination of the consent decree under the

4

United States District Court

For the Northern District of California

1    Prison Litigation Reform Act, 18 U.S.C. 3626.  Judge Charles Legge, who had taken over the

2    action after Judge Weigel left the bench, granted the termination motion.  Defendants then

3    moved to terminate the order of reference on the ground that there was no longer anything for

4    the monitor to oversee.  The motion was granted on February 27, 1998.  Plaintiffs then appealed

5    the termination of the decree.  The Ninth Circuit reversed and remanded, holding that the

6    termination provision of the PLRA should not have been used to terminate the decree without

7    an evidentiary hearing to ascertain whether there were ongoing federal violations.  *Thompson v.*

8    *Enomoto* (*Thompson IV*), 220 F.3d 987, 990, 996, 1009 (9th Cir. 2000).  The monitor issue was

9    not, however, addressed.

10        After remand, Judge Legge left the bench and the case was reassigned to the

11   undersigned on June 11, 2001.  Although the Ninth Circuit had remanded so that an evidentiary

12   hearing could be held to prove up violations, no one asked for such a hearing on remand.

13   Nor did anyone re-move to terminate.  Instead, counsel entered into negotiations, leading to the

14   proposed modification now at issue.

**B.    Proposed Modification to the Consent Decree.**

16        At least in part, the pending proposal was prompted by defendants' desire to build a new

17   building at San Quentin to house the ever-growing Death Row population.  The building is not

18   expected to be occupied before 2009, although no occupancy date has been set (Fama Decl.

19   ¶ 24).  Ground has not yet been broken for the new facility.  It is still only in the planning stages

20   and may never, in fact, be built.  Unless terminated, the existing decree will continue to be in

21   effect for prisoners in existing facilities.  The changes proposed in the modification would affect

22   only prisoners in the possible new building (Stip. for Modification ¶ 2).  Additionally, the

23   stipulation contains revised procedures governing the conditions under which condemned

24   prisoners will be held in the new unit.  No change, however, is directed at any alleged federal

25   violation in the existing facilities.

26

27

28

United States District Court

For the Northern District of California

If the new building materializes, the major change to the decree would be:

- Instead of only Grades A and B, prisoners in the new building would be divided into five grades, A–E. The new system would separate existing distinctions *within* grades into *separate* grades (Fama Decl. ¶ 16).

- Grade A prisoners under the new system would be similar to current Grade A prisoners housed in the North Segregation unit. Those inmates have long-term records of being the best behaved of all condemned prisoners.

- Grade B prisoners under the new system would be similar to those Grade A prisoners now housed in the East Block unit, who are considered peaceful but do not have as long a track record of docility as North Segregation inmates.

- Grade C prisoners would be those currently called "walk-alones," prisoners who would be Grade A inmates except for the fact that other inmates wish to harm them.

- Grade D prisoners would be those now called Grade B prisoners and who have a pending serious rules violation charge or are being investigated by prison officials. Also classified as Grade D will be new inmates not yet classified and Grade C prisoners who are not reasonably safe even with other Grade C inmates.

- Grade E prisoners would be the hard-core, dangerous or incorrigible inmates, who have a high escape or violence potential, or who have serious discipline problems.

- The modification would provide specified periods that inmates in the new possible building must spend in more restrictive grade classifications if they commit specific types of violations. For example, if an inmate were to commit a serious rule violation, he would not be able to become a Grade A prisoner for at least five years. If he were to assault another

United States District Court

For the Northern District of California

inmate (other than in mutual combat) or commit a drug-distribution offense, he could not become Grade A for at least ten years. Under the current system, the criteria are looser, so that an inmate could become a Grade A prisoner despite committing such offenses within the relevant time periods (compare Consent Decree 6–8 to New Condemned Manual 6–7).

- Some requirements would be eliminated entirely. For example, the prison would no longer have to supply particular yard equipment, such as a "heavy punching bag," "[j]ump ropes," and a "medicine ball," required by the current decree. Inmates in the new building would no longer have a right to play ping pong in their common areas. Nor would they be guaranteed a stool in their cells (Consent Decree 10–13).

- Attorney visits, allowed by the current decree but not guaranteed for any particular periods, would be permitted for at least six hours every weekday (compare Consent Decree 19 to New Condemned Manual 12, 15, 19, 24, 27).

- Instead of using gang "membership or affiliation" as a factor to classify inmates, the new procedures would penalize only "participation in gang activity," reflecting a change in focus from inmates' gang status to their gang-related conduct (compare Consent Decree 8 to New Condemned Manual 5).

In addition to these changes in living conditions, defendants would agree not to seek termination of the existing consent decree unless it develops that the new unit is not "reasonably likely . . . [to] be constructed" (defendants bearing the burden of so proving) or if the new unit does not begin accepting inmates within seven years of court approval of the modification. Defendants also would agree not to change the Condemned Manual unless modification is necessary to "prevent a significant security risk that is independent of the prisoners' condemned

**United States District Court**
For the Northern District of California

status" or the modification does not significantly diminish the benefits to prisoners.[1] Finally, defendants would agree not to seek to terminate the proposed consent decree during the two-year period beginning when the new unit is fifty percent occupied or during any one-year period after a court finding that defendants are not in "substantial compliance" with the new Condemned Manual (Proposed Consent Decree ¶¶ 3–5).

Pursuant to a court order filed on August 5, 2005, inmates were provided notice of the proposed modification.  Inmates were also provided with individual copies of the stipulation, proposed consent decree, and Condemned Manual on June 15, 2006.  Through July 18, 2006, the Court received comments from 72 prisoners who objected to the stipulation (Fama Decl. ¶ 25).  Additionally, Charles Carbone and Diana Samuelson, attorneys representing intervenor/objector prisoner Freddie Fuiava, submitted a 35-page summary of the comments made by approximately 198 identifiable inmates who responded to the two notices regarding the proposed modification (Samuelson Decl. ¶ 3).

Objections to the current proposal to modify the consent decree focus on a few issues. Some inmates object because they do not believe counsel for plaintiffs allowed them enough participation in the process.  Some inmates argue that the proposed revisions do not resolve the claims asserted in the operative complaint, since the complaint focused exclusively on conditions at San Quentin's existing Death Row.  The main issue — and the one of most concern — concerns the gang-validation regulations to be applied on Death Row.  Under existing Title 15 of the California Administrative Code, prisoners are provided procedural safeguards prohibiting discriminatory and arbitrary gang classification.  Cal. Code Regs. Tit. 15, § 3378. Specifically, classification of prisoners based on gang involvement requires three independent source items of document indicative of actual membership in addition to other administrative protections.  Cal. Code Regs. Tit. 15, § 3378(c)).  Even now, however, defendants do not apply those provisions to prisoners on Death Row.  Although Title 15 does not exempt Death Row

---

[1] The proposed consent decree would include a new institutional procedure titled the "Condemned Manual."  This manual sets forth policies and procedures, details organizational framework, and describes the criteria and standards governing the operation of the proposed unit.

**United States District Court**

For the Northern District of California

1   from the procedure, prison officials have simply refused to give Death Row inmates the benefit

2   of these safeguards.  Defendants have already written their current practice into the existing

3   decree, thereby using the supremacy of the federal decree to avoid having to amend Title 15.

4   As to the new proposed facility, they seek to do the same, *i.e.*, to write their anticipated and

5   expanded classification system into the modified decree, again without having to amend Title 15.

6   The objectors believe that the current gang-classification procedures on Death Row, which affect

7   the degree of freedom prisoners have within the prison, are wielded arbitrarily by prison officials

8   and are used to punish some prisoners unfairly.  Instead, they want Title 15 to be used.

9           **3.      CLASS CERTIFICATION.**

10          For reasons lost in lore in this aged case, no class was ever certified, either before or at

11   the time the consent decree was entered in 1980.  The district court and the Ninth Circuit,

12   however, "treated" the case as a representative class action, according to plaintiffs' counsel,

13   although the extent to which various earlier judges on this case were aware of the lapse is

14   questionable.  *See, e.g., Thompson I*, 542 F. Supp. at 770 (applying decree to new prisoners since

15   entry of consent decree); Order at 1 (Dec. 18, 1986); Order Denying Defs.' Mot. for

16   Reconsideration & Alternative Mot. for Stay at 6 (Jan. 29, 1987); *Thompson III*, 915 F.2d at

17   1389–90 (holding that decree applied to all condemned prisoners housed at San Quentin).

18          This case has been, in effect, managed by the lawyers and not by any representatives of

19   the inmates.  It deserves to be said, however, that the Prison Law Office is well qualified to serve

20   as class counsel.  From the filing of the complaint through today, lawyers affiliated with the

21   Prison Law Office, a not-for-profit law group that represents state prisoners, have prosecuted the

22   case.  Lead plaintiffs' counsel, Steven Fama, has worked for the office since 1985.  He has

23   represented inmates in prison-condition cases such as *Wright v. Enomoto*, which challenged

24   conditions of confinement for high-risk prisoners and won procedural protections for prisoners

25   facing classification as such (Compl. 1; Fama Decl. ¶¶ 1, 5–6).  *Wright v. Enomoto*, 462 F. Supp.

26   397, 398–99 (N.D. Cal. 1976) (known as *Toussaint v. McCarthy* when Mr. Fama worked on the

27   case).  He represented prisoners challenging practices at Pelican Bay State Prison.  *Madrid v.*

28   *Gomez*, 889 F. Supp. 1146, 1155 (N.D. Cal. 1995).  He successfully advocated a judicial

**United States District Court**

For the Northern District of California

takeover of medical care in state prisons. *See Plata v. Schwarzenegger*, No. C01-01351 TEH, 2005 WL 2932253, at *1 (N.D. Cal. Oct. 3, 2005). In addition, Mr. Fama authored an edition of the *California State Prisoner's Handbook*, a guide to prison and parole law. Attorney Fama is well qualified to be class counsel. Nonetheless, it is disappointing that counsel never attempted to comply with FRCP 23. The undersigned learned of the snafu only by study of the file, which was confirmed by counsel only after inquiry by the Court.

We thus have no certification in the file. We do not even have a plaintiff, the original plaintiffs having been removed from Death Row. The Prison Law Office was ordered to move for certification if it wanted to maintain this case as a representative action. Counsel were also advised to move for substitution of plaintiffs if they wanted to pursue modification of the decree. The Court granted a motion to intervene by inmate Freddy Fuiava, who objected to the proposed modification, represented by attorneys Charles Carbone and Diana Samuelson (Order Granting Mot. to Intervene 1 (Apr. 6, 2006)).

Defendants and plaintiffs stipulated to substituting the new plaintiffs into the action (Stip. 1–2 dated Mar. 29, 2006). They are inmates Andrew Lancaster, Jeffery Mills, Dexter Williams, William Dennis, Steve Livaditis, Jimmy Van Pelt, H. Lee Heishman III and Johnaton George. Messrs. George and Lancaster are now classified as Grade B prisoners, who are considered high-security risks and are entitled to fewer privileges than Grade A Death Row inmates (Mot. to Add Pls., Exh. G (George Decl.), Exh. H (Lancaster Decl.); Consent Decree 4). The other six proposed plaintiffs are now Grade A prisoners (Mot. to Add Pls., Exhs. A–F (other proposed plaintiffs' declarations)). Intervenor has not opposed addition of the new plaintiffs. The motion to substitute plaintiffs is **GRANTED**.

Plaintiffs also move to certify the class. Intervenor opposes the motion to certify the class. Defendants, however, do not (Defs.' Resp. to Pls.' Mot. for Class Cert. 1, 3). This 27-year-old action is now before the Court for the first time on a class-certification motion and a separate motion to approve the proposed modification to the consent decree.

1

**ANALYSIS**

2

**1.    CLASS CERTIFICATION:  FRCP 23 REQUIREMENTS.**

3        A motion for class certification must satisfy the prerequisites of FRCP 23(a) as well as

4    one of the three conditions set forth in FRCP 23(b).  Under FRCP 23(a), a class can be certified

5    only if (1) it is "so numerous that joinder of all members is impracticable, (2) there are questions

6    of law or fact common to the class, (3) the claims . . . of the representative parties are typical of

7    the claims . . . of the class, and (4) the representative parties will fairly and adequately protect

8    the interests of the class."  In this motion, plaintiffs seek certification under FRCP 23(b)(2),

9    which requires that "the party opposing the class has acted or refused to act on grounds generally

10   applicable to the class, thereby making appropriate final injunctive relief or corresponding

11   declaratory relief with respect to the class as a whole."

12       This order finds that with respect to the existing consent decree, defendants' practices

13   and policies, as alleged in the complaint and as prescribed in the existing consent decrees, affect

14   the class on the same general grounds.

15              **A.      FRCP 23(a)(1):  Numerosity.**

16       Numerosity requires that the class be so numerous that joinder is impracticable, not

17   impossible.  *See Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909, 913 (9th Cir. 1964).

18   None of the intervenors contests certification for failure to meet this condition.  Furthermore, as

19   a class of over 600 condemned prisoners housed at San Quentin, plaintiff class clearly satisfies

20   this requirement.

21              **B.      FRCP 23(a)(2):  Commonality.**

22       "[C]ommonality is satisfied where [a] . . . lawsuit challenges a system-wide practice or

23   policy that affects all of the putative class members."  *Armstrong v. Davis*, 275 F.3d 849, 868

24   (9th Cir. 2001).  In the instant action, the complaint alleged that defendants imposed a common

25   policy of segregation and a common system of sub-par living conditions upon all condemned

26   inmates (Compl. ¶¶ 21, 29–46).  The suit thus challenged a "system-wide practice or policy that

27   affects all of the putative class members."  *Armstrong*, 275 F.3d at 868.  The complaint alleged

28

**United States District Court**
For the Northern District of California

11

that these conditions violated the First, Eighth and Fourteenth Amendments, thus raising questions of law common to all prisoners.

The situation has changed since the complaint was filed in 1979, however, in part due to implementation of the consent decree. The consent decree itself is now a common policy under which all inmates live. Its enforcement poses questions of law and fact common to all class members.

Intervenor Fuiava contends, however, that commonality does not exist because he and other class members "do not share the same event, practice, or course of conduct that forms the basis of the representative plaintiffs' claims." He makes three arguments in support of this contention. *First*, he notes that six of the plaintiffs are Grade A prisoners, while intervenor and about 120 other prisoners are in the more restrictive Grade-B classification (Opp. 2–3). Two of the proposed representatives, however, are Grade B prisoners. The proportion of Grade A representatives to Grade B representatives, 3:1, is similar to the overall ratio of Grade A inmates to Grade B inmates, 4:1. This argument is therefore unpersuasive. As we move forward, however, the Court will be sensitive to whether the Grade B representatives sign onto and support any actions advanced on behalf of the class.

*Second*, Intervenor Fuiava claims that the named Grade B plaintiffs, Messrs. George and Lancaster, have not produced evidence that they were put in Grade B status for the same reasons as other Grade B prisoners or by the same procedures (Opp. 3). It is true that Grade B inmates are given that status for varying reasons. Some end up in that position because they tried to escape. Others have their privileges taken away because they trafficked in drugs. A portion of them never obtain Grade A status because they are affiliated with gangs (see Consent Decree 6–8 (listing factors)). These differences, however, are due only to the consent decree, *i.e.*, the remedy and classification procedures imposed in this very action. They are not due to the injuries plaintiffs claimed in bringing this action, which arose from a unitary policy that raised common issues of fact and law. Even now, the consent decree applies equally to all prisoners and therefore presents common issues of fact and law.

United States District Court

For the Northern District of California

*Third*, Intervenor Fuiava argues that there is no reason to believe that "defendants applied the same law or regulatory scheme . . . [as] that used on the [other] proposed class members" (Opp. 4). There is, however, no dispute that the consent decree and its modifications govern the treatment of all condemned inmates. The same "regulatory scheme" therefore *was* applied to all members of the class, contrary to intervenor's assertion.

The differing effects that a single policy have on different inmates is not sufficient to defeat the assertion of common questions of law or fact. The Ninth Circuit faced such an issue in *Armstrong*, where parole candidates with various disabilities sought certification as a class to challenge alleged failures to accommodate them at parole-board hearings. Defendants argued that the state's policies affected prisoners with different disabilities in different ways, defeating the assertion of commonality. The Ninth Circuit held, however, that "the differences that exist here do not justify requiring groups of persons with different disabilities, all of whom suffer similar harm from the Board's failure to accommodate their disabilities, to prosecute separate actions. The commonality requirement is met." 275 F.3d at 868. Just as in *Armstrong*, here plaintiffs alleged in the complaint that they suffered similar harm from defendants' practices — cruel and unusual punishment, denial of due process and curtailment of their freedom to worship. Commonality can be satisfied even when there are divergent factual predicates as long as there are some common legal issues. *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998). The fact that they may suffer these injuries in different ways does not erase the fact that they generally share common questions of law and fact.

Intervenor also doubts commonality, saying that class members are in dispute among themselves whether the proposed modification of the decree is desirable. The dispute, although important in this proceeding, has nothing to do directly with whether there is a common question of law or fact.

In summary, with regard to the plaintiffs' claims asserted in the original complaint, the distinctions and potential differences that intervenor raises do not affect the fact that the policies prison officials applied to all condemned prisoners and the common injuries plaintiffs alleged in

United States District Court
For the Northern District of California

1  the complaint raise common issues of fact and law.  FRCP 23(a)(2) is satisfied for the existing

2  consent decree.

3            **C.**        **FRCP 23(a)(3):  Typicality.**

4         The purpose of the typicality requirement is to assure that the interests of the named

5  representative align with the interests of the class.  *Hanon v. Dataproducts Corp.*, 976 F.2d 497,

6  508 (9th Cir. 1992).  The Ninth Circuit has stated that

7        [w]here the challenged conduct is a policy or practice that affects
      all class members, the underlying issue presented with respect to

8        typicality is similar to that presented with respect to commonality,
      although the emphasis may be different.  In such a case, because

9        the cause of the injury is the same . . . the typicality inquiry
      involves comparing the injury asserted in the claims raised by the

10        named plaintiffs with those of the rest of the class. We do not
      insist that the named plaintiffs' injuries be identical with those of

11        the other class members, only that the unnamed class members
      have injuries similar to those of the named plaintiffs and that the

12        injuries result from the same, injurious course of conduct.

13  *Armstrong*, 275 F.3d at 868–69.

14         In the instant case, the original plaintiffs alleged in the complaint that they all suffered

15  the same injuries — arbitrary classification as high-security risks, with the result that they were

16  housed without basic comforts, hygiene, religious freedom and educational opportunity.

17  The case is now, however, in an unusual posture.  The injuries that plaintiffs originally alleged

18  have been remedied by the decree.  The remaining issue is enforcement.  Although no violations

19  of the decree are now known, our new representatives would seem to be typical of the population

20  with a sufficient stake to police enforcement of the decree for all current inmates.

21         Intervenor Fuiava argues that the Grade B representative plaintiffs do not have claims

22  that are typical because only one — Mr. Lancaster — is housed in the adjustment center, where

23  Intervenor Fuiava is located, and because Mr. George has been a Grade B prisoner for two years,

24  by comparison with the nine years Intervenor Fuiava has spent in that status (Opp. 7).

25  Requiring similar periods of confinement or confinement in the same wing of Death Row would

26  impose typicality requirements more stringent than those sanctioned by the Ninth Circuit.

27  That court held that named plaintiffs' injuries need not be "identical with those of the other class

28  members, [so long as] . . . the unnamed class members have injuries similar to those of the

United States District Court
For the Northern District of California

named plaintiffs and that the injuries result from the same, injurious course of conduct."

*Armstrong*, 275 F.3d at 869.  Here, the injuries alleged in the complaint are typical enough of

those suffered by other class members to satisfy FRCP 23, in part because they result from the

same prison policies.

### D.   FRCP 23(a)(4):  Fair and Adequate Representation.

To certify a class, a court must find that "the representative parties will fairly and

adequately protect the interests of the class."  FRCP 23(a)(4).  "Resolution of two questions

determines legal adequacy:  (1) do the named plaintiffs and their counsel have any conflicts of

interest with other class members and (2) will the named plaintiffs and their counsel prosecute

the action vigorously on behalf of the class?"  *Hanlon v. Chrysler Corp.*, 150 F.3d at 1020.

"Adequacy of representation depends on the qualifications of counsel for the representatives,

an absence of antagonism, a sharing of interests between representatives and absentees, and the

unlikelihood that the suit is collusive."  *In re N.D. Cal., Dalkon Shield IUD Prods. Liab. Litig.*,

693 F.2d 847, 855 (9th Cir. 1982).

Here, movants' counsel has a long record of prosecution of this and similar

prisoner-rights cases (Fama Decl. ¶¶ 5–6, 12–15, 19–20).  The inmates obviously share an

interest in preventing their cruel and unusual punishment, loss of religious freedom and arbitrary

treatment.  There are no apparent conflicts of interest.  There is, however, substantial antagonism

among class members in two areas.  At least 66 inmates expressed their displeasure with

plaintiffs' counsel.  About 72 inmates submitted comments in opposition to the proposed

modification, according to a summary made by intervenor's counsel that has not been challenged

by plaintiffs.

Intervenor Fuiava argues that the adequacy requirement is not met because the named

plaintiffs' interests are antagonistic to those of at least one-third of the proposed class.

This argument is not supported by the record.  Intervenor's counsel submitted objections from

about one-sixth of the population.  Some of these comments, moreover, were in response to a

previous proposal that has since been modified in an attempt to address objections.  It is possible,

therefore, that some of these objectors were mollified.  Furthermore, the approximately

United States District Court

For the Northern District of California

72 objectors have no apparent difference of opinion with Jeffery Mills, the proposed named representative.  By their own standards, they appear to be adequately represented by him. Intervenor also argues that "many comments from proposed class members claim[] that the named plaintiffs are not adequate . . . because their daily routine and classification issues are not common to the class and in fact are in conflict with other class members" [sic].  They cite, however, only to one comment so claiming (Opp. 9).

Intervenor Fuiava also argues against adequacy on the ground that the representatives will have "conflicts of interest" with unnamed class members due to existing and inevitable disagreements over what life on Death Row should be like.  Such disagreements, however, are not conflicts of interest.  People with exactly aligned interests nevertheless may conflict over how to achieve their goals.  Intervenor cites no authority for the proposition that mere disagreements are enough to sink a certification motion.  Plaintiffs, by contrast, note that the Ninth Circuit in *Probe v. State Teachers' Ret. Sys.*, 780 F.2d 776, 781 (9th Cir. 1986), held that representatives were adequate despite the fact that some class members benefitted from the programs the representatives were challenging, and thus might oppose the relief sought.

Intervenor Fuiava also claims that the dislike of plaintiffs' counsel voiced by about 66 inmates renders the Prison Law Office inadequate.  He does not, however, assert that these objectors have any *good* reason to be displeased with the Prison Law Office's work on this case, stating instead that the deficiencies of counsel may be "perceived" rather than "real" (Opp. 11–12).

**E.      FRCP 23(b): Declaratory or Injunctive Relief.**

FRCP 23(b)(2) permits class actions for declaratory or injunctive relief where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief."  Intervenors do not contend that plaintiffs fail

United States District Court

For the Northern District of California

1   to satisfy the strictures of FRCP 23(b)(2).  Consequently, certification of the proposed class is

2   proper with regard to enforcement of the existing consent decree.[2]

3                          *           *           *

4          Given the substantial objections made and given the nature of the class, this order

5   requires the following procedure for all future motions in this case.  Each motion on behalf of the

6   class must be accompanied by declarations of all the representatives of the class stating their

7   specific views on the motion and demonstrating that the declarants have read and understood the

8   motion.  When a motion by defendants is responded to, the same procedure shall apply to verify

9   that the class representatives are on board with counsel's litigation strategy.  Class actions are

10  supposed to be directed by the class representatives.  Of course, they must be advised by class

11  counsel but the class representatives, not class counsel, are supposed to direct the litigation.

12  For too long, this action has been directed solely by the Prison Law Office without even the

13  semblance of a class representative.  A copy of this order must be provided to each

14  representative and counsel shall explain this paragraph to each representative and explain his

15  obligations as a class representative.  This declaration requirement does not apply to purely

16  procedural motions, such as scheduling motions.

17                    **F.      FRCP 23 and the Proposed Modification.**

18         The foregoing sustains class certification as to the issues raised in the existing consent

19  decree and its enforcement going forward.  A much different question, however, is presented as

20  to the proposed modification.  It concerns new events far in the future.  The new facility may

21  never be built.  If it is, its population will necessarily change from the existing population,

22  although some overlap will, of course, be likely.  We already have a sharp division among the

23  existing population over the merits of the counsel-negotiated proposal.  We do not yet know the

24

25         [2] The Court has received several prisoners' applications to opt out of the class action.  Plaintiffs move
    to certify the class under FRCP 23(b)(2), seeking injunctive and/or declaratory relief.  In contrast to a class
    certified under FRCP 23(b)(3), members of a FRCP 23(b)(2) class do not have the right to opt out.

26  *See Molski v. Gleich*, 318 F.3d 937, 947 (9th Cir. 2003) (citing *Ticor Title Ins. Co. v. Brown*, 511 U.S. 117, 121
    (1994) (per curiam).  Consequently, FRCP 23(b)(2) class members who are subject to the court's jurisdiction are

27  bound by a settlement or judgment on the class's claims. *See Colesberry v. Ruiz Food Products, Inc.*, 2006 WL
    1875444 at *5 (E.D. Cal. June 30, 2006).  The prisoners' applications to opt out of the class action are therefore

28  denied.

United States District Court

For the Northern District of California

1   shape and design of the new facility.  Only after it has been built (if ever) and after a shake-down

2   adjustment period, can the inmates appreciate all the nuances of life and classification in the new

3   death-row facility.  Our new representatives cannot possibly anticipate all issues now, even as to

4   the classification system.  Yet counsel would have them acquiesce in a new classification regime

5   before the full ramifications are clear.  Adequate representation is not shown as to these issues,

6   so class certification will be denied as to the proposed modification.  For the same reasons, the

7   Court cannot find that the proposed modification is "fair, reasonable and adequate" under

8   FRCP 23(e).

9          **2.      MODIFICATION OF THE CONSENT DECREE.**

10          Although the foregoing is dispositive as to the proposed modification, there is a separate

11   and inadequate obstacle:  the Prison Litigation Reform Act.  The PLRA bars the modification

12   unless it is shown that the modification is needed to meet a "current and ongoing violation" of

13   the prisoners' constitutional rights.  18 U.S.C. 3626(b)(3).

14          **A.      The Prison Litigation Reform Act.**

15          In 1996, Congress enacted the PLRA in its effort to make substantial changes to

16   civil-rights litigation brought by prisoners under 42 U.S.C. 1983 and other federal laws.  Pub. L.

17   No. 104-134, 110 Stat. 1321, §§ 801–810 (1996).  The PLRA is intended to "provid[e]

18   reasonable limits on the remedies available in" lawsuits concern prison conditions.  *See* H.R.

19   Rep. No. 21, 104th Cong., 1st Sess. 7 (1995).  The purpose of the PLRA was thus to limit

20   federal-court supervision of prisons.  Courts may do so only where necessary to correct a

21   violation of a federal right.

22          The Act's goals are accomplished, in part, by limiting the power of federal courts to grant

23   or approve certain remedies in actions challenging prisoner conditions:  "In any civil action with

24   respect to prison conditions, the court shall not enter or approve a consent decree unless it

25   complies with the limitations set forth in 18 U.S.C. 3626(a)."  18 U.S.C. 3626(c)).  In turn,

26   Section 3626(a) provides:

27                  Prospective relief in any civil action with respect to prison
                    conditions shall extend no further than necessary to correct the
28                  violation of the Federal right of a particular plaintiff or plaintiffs.
                    The court shall not grant or approve any prospective relief unless

18

United States District Court

For the Northern District of California

> the court finds that such relief is narrowly drawn, extends no
> further than necessary to correct the violation of the Federal right,
> and is the least intrusive means necessary to correct the violation
> of the Federal right.

18 U.S.C. 3626(a)(1)(A).

The PLRA defines "prospective relief" as "all relief other than compensatory monetary damages." 18 U.S.C. 3626(g)(7). "Relief" is defined as "all relief in any form that may be granted or approved by the court, and includes consent decrees . . ." (18 U.S.C. 3626(g)(9)).

The PLRA's prospective-relief limitation clearly confines the power of federal courts to circumstances where prospective relief is necessary to correct specific violations of federal rights. Furthermore, such relief must constitute the "least intrusive means" necessary to correct such violations. Consequently, to prevail on their motion to modify the consent decree, movants must establish that the prospective relief extends "no further than necessary to correct the violation" of their Eighth Amendment rights. 18 U.S.C. 3626(a)(1)(A). The text of this provision directly suggests that, in the absence of a "current and ongoing" violation, there is no occasion to fashion prospective relief to cure the violation. *See Hallet v. Morgan*, 296 F.3d 732, 743, (9th Cir. 2002) (reviewing grant of motion to terminate in § 1983 action involving prisoners confined at a women's state prison and holding that the PLRA requires prisoners to prove a "current and ongoing" violation of their constitutional rights to obtain prospective relief). Thus, if the prospective remedy is directed at future circumstances uncorrelated to present circumstances, the PLRA bars that particular prospective relief.

**B.     Application of the PLRA to the Proposed Modification.**

The proposed modification does not merely revise provisions of the existing consent decree but, instead, implements a "new [c]onsent [d]ecree" governing the conditions under which condemned prisoners will be held in a new unit that may or may not be built at San Quentin in about seven years (Br. 5–6). Intervenor Fuiava objects to the settlement because "[t]he operative complaint has nothing to do with the settlement proposal" and "the claims resolved in the settlement no longer resemble the claims advanced in the operative complaint" (Opp. 2). Intervenor Fuiava also contends that the settlement is premature because it seeks to remedy speculative constitutional violations at the new unit that have not yet occurred

**United States District Court**
For the Northern District of California

1  (Opp. 2–3). In response, plaintiffs argue their stipulation simply requires the continuation of the

2  existing degree and applies the same basic program for condemned prisoners if and when the

3  new facility is occupied (Reply Br. 5–6).

4       To step back and review the history, the operative complaint asserted federal violations in

5  1979 on Death Row.  These violations were dealt with by the existing consent decree and its

6  implementation.  Presumably, we have had years of substantial compliance.  The modification is

7  thus not directed at any current federal violation.  This is critical.

8       Also critical is that, given the uncertainties of the future, it is now impossible to tell

9  whether the modification is "narrowly drawn, extend[ing] no further than necessary" and is the

10  "least intrusive means necessary" to correct the imagined violation of future rights.

11  The proposed consent decree looks too far into the future to meet the requirements of the

12  PLRA's prospective relief provisions.[3]

13       Plaintiffs reply that existing conditions continue to violate condemned prisoners' federal

14  rights, thereby justifying continuance and modification of the consent decree.  Specifically, in

15  their briefs, but without evidentiary support in the record, plaintiffs assert that current conditions

16  include inadequate classification, out-of-cell time, law library access, religious services, food

17  service, noise, health care and disability accommodations (Plaintiffs' Resp. Ct's Order 4).

18       The original complaint alleged that the prisoners were not allowed physical contact with

19  visitors (Compl. ¶ 29).  Under the existing decree, prisoners are eligible for such visits six days

20  per week (Consent Decree 17).  The complaint alleged that prisoners were only allowed to

21  shower ten minutes per week (Compl. ¶ 32).  The consent decree gave them access to showers

22  from 9:00 a.m. to 3:00 p.m. daily (Consent Decree 9–11).  The complaint claimed that inmates

23

24       [3] Intervenor Fuiava argues that the proposed modification is improper because it presents relief for
claims which are now neither ripe nor included in the operative complaint.  A claim is not ripe for adjudication

25  if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.
*See Assoc. of Medical Coll. v. United States*, 217 F.3d 770, 780 (9th Cir. 2000) (refusing to review claims for

26  requested injunctive and declaratory judgment unless administrative determinations arise in the context of a
controversy ripe for judicial resolution).  The ripeness doctrine is meant to prevent courts from deciding issues

27  which are theoretical, speculative or abstract that have not yet impacted parties.  *Assiniboine and Sioux Tribes of
Fort Peck Indian Reservation v. Bd of Oil and Gas Conservation of Montana*, 792 F.2d 782, 787–88 (9th Cir.

28  1986).  The PLRA does not use the term "ripe."  But it does limit prospective relief to remedies needed to cure
existing violations.

only got three hours of exercise outdoors every four days (Compl. ¶ 32).  The consent decree required at least three days per week of outdoor exercise, with nine hours per week being the minimum for all but walk-alone prisoners (Consent Decree 8–9).  In 1979, the prison's indoor lighting was alleged to be "inadequate for most purposes" (Compl. ¶ 39).  Now, each inmate is entitled to "a frosted bulb of adequate wattage" (Consent Decree 12).  Rather than allegedly being forbidden to clean common areas, inmates are allowed to scour them daily (compare Compl. ¶ 40 to Consent Decree 15).  The prison must supply additional athletic equipment, including a weight machine, free weights, a speed bag, boxing gloves, a chin-up bar, a medicine ball, jump ropes and ping-pong tables (compare Compl. ¶ 42 to Consent Decree 10–11 and Stip. to Modify Consent Decree & Order 2–3 (March 17, 1988)).  Prisoners now are allowed to attend group religious services (compare Compl. ¶ 44 to Consent Decree 14–15).

These changes remedied the alleged deficiencies that existed at the time the complaint was filed.  No new problems have been proven, except for the discriminatory application of the classification regime, *as alleged by Intervenor Fuiava*.  Plaintiffs' counsel advanced the existing decree as a cure for the constitutional violations that once allegedly existed.  So long as defendants have abided by the existing decree, they cannot be said to be violating the rights originally alleged.  Put differently, plaintiffs' counsel surely would not have agreed to the existing decree if it allowed the original violations to continue.  Plaintiffs are entitled to vigorously enforce the existing decree.  But over the last seven years no motions complaining of violations have been made.

That is the long answer.  The short answer is that even if ongoing violations of the existing decree could be proven (and they have not been) such violations would only justify continuation and enforcement of the existing decree.  They would not justify the adoption of the proposed modification, for the latter would provide no cure for any immediate and current federal violations.  Presumably, that is because there have been no violations.

### C.   *Thompson IV.*

It is true that the Ninth Circuit placed a narrow construction of the PLRA in its decision in *Thompson IV*, 220 F.3d 987.  Judge Legge had granted termination based upon his

21

United States District Court

For the Northern District of California

determination that there were no ongoing violations that required continuation of any decree. On appeal, the Ninth Circuit reversed the termination. Upon review, the Ninth Circuit held that the district court was required to take evidence on the current circumstances at the prison, at least with respect to those remedies as to which plaintiffs did not concede that defendants were in compliance.

The Ninth Circuit addressed the issue of *terminations*. This order addresses modifications and, more pointedly, modifications that extend decrees far into the future, the opposite of the action taken in *Thompson IV*. Even as to terminations, however, the Ninth Circuit emphasized the need to anchor decrees in a need to correct current conditions, remanding for an evidentiary hearing as to what current violations justified continuance of the decree. *Thompson IV* is fully consistent with the main point here. Movants must establish that one or more current and ongoing violations will be cured by the proposed prospective relief. *Hallet v. Morgan*, 296 F.3d 732, 743 (9th Cir. 2002). Movants have failed to meet their burden. In response to the Court's order dated August 21, 2006, asking what conditions exist at San Quentin that currently violate a federal right, movants evaded the question, responding instead that the Court "is not required to hold a hearing or enter particularized findings regarding the Section 3626(a)(1)(A) criteria if the facts or factors are not in dispute" (Plaintiffs' Resp. to Ct. Order Br. 3–4). It is true that in a highly conclusory fashion counsel stipulated that the modification was based on violations of the Eighth Amendment and that it was narrowly drawn to correct the violation. But, in the face of the statutory command, the Court cannot in good faith acquiesce in such a conclusory and collusive finding.[4]

---

[4] A distinction must be drawn between the traditional discretionary/balancing test for ending a consent decree, as in *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367 (1992), *Bd. of Educ. v. Dorrell*, 498 U.S. 467 (1992), *Freeman v. Pitts*, 503 U.S. 467 (1992), versus the mandatory termination mandate of the PLRA. The Ninth Circuit decision placed a narrowing construction on the PLRA. It did not, however, limit the traditional discretionary/balancing test. The latter issue was never reached since Judge Legge had ruled the PLRA, standing alone, compelled termination.

**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CONCLUSION**

The motion to add new plaintiffs is **GRANTED**.  They are adequate representatives.  The motion to certify the class is therefore **GRANTED** to the extent stated above.  The following class is certified:

> All condemned prisoners currently confined to Death Row at San Quentin and an unknown number of prisoners who will in the future be condemned to death and confined at San Quentin prison who seek injunctive and declaratory relief to enforce the existing consent decree.

This class is certified solely for injunctive and declaratory relief with respect to all issues pertaining to the existing consent decree and for the purpose of policing the ongoing administration of the existing consent decree.  This limitation, of course, is without prejudice to a motion, should the need arise, to amend the complaint to assert new federal violations.

With respect to their motion for modification of the consent decree, movants have failed to carry their burden.  The motion to modify the decree is **DENIED**.

**IT IS SO ORDERED.**

Dated:  October 4, 2006.

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE