**United States District Court**
For the Northern District of California

1

2

3

4

5

6                     IN THE UNITED STATES DISTRICT COURT

7

8                    FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10   ANDREW LANCASTER, JEFFERY MILLS,          No. C 79-01630 WHA
     DEXTER WILLIAMS, WILLIAM DENNIS,
11   STEVE LIVADITIS, JIMMY VAN PELT,
     H. LEE HEISHMAN III AND JOHNATON
12   GEORGE,                                    **ORDER RE MOTION FOR
                                                CONTEMPT AND MOTION TO
13              Plaintiffs,                      MODIFY CONSENT DECREE**

14        v.

15   JAMES E. TILTON, Acting Secretary,
     California Department of Corrections and
16   Rehabilitation, and ROBERT L. AYERS, JR.,
     Acting Warden, San Quentin State Prison,
17
                Defendants.
18   _____/

19

20                            **INTRODUCTION**

21          In this 28-year old prison-conditions case brought by Death Row inmates at San Quentin

22   State Prison, there are three pending motions.  Plaintiffs move for contempt and enforcement of

23   the consent decree.  They also move to modify the consent decree.  For the below-stated

24   reasons, plaintiffs' motion for contempt and enforcement is **GRANTED IN PART AND DENIED IN

25   PART**, and will, as to some issues, require an evidentiary hearing.  Plaintiffs' motion to modify

26   the consent decree requires further factual findings and will be resolved after an evidentiary

27   hearing.  As to the issues on which plaintiffs have prevailed, defendants are ordered to submit a

28

1  plan to cure the violations within 45 days.  This will not be delayed pending resolution of the

2  evidentiary hearings on *other* issues, which may take some time.

3  **STATEMENT**

4  The condemned prisoners at San Quentin are plaintiffs in this prisoner-rights case.  A

5  consent decree between plaintiffs and defendants has governed defendants' conduct for

6  twenty-seven years.  The full procedural history of this action is set forth in an order dated

7  October 4, 2006, which granted class certification and denied a joint motion to modify the

8  consent decree.  *See Lancaster v. Tilton*, 2006 WL 2850015, at *1–3 (N.D. Cal. Oct. 4, 2006).

9  As discussed in that order, following a Ninth Circuit remand, this case was reassigned to the

10  undersigned judge in June 2001.  The court of appeals had specifically remanded the case for an

11  evidentiary hearing on the issue of inmate classification, but no party thereafter ever moved for

12  such a hearing.  Moreover, plaintiffs had never, from 2001 through 2006, alleged that

13  defendants had violated the consent decree.  It was only after this Court rejected a proposed

14  decree modification in October 2006 — over five years after the remand — that plaintiffs'

15  counsel first suggested that defendants were actually in violation of the existing decree.

16  Nonetheless, in November 2006, this Court permitted the parties to file a motion for leave to

17  amend the complaint, a motion to enforce the consent decree, or a motion for contempt.  The

18  parties were given over four months to investigate the extent of defendants' compliance (or

19  noncompliance) with the consent decree.

20  Plaintiffs have filed two motions:  (1) a motion for contempt and order enforcing the

21  consent decree, and (2) a motion to modify the consent decree.

22  **ANALYSIS**

23  **II.      PLAINTIFFS' MOTION FOR CONTEMPT AND FOR ENFORCEMENT.**

24  Plaintiffs seek a determination that defendants are in civil contempt due to their failure

25  to comply with certain provisions of the consent decree.  Plaintiffs seek sanctions to coerce

26  compliance as well as an order requiring defendants to file a satisfactory plan that will result in

27  compliance with the consent decree provisions being violated.

28

2

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

**A.      Whether the Consent Decree Was Terminated.**

A threshold question must first be resolved.  Defendants contend that the only provisions of the consent decree that are enforceable are those regarding classification, as all other provisions, they say, were terminated years ago.  Plaintiffs, however, argue that the original consent decree (with modifications) remains fully viable.

The procedural history on this point is most convoluted.  In his 1997 order terminating the consent decree, Judge Charles Legge explained:

> Defendants[] move to terminate four remedies provided in the decree.  Specifically, they are those concerning (1) noise, (2) access to legal materials, (3) classification of prisoners, and (4) group religious services.  The termination of these four remedies is contested by plaintiffs, but plaintiffs do not contest that the remaining prospective remedies of the decree are subject to termination.  Therefore, if defendants prevail on those four remedies, the remainder of the consent decree is in essence terminated.

*Thompson v. Gomez*, 993 F. Supp. 749, 755 (N.D. Cal. 1997).  After evaluating each of the four remedies on a "provision-by-provision basis," Judge Legge terminated the consent decree as to "all prospective relief."  *Id.* at 758, 766.

Plaintiffs appealed the termination order to the Ninth Circuit.  Before the court of appeals, plaintiffs only challenged Judge Legge's conclusions as to the four disputed remedies. The Ninth Circuit itself recognized that at the district court level, "plaintiffs conceded that all but four remedies granted in the consent decree and subsequent proceedings were terminable under the PLRA."  *Gilmore v. People of the State of Cal.*, 220 F.3d 987, 1009 (9th Cir. 2000).

In its opinion, the Ninth Circuit directed:  "[T]he district court must assess the current conditions with respect to inmate classification on remand — particularly the housing of Grade A inmates with prisoners confined to administrative segregation."  *Id.* at 1010.  In the conclusion of the opinion, the court stated: "Accordingly, we REVERSE the termination of prospective relief . . . and REMAND for further proceedings consistent with this order."[1]

---

[1]  At San Quentin, Grade A inmates are considered low security risk inmates.  Grade B inmates are considered high security risks.

United States District Court

For the Northern District of California

1    In plaintiffs' view, the Ninth Circuit's reversal and remand nullified Judge Legge's

2    entire termination order.  Defendants contend that the Ninth Circuit reversed the termination

3    only as to those provisions dealing with inmate classification and that *only* those provisions

4    have any continuing viability.

5    Defendants' position loses force in light of their conduct following the Ninth Circuit's

6    remand.  In the six years following the Ninth Circuit's opinion, defendants have never

7    suggested that any part of Judge Legge's termination order remained in effect.  Indeed, the

8    briefs on the instant motions are the first suggestion by defendants that the consent decree has

9    not remained viable following the Ninth Circuit's opinion.  Since 2000, defendants

10   acknowledged in several *jointly filed* case management statements that the consent decree was

11   still ongoing and that defendants had continued to rely on the decree provisions.  One such

12   statement, dated January 3, 2002, and signed by counsel for both parties, stated:  "The Ninth

13   Circuit's reversal of the termination order means that the consent decree remains in effect"

14   (Docket No. 789 at 4).  In a subsequent statement, the parties stipulated (Docket No. 793,

15   emphasis added):

16          Following the January 10, 2002 conference, the Court filed a Case
             Management Order providing that any motion by defendants to
17          terminate the consent decree in calendar year 2002 must be filed
             by April 25, 2002.  The Court further ordered a further case
18          management conference in May 2002 if defendants filed a
             termination motion by that date.
19
             Defendants did not file a termination motion on or before April
20          25, 2002.  For this reason, no case management conference was
             held in May.  On June 21, 2002, the Court filed a notice
21          scheduling the present case management conference.

22                      *              *              *

23          *Because defendants did not file a termination motion by April 25,*
             *2002, the consent decree remains in effect.*
24
     In addition, defendants have actively relied on the consent decree, even agreeing to
25
     continue and modify it.  Although this Court eventually denied the request to modify, both
26
     parties stipulated to the following in July 2003 (Docket No. 826 at ¶ 3):
27

28
                                             4

United States District Court

For the Northern District of California

> [F]or purposes of this case only, . . . the Consent Decree as modified by the Monitor's sixth report filed November 21, 1995 (the existing Consent Decree) and the new Consent Decree are based upon violations of plaintiffs' Eighth Amendment right to be free of conditions that amount to cruel and unusual punishment and plaintiffs' Fourteenth Amendment due process right, and that the relief provided in the new Consent Decree is narrowly drawn, extends no further than is necessary to correct the violations of plaintiffs' federal rights, and is (due to the physical condition of the existing facilities at San Quentin State Prison) the least intrusive means necessary to correct the violation of plaintiffs' federal rights.

Moreover, in 2006 defendants' counsel admitted on the record that the consent decree was still in place, stating: "Your Honor, the old consent decree was entered, if I'm not mistaken, in 1980. It went through a few modifications. That is currently what the prison operates the Condemned Unit under, is that old consent decree" (Transcr. of Hrg. dated Feb. 9, 2006, at 11). Since 2001, defendants simply have never alleged that the consent decree was already terminated.[2]

The Ninth Circuit stated *without qualification* that it "REVERSE[D] the termination of prospective relief." *Gilmore*, 220 F.3d at 1010. Had the court intended to vacate only part of the order, it could have done so explicitly. Both parties have for six years construed the Ninth Circuit's opinion as vacating, in full, Judge Legge's termination of the consent decree. For six years defendants have represented to this Court their belief that the consent decree was still in effect and only now — after declining several invitations to file termination motions — have reversed field and assert that most of the consent decree is no longer valid. Moreover, defendants apparently continued to operate San Quentin pursuant to the consent decree. Any ambiguities of the Ninth Circuit's language aside, it would be unfair to plaintiffs to now hold

---

[2] Five days after the hearing on these motions, defendants submitted an unauthenticated letter from Sara Turner at the California Attorney General's office, addressed to Steven Fama, one of plaintiffs' attorneys. The letter, dated October 16, 2002, purported to explain "defendants' position with respect to issues to be addressed in a future termination motion" (Docket No. 1141 at Exh. A). The letter indicated that defendants believed at the time that there were only two consent decree issues remaining — access to legal materials and the classification of prisoners. There is, however, no suggestion by defendants that this letter was ever sent to the Court. Nor is there any record of the letter on the docket. The letter itself simply does not suggest that defendants ever represented *to the Court* that only limited portions of the decree remained viable.

5

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

the bulk of the consent decree invalid after defendants themselves have relied on the validity of the decree in the intervening years.  This order finds that the consent decree remains fully viable.

**B.      Enforcing Consent Decree Requirements Above the Constitutional Minimum.**

As to the claimed violations of the consent decree, defendants' arguments against many of plaintiffs' allegations are the same.  Defendants do not actually contend that they are in compliance with the consent decree; they instead allege that because the consent decree requires *more* than the Constitution requires, the enforcement of many of the decree's provisions is impermissible under the Prison Litigation Reform Act of 1995, 42 U.S.C. 1997e *et seq*. Defendants rest on the Ninth Circuit's statement that under the PLRA, "no longer may courts grant or approve relief that binds prison administrators to do more than the constitutional minimum."  *Gilmore*, 220 F.3d at 999.  Specifically, in a situation where prospective relief has already been granted by a court, "any 'prospective relief' that exceeds the constitutional minimum must be terminated regardless of when it was granted."  *Ibid.* (citing 18 U.S.C. 3626(b)(2) & (b)).

Defendants' contention — that the terms of the consent decree are unenforceable to the extent they exceed the constitutional minimum — lacks merit.  The quoted Ninth Circuit language deals with termination, not enforcement.  *One problem with applying the PLRA's termination provision here is that no party has made a termination motion since remand.* Indeed, subsection (1) of Section 3626(b) states that prospective relief may be "terminable *upon the motion* of any party or intervener," subject to certain conditions.  Until such a motion is made, this Court must enforce the valid consent decree as written.

It is the Court's experience that institutions sometimes prefer to have a consent decree in place for reasons of obtaining funding, for invoking the supremacy of the federal decree to override state and local regulations, and for other reasons.  It is not entirely clear that defendants here truly want to terminate or modify the consent decree.  The statute gives defendants the

6

United States District Court

For the Northern District of California

right to so move, the Court would have to entertain such a motion, and likely such a motion would have to be granted at least in part. In the meantime, no motion having been made, much less granted, the consent decree will be enforced as written.

The law on this point is well-settled, and defendants cite no contrary authority. "The *enforcement* of a valid consent decree is not the kind of 'prospective relief' considered by § 3626(a). As long as the underlying consent order remains valid — neither party has made a 3626(b) motion to terminate — the court must be able to enforce it." *Essex County Jail Annex Inmates v. Treffinger*, 18 F. Supp. 2d 445, 462 (D.N.J. 1998) (emphasis added); *Jones-El v. Berge,* 374 F.3d 541, 545 (7th Cir. 2004) (same); *see also Hallett v. Morgan*, 296 F.3d 732, 743 (9th Cir. 2002). Thus, while the consent decree is still valid and binding, defendants must comply with its terms, and this Court retains the power to hold them in contempt for any violations. In this posture, it is irrelevant whether the consent decree provides protections above the constitutional minimum.

### C.    Class Members' Allegations of Ongoing Violations of the Consent Decree and Federal Rights.

We now turn to the alleged violations raised by plaintiffs. As discussed above, the important question is whether defendants are abiding by the consent decree. The Ninth Circuit has explained that a "consent decree is an injunction." *Gates v. Shinn*, 98 F.3d 463, 468 (9th Cir. 1996). Specifically, a "judgment issued by a court in the exercise of its equitable or admiralty jurisdiction is called a decree, and when a decree commands or prohibits conduct, it is called an injunction." Thus, it is "subject to the rules generally applicable to other judgments and decrees." *Ibid.* (quoting *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 378 (1992)).

"[C]ourts have inherent power to enforce compliance with their lawful orders through civil contempt." *Shillitani v. United States*, 384 U.S. 364, 370 (1966). "If a person disobeys a specific and definite court order, he may properly be adjudged in contempt. A person fails to act as ordered by the court when he fails to take all the reasonable steps within his power to insure compliance with the court's order. It does not matter what the intent of the appellants

7

was when they disobeyed the court's order." *In re Crystal Palace Gambling Hall, Inc.*, 817 F.2d 1361, 1365 (9th Cir. 1987) (internal citations, quotation marks, and alterations omitted). The Ninth Circuit has also explained that "[s]ubstantial compliance with the court order is a defense to civil contempt, and is not vitiated by a few technical violations where every reasonable effort has been made to comply." *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993) (quotations omitted). "The standard for finding a party in civil contempt is well settled: The moving party has the burden of showing by clear and convincing evidence that the contemnors violated a specific and definite order of the court. The burden then shifts to the contemnors to demonstrate why they were unable to comply." *In re Bennett*, 298 F.3d 1059, 1069 (9th Cir. 2002).[3]

### PART 1: PROVEN CONSENT DECREE VIOLATIONS.

This order finds that as to the following provisions, plaintiffs have proven by clear and convincing evidence that defendants are in violation of the consent decree.

### (a)     Clothing.

The consent decree provides that "[c]lothing will be of good repair and of appropriate size" (Consent Decree VI.L.5).[4]

Plaintiffs allege that inmates do not have adequate clothing as required by the consent decree. In response to a December 2006 audit, San Quentin's warehouse manager, Debbie Pearl, explained that they suffer from regular shortages of t-shirts, boxers, and sheets (Fama Decl. Exh. 12 at 5027). Lieutenants on the East Block have testified that appropriately fitting

---

[3] The following inmates submitted declarations in support of plaintiffs' motion: Cristhian A. Monterroso, Conrad Jess Zapien, Dexter Williams, Donald Griffin, Donald R. Debose, Douglas Mickey, Evan T. Nakahara, Fred H. Freeman, Gary D. Hines, H. Lee Heishman, Isaac Gutierrez, Jeffery Mills, Jimmy Van Pelt, Johnaton S. George, Keith Loker, Larry Graham, Martin James Kipp, Paul N. Henderson, Raymond Butler, Ricardo R. Sanders, Richard Vieira, Robert Jurado, Roger Hoan Brady, Ronald Sanders, Steve Livaditis, Steven Bonilla, Virendra Govin, William A. Noguera, and William M. Dennis.

[4] The consent decree is part of the record herein, filed at Docket No. 681 (Sixth Report of the Monitor) and No. 828 Exhibit A (Consent Decree and Modifications to Consent Decree through June 1988). In addition, a copy is appended to the recent declaration of Steven Fama as Exhibits 10 and 11.

United States District Court
For the Northern District of California

clothing has been unavailable at times and cannot be immediately replenished (Fama Decl. Exh. 3 at 74–76, Exh. 4 at 108–10, 112–13).

Condemned prisoners are regularly unable to exchange their old, worn-out or ill-fitting clothing and linens for supplies that are in good repair and that fit appropriately. Often they are told that appropriate clothing is simply unavailable. Thus many condemned prisoners do not have full sets of state-issued whites and/or blues. Inmate Graham alleged that he had to wear the same two pairs of undershorts for three years, even though the waist bands were falling apart and he had been asking for replacements. Other inmates described clothes that do not fit, are of poor repair, and are not being replaced (Graham Decl. ¶¶ 4, 5; Van Pelt Decl. ¶¶ 6, 7; Hines Decl. ¶ 6; Monterroso Decl. ¶ 8; Butler Decl. ¶¶ 6, 7; Bonilla Decl. ¶ 3; Donald Decl. ¶ 6; Nakahara Decl. ¶ 5; Ricardo Sanders Decl. ¶ 7; Debose Decl. ¶ 8; Gutierrez Decl. ¶ 6; Govin Decl. ¶ 3).

Plaintiffs have provided evidence that prisoners' clothing is not "of good repair and appropriately sized" as required by the consent decree. Indeed, defendants do not dispute that clothing shortages mean that some inmates do not have a full set of whites and blues. Plaintiffs have shown by clear and convincing evidence that the clothing provision of the consent decree has been and continues to be persistently violated.

### (b)   Hot Carts.

The consent decree provides that "[m]eals shall continue to consist of two hot meals and a bag lunch" (Consent Decree VI.D.1). The decree also provides: "There are, for the use of SHU II, three working hot carts and a hot cabinet, which shall be maintained. Every effort shall be made to ensure serving of foods as hot as possible" (Consent Decree VI.D.2).[5]

For years after the consent decree went into effect, defendants used hot carts to serve breakfast and dinner to condemned prisoners in their cells. Food prepared in the central kitchen

---

[5]  "SHU II" stands for Security Housing Unit II, which constitutes the top floor of the structure at San Quentin known as North Block (Consent Decree II).

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    was brought to the housing units, placed in heated carts on the tiers, then served on disposable

2    paper trays at each cell front (Fama Decl. Exh. 4 at 84, Exh. 5 at 21–22, 28–29).

3         Condemned prisoners are fed breakfast and dinner in their cells (Fama Decl. Exh. 1 at

4    103–04).  Defendants concede that hot carts are no longer used for delivery and that food is not

5    served as hot as possible.  San Quentin stopped using hot carts to serve meals around September

6    2004.  Since then, food prepared in the central kitchen has been placed on individual trays that

7    are then delivered to prisoners in their cells via push carts (Fama Decl. Exh. 5 at 12–13, 17).

8    The distribution of the trays to tiers, and then to each cell, can take a considerable amount of

9    time.  Prisoners indicated that the food that is meant to be hot is often cold or lukewarm.  Many

10   prisoners stated in declarations that the food served now contrasts sharply with the hot food that

11   was served previously, according to the requirements of the consent decree (Henderson Decl. ¶

12   4; Butler Decl. ¶ 5; Hines Decl. ¶ 5; Monterroso Decl. ¶ 7; Nakahara Decl. ¶ 4; Ricardo Sanders

13   Decl. ¶ 4; Van Pelt Decl. ¶ 5; Loker Decl. ¶ 8; Debose Decl. ¶ 4; Griffin Decl. ¶ 4; Graham

14   Decl. ¶ 3; Gutierrez Decl. ¶ 2; Mills Decl. ¶ 4; Ronald Sanders Decl. ¶ 10; Govin Decl. ¶ 5;

15   Vieira Decl. ¶ 7; Mickey Decl. ¶ 5).[6]

16        Defendants are no longer serving food on hot carts and defendants do not dispute that

17   food is not being served "as hot as possible."  Plaintiffs have proven by clear and convincing

18   evidence that the hot food provision of the consent decree has been and continues to be

19   persistently violated.[7]

20   _____

21        [6] Some plaintiffs in the class allege increased health problems since San Quentin switched from the hot
     carts and began serving cold or lukewarm food on unsanitary trays.  Inmates indicated in declarations that since
22   the new food-serving process began, they have experienced diarrhea, food poisoning, and nausea (Dennis Decl.
     ¶ 5; Ronald Sanders Decl. ¶ 12; Vieira Decl. ¶ 8; Jurado Decl. ¶ 7).  Defendants suggest that the declarations of
23   inmates Dennis, Vieira, and Jurado are untrue to the extent they assert that they have suffered recurring
     digestive problems since defendants stopped using hot carts (Dennis Decl. ¶ 5; Vieira Decl. ¶ 8; Jurado Decl.
24   ¶ 7).  Defendants contend that plaintiffs' medical records for the past twelve months contradict these allegations
     (Def.'s Mot. to Seal Exhs. A, B, C).  This is only partially true, because the medical record for one of these
25   inmates demonstrates that he did allege diarrhea as a result of the changes in the food delivery (Defs. Mot to
     Seal Exh. B).

26
          [7] Defendants allege that food provided to the inmates at San Quentin is prepared, stored, and served in
27   accordance with the guidelines set out in the ServSafe Program and with the California Uniform Retail Food
     Facilities Law (CURFFL).  Cal. Health & Safety Code 113700, *et seq.*  Defendants contend that CURFFL

28

United States District Court

For the Northern District of California

1    Very possibly, this is a good example of a consent decree requirement that goes beyond

2    the Eighth Amendment requirements.  Defendants have no one to blame for having agreed to

3    this provision and no one to blame but themselves for neglecting to move and to obtain an order

4    under the PLRA to terminate the provision.  Meanwhile, as stated, this provision will be

5    enforced.

6                  **(c)      Adjustment Center Individual Exercise Yards.**

7    The consent decree provides:  "Inmates will be provided with outdoor exercise at least 3

8    days per week" (Consent Decree V.A.1).  The decree further specifies:  "So long as

9    non-condemned inmates are housed in SHU II, the following shall be the minimum weekly yard

10   exercise periods:  Grade A yard:  9 hours; Grade B yard:  9 hours; Walk-alone yard:  3 hours"

11   (Consent Decree V.A.3).

12   Plaintiffs allege that the condemned Grade B prisoners who are assigned to exercise on

13   Individual Exercise Yards (IEYs) are not afforded adequate exercise, either with respect to the

14   number of days or hours per week that are required by the consent decree.  There are

15   approximately 70 Grade B condemned prisoners who are typically assigned to an IEY in the

16   Adjustment Center.  These prisoners share use of the IEYs with the approximately 20

17   non-condemned Administrative Segregation ("AdSeg") prisoners who are typically housed in

18   the Adjustment Center.  The opportunity for these condemned prisoners to use the yard is

19   limited by the fixed number of IEYs and staff in the Adjustment Center (Fama Decl. Exh. 2 at

20   57, 75–76, 19, Exh. 3 at 30–31, Exh. 6 at 25).

21   Since February 2006, only 17 of the Adjustment Center's 34 IEYs have been in

22   operation.  As a result, condemned prisoners are offered yard time only once or twice a week

23

24   _____

25   requires that food must be served or discarded within four hours after being removed from temperature control.
     Defendants allege that under the worst case alleged by plaintiffs, food is delivered an hour and a half after it is
     removed from temperature control.  Additionally, under guidelines set out by the National Restaurant

26   Association Educational Foundation and California law, plaintiffs still receive their trays at least two and a half
     hours before any bacteria begins to form.  Cal. Health & Safety Code 113995(d)(3)(B), Flores Decl. ¶¶ 4, 5.

27   Whether defendants are doing the minimum under the act, however, is irrelevant to whether food is being served
     "as hot as possible" as required by the consent decree.

28

1   (Butler Decl. ¶ 2; Monterroso Decl. ¶ 3).  The December 2006 Audit found that San Quentin

2   was in violation of the consent decree with respect to these inmates' access to yard (Fama Decl.

3   Exh. 7 at 2071, Exh. 2 at 79).

4          Yard is typically scheduled for three and one half hours per session.  Approximately

5   three and one half hours of yard time once or twice a week does not meet the decree's

6   requirement that Grade B inmates receive nine hours of yard time each week.  Seventeen IEYs

7   have been inoperative for over a year.  The California Department of Corrections and

8   Rehabilitation's Facilities Management Department has withdrawn its approval for the funding

9   necessary to repair the yards.  San Quentin is attempting a pilot program to repair the yards with

10  materials that do not require approved funding.  Warden Robert Ayers does not know when the

11  program will begin, nor does he know if the pilot program repairs will render all 17 IEYs

12  operational.  Another plan to modify staff schedules so that more yard periods could be run in

13  the Adjustment Center has not yet been approved for implementation (Fama Decl. Exh. 1 at

14  19–30, Exh. 2 at 80–83).

15         Defendants do not deny that these inmates are provided with three and one half to seven

16  hours of exercise per week, rather than the nine hours required by the consent decree.  Plaintiffs

17  have shown by clear and convincing evidence that, with respect to Adjustment Center IEYs, the

18  exercise provisions of the consent decree have been and continue to be persistently violated.

19                    **(d)      East Block Grade B Individual Exercise Yards.**

20         As described above, the consent decree states that "[i]nmates will be provided with

21  outdoor exercise at least 3 days per week" (Consent Decree V.A.1).  "So long as

22  non-condemned inmates are housed in SHU II, the following shall be the minimum weekly yard

23  exercise periods:  Grade A yard:  9 hours; Grade B yard:  9 hours; Walk-alone yard:  3 hours"

24  (Consent Decree V.A.3).

25         As with the inmates in the Adjustment Center, plaintiffs allege that opportunities for

26  yard time for Grade B condemned prisoners assigned to IEYs in East Block are similarly

27  limited.  Like in the Adjustment Center, the Grade B condemned and AdSeg non-condemned

28

United States District Court

For the Northern District of California

1    prisoners assigned to IEYs are scheduled to go to yard at the same time.  The 14 IEYs

2    designated for Grade B and AdSeg use in East Block do not accommodate the population, and

3    space limitations prevent adequate provision of yard time (Fama Decl. Exh. 4 at 38–41, Exh. 2

4    at 104–05, 191–92).

5        Grade B inmates assigned to an IEY in East Block are sometimes allowed yard time

6    once or twice a week.  Other times, they are simply not offered yard time.  In January 2007,

7    they were not offered the opportunity to go out once during the entire month.  In December

8    2006, they were offered twice.  In November 2006, they were offered once.  In October 2006,

9    they were offered three times (Fama Decl. Exh. 18 at 276, 470, 670, 7987, Exh. 2 at 128–29,

10    115–16).  When these inmates are allowed out, they receive at most four hours of yard time per

11    session.  According to prisoners, they often receive less than four hours of yard time (Fama

12    Decl. Exh. 2 at 105; Hines Decl. ¶ 2).

13        Warden Ayers stated that he hopes that more IEYs will be constructed as part of a

14    building project to be undertaken by the federal receiver in *Plata v. Schwarzenegger*, Civ. No.

15    01-1351 THE.  Under that project, the East Block IEYs will be demolished to make room for a

16    medical building.  They will be rebuilt in another part of San Quentin.  Warden Ayers is hopeful

17    that more IEYs will be built as part of this project, but he is not assured that this will happen.

18    Nor is he certain that it would solve all of the issues with respect to the adequacy of yard

19    opportunities in East Block (Fama Decl. Exh. 1 at 34, 45).

20        Defendants do not dispute that these inmates are provided with four to eight hours of

21    exercise per week, rather than the nine hours required by the consent decree.  Plaintiffs have

22    shown by clear and convincing evidence that, with respect to the East Block Grade B IEYs, the

23    exercise provisions of the consent decree have been and continue to be persistently violated.

24                    **(e)**    **East Block Grade A Individual Exercise Yards.**

25        The consent decree provides:  "Grade A inmates in East Block shall be allowed access

26    to adequate exercise areas, which are equipped with a covering for protection from inclement

27    weather, between the hours of 7:30 a.m. and 1:30 p.m.  Exercise yard access will be offered to

28

United States District Court

For the Northern District of California

the Grade A inmates in East Block seven (7) days per week, regardless of weather conditions, except during dense fog" (Consent Decree V.B.2 as added by Sixth Report of the Monitor at 24).

There are 45 Grade A inmates who are assigned to only three IEYs in East Block.  As with the Grade Bs, the scarcity of IEYs relative to the number of Grade A prisoners makes it virtually impossible to afford these prisoners adequate access to the yard.  Under the consent decree, these prisoners are supposed to be offered yard every day.  Often, however, they are offered yard time only once or twice a week.  There are no plans to remedy the inadequate yard time being provided to Grade A prisoners in East Block (Fama Decl. Exh. 2 at 92–93, 98–99, 101–02).

Many of the Grade A prisoners assigned to an IEY in East Block do not receive any yard time.  In January 2007, these prisoners were offered the opportunity to go out three times in the entire month.  They were given four opportunities in November 2006, and seven opportunities in October 2006 (Fama Decl. Exh. 18 at 276, 470, 4987).

At least one prisoner assigned to these IEYs has not been offered access to yard since October 1, 2005 (Brady Decl. ¶¶ 4–6).  When East Block Grade A prisoners are allowed to use IEYs, they are let out for about an hour to two hours.  This falls short of the out-of-cell and yard time to which they are entitled under the consent decree.  Prisoners are allowed neither the number of hours nor the number of days required under the consent decree (Fama Decl. Exh. 4 at 65; Nakahara Decl. ¶ 2).

Defendants allege that plaintiffs have offered no evidence that any of the Grade A walk-alone inmates have suffered an injury because of the amount of outdoor exercise they receive.  They further dispute Nakahara's declaration that he was offered yard twice a week because Nakahara was never classified as a Grade A walk-alone inmate (Dull Decl. ¶ 8).  Nevertheless, defendants do not dispute the rest of plaintiffs' evidence nor the allegation that these inmates are not offered yard every day as required by the consent decree.  Plaintiffs have

14

**United States District Court**
For the Northern District of California

1   shown by clear and convincing evidence that, with respect to the East Block Grade A IEYs, the

2   exercise provisions of the consent decree have been and continue to be persistently violated.

3              (f)      **East Block Grade B Group Exercise Yards.**

4          The consent decree provides: "Inmates will be provided with outdoor exercise at least 3

5   days per week" (Consent Decree V.A.1).  "So long as non-condemned inmates are housed in

6   SHU II, the following shall be the minimum weekly yard exercise periods:  Grade A yard: 9

7   hours; Grade B yard: 9 hours; Walk-alone yard: 3 hours" (Consent Decree V.A.3).

8          There are 22 to 24 Grade B prisoners assigned to a group exercise yard in East Block.

9   The consent decree requires that Grade B prisoners be afforded exercise three times per week

10  for a total of nine hours.  These prisoners are only afforded the opportunity to go to the yard

11  twice per week, for approximately three and one half to four hours per session (Fama Decl. Exh.

12  2 at 102–04).

13         Defendants do not dispute that the provision is violated.  Plaintiffs have shown by clear

14  and convincing evidence that, with respect to the East Block Grade B Group Exercise Yards,

15  the exercise provisions of the consent decree have been and continue to be persistently violated.

16             (g)      **East Block Grade A Group Exercise Yards.**

17         The consent decree provides:  "Grade A inmates in East Block shall be allowed access

18  to adequate exercise areas, which are equipped with a covering for protection from inclement

19  weather, between the hours of 7:30 a.m. and 1:30 p.m.  Exercise yard access will be offered to

20  the Grade A inmates in East Block seven (7) days per week, regardless of weather conditions,

21  except during dense fog" (Consent Decree V.B.2 as added by Sixth Report of the Monitor at

22  24).

23         Grade A prisoners assigned to a group yard in East Block are allowed access to the yard

24  every day.  Correctional staff contend that on the days the yard is operating, Grade A prisoners

25  assigned to the group yards typically receive between five and six hours of yard per session

26  (Fama Decl. Exh. 4 at 64, 66, Exh. 2 at 91).

27

28

**United States District Court**

For the Northern District of California

1    It is reported, however, that the yard time they are actually given is significantly less

2    than what is claimed by the correctional staff, and never more than five hours (Zapien Decl. ¶ 5;

3    Ricardo Sanders Decl. ¶ 2; Loker Decl. ¶ 4).  Plaintiffs allege that Grade A prisoners on group

4    yards are thus not offered the consent decree's six hours of yard daily.

5    Again, defendants allege that because the Constitution does not require defendants to

6    provide inmates with six hours of outdoor exercise each day, this provision of the consent

7    decree is unenforceable.  By Act of Congress, this argument is of no avail in the absence of a

8    motion to terminate.  Defendants do not dispute the allegation that they fail to provide the

9    amount of exercise required under the consent decree.  Plaintiffs have shown by clear and

10   convincing evidence that, with respect to the East Block Grade A Group Exercise Yards, the

11   exercise provisions of the consent decree have been and continue to be persistently violated.

12                      **(h)      Equipment and Showers.**

13   The consent decree contains the following provisions with respect to equipment and

14   showers on the yard:  "All inmates will continue to have available use of the yard shower during

15   exercise periods on the yard.  All yard showers shall be plumbed with hot and cold running

16   water, adjustable by the showering inmate" (Consent Decree VI.C.2 as modified by Sixth

17   Report of the Monitor at 41).  With respect to Grade A Yard Equipment:  "Good faith efforts

18   have been and will be made to provide sufficient free weights to adequately accommodate the

19   needs of the current and any future increased or decreased condemned population, in tonnage,

20   reasonable increments and benches.  Defendants, through their recreation supervisor(s), will

21   review the weight needs twice yearly and order replacements or make adjustments as necessary.

22   In doing so, condemned prisoners may suggest needed equipment, which requests shall be

23   considered by the recreation supervisor" (Consent Decree VI.A.11 as modified by Sixth Report

24   of the Monitor at 40).  Furthermore, "[j]ump ropes will be provided upon request" (Consent

25   Decree VI.A.8 as modified by Sixth Report of the Monitor at 39).  Finally, the decree also

26   provides:  "There will be provided, for the use of Grade A inmates in the North Segregation

27

28

United States District Court

For the Northern District of California

1  Unit, on the tier: Two ping pong tables" (Consent Decree VI.B.2 as modified by Sixth Report

2  of the Monitor at 40).

3      Showers are not available on any of the IEYs. On those yards that do have showers, the

4  showerheads are regularly clogged by mineral build-up that impedes the flow of water. The

5  correctional staff have not repaired this problem. Also, there are no weights, jump ropes, or

6  ping pong tables available on the Grade A group exercise yards, as required by the consent

7  decree.

8      Defendants again do not address the issue of whether the consent decree has been

9  violated. They do not dispute the factual allegations that working showers, weights, jump

10 ropes, and ping pong tables are not provided. Plaintiffs have shown by clear and convincing

11 evidence that the equipment and shower provisions of the consent decree have been and

12 continue to be persistently violated.

13     As with other consent decree provisions, the Court doubts that the Constitution goes so

14 far as to guarantee condemned inmates access to jump ropes and ping pong tables. But

15 defendants agreed to these provisions. By failing to provide these items, defendants have

16 reneged on their agreement. The Court will hold defendants to their word.

17                    **(I)    Suspension of Yard Time.**

18     The consent decree provides: "The provision of exercise may be suspended for a period

19 not to exceed ten (10) days as to any prisoner if the suspension is based upon genuine reasons of

20 inmate safety or prison security. The limitation on suspension of exercise pertains to calendar

21 days, not non-consecutive "yard" days, i.e., days when the prisoner normally would be allowed

22 on the exercise yard, skipping other days in between. When outdoor exercise is suspended

23 under this provision for all or any discrete part of an exercise yard group due to misbehavior

24 occurring on the yard, defendants shall: (1) Begin the investigation into the cause and extent of

25 the misbehavior promptly upon the suspension of exercise; (2) Identify as quickly as possible

26 the prisoners involved in the misconduct; and (3) Restore exercise privileges on the next

27

28

United States District Court

For the Northern District of California

1    scheduled yard day for all inmates identified as non-involved following investigation" (Consent

2    Decree V.D. as added by Sixth Report of the Monitor at 26).

3        Plaintiffs allege that, in violation of the consent decree, the exercise program has been

4    cancelled for more than 10 consecutive days without a written declaration of emergency from

5    either the warden or the secretary.  Before October 2006, a suspension occurred as a result of an

6    investigation into the attempted murder of a prisoner on the yard (Fama Decl. Exh. 3 at 58–60,

7    Monterroso Decl. ¶ 4).  Within the past year, prisoners have experienced other prolonged

8    suspensions of yard (Butler Decl. ¶ 2).  Despite these prolonged suspensions of more than 10

9    days, no written declarations of emergency have been issued (Fama Decl. Exh. 21 Req. No. 15).

10       Plaintiffs have supported their allegation of a consent decree violation by clear and

11   convincing evidence.  Defendants do not dispute the facts alleged, showing that defendants have

12   cancelled yard for more than 10 consecutive days without a written declaration of emergency.

13   Plaintiffs have proven that the yard-suspension provision of the consent decree has been and

14   continues to be persistently violated.

15                     **(j)      Hobbycraft.**

16       The consent decree provides that "Grade A inmates shall be afforded art hobbycraft,

17   including oils" (Consent Decree VI.G.1)

18       Currently, not all Grade A prisoners who want to participate in art hobbycraft are

19   afforded that opportunity, with some apparently being denied for years.  As of December 1,

20   2006, only 86 condemned prisoners were afforded art hobbycraft, or about 20 percent of the

21   Grade A population.  One Grade A prisoner was told in January 2005 that it would take "many

22   years" before he could participate (Van Pelt Decl. ¶¶ 8–10).  Other Grade A prisoners are

23   similarly not afforded art hobbycraft (Mills Decl. ¶ 9; Graham Decl. ¶ 10).

24       Defendants do not dispute the facts alleged by plaintiffs.  Plaintiffs have shown by clear

25   and convincing evidence that the hobbycraft provision of the consent decree has been and

26   continues to be persistently violated.

27

28

**United States District Court**
For the Northern District of California

### (k)    High School Education.

The consent decree requires that "[d]efendants shall continue the availability of present high school education programs" (Consent Decree VI.I.1).

Currently, no high school programs are provided (Monterroso Decl. ¶ 11; Jurado Decl. ¶ 17). San Quentin managers admit that no high school program is available to Grade B prisoners (Fama Decl. Exh. 2 at 189–90, Exh. 3 at 63). Defendants do not dispute plaintiffs' facts. Plaintiffs have shown by clear and convincing evidence that the education provision of the consent decree has been and continues to be persistently violated.

### (l)    Visiting.

The consent decree provides: "Visits are by appointment for a minimum of two and one half hours, subject to space availability. Longer minimum visits may be obtained by prior arrangement in the case of those visitors who must travel over 200 miles. Maximum length of visit is subject to space availability" (Consent Decree VII.7).

The appointment process requires visitors to call a particular telephone number at San Quentin to request a visiting date and time. There has been, however, a physical problem with the prison's telephone lines. As a result, the warden explains that visitors have been unable to get through on the line (Fama Decl. Exh. 1 at 88–90).

In 2006, the warden tried to correct the problem and some repair work did occur. Condemned prisoners, however, state that their visitors remain unable to schedule visits by telephone, or can do so only with considerable difficulties (Livaditis Decl. ¶ 4; Dennis Decl. ¶ 6). Plaintiffs allege that this is a violation of the consent decree.

Moreover, personal visits last only two hours, not two and one half hours as required by the consent decree. The visits are not extended even when space is clearly available. Visits are immediately terminated if the prisoner needs to use a restroom. Also, San Quentin officials are not complying with the consent decree provision requiring longer minimum visits when visitors travel over 200 miles (Brady Decl. ¶ 10; Kipp Decl. ¶¶ 5–6; Dennis Decl. ¶ 6; Loker Decl. ¶ 16; Mickey Decl. ¶ 8).

**United States District Court**
For the Northern District of California

1    Defendants characterize plaintiffs' reason for the decline in the number of visitors —

2    problems with the phone system — as mere speculation.  The consent decree does, however,

3    require two and a half hour visits, subject to space availability.  The inmates have shown that

4    the visit lengths are below the minimum required by the consent decree, which defendants do

5    not dispute.  Plaintiffs have shown by clear and convincing evidence that the visitor provisions

6    of the consent decree have been and continue to be persistently violated.

7                    **(m)       Contents of Cells and Showers.**

8    The consent decree requires the following with respect to the contents of cells and

9    showers:  "A bench or stool and clothing hooks will be provided in the tier shower areas.

10   Provided, this section VI.C.5 does not apply to Grade B condemned prisoners assigned to

11   Security Housing Unit I (the Adjustment Center at San Quentin)" (Consent Decree VI.C.5 as

12   modified by the Sixth Report of the Monitor at 41).  Additionally, "[c]ells for Grade A inmates

13   shall be provided with wooden clothing hooks" (Consent Decree VI.E.2).  Furthermore, "[a]

14   writing board will be provided to Grade A inmates" (Consent Decree VI.E.9 as modified by the

15   Sixth Report of the Monitor at 42).  Finally, "[a] fixed, fold-out stool or bucket shall be

16   provided" (Consent Decree VI.E.8 as modified by the Sixth Report of the Monitor at 42).

17   Plaintiffs allege that not all showers outside of the Adjustment Center are equipped with

18   a bench and clothing hook (Loker Decl. ¶¶ 1, 15; Mills Decl. ¶ 3).  Some Grade A prisoners do

19   not have clothing hooks in their cells and/or are not able to secure a writing board (Ricardo

20   Sanders Decl. ¶ 6; Debose Decl. ¶¶ 6, 7; Jurado Decl. ¶ 5).  Not all cells are equipped with a

21   stool or a bucket (Fama Decl. Exh. 3 at 67–68).

22   Defendants do not dispute these facts.  Plaintiffs have shown by clear and convincing

23   evidence that the consent decree provisions regarding the contents of cells and showers have

24   been and continue to be persistently violated.

25

26

27

28

20

1      **(n)    Staff Screening.**

2          According to the consent decree, "[d]efendants agree that personnel assigned to the

3   condemned unit should be carefully screened for suitability" (Consent Decree XI.1).

4          At San Quentin, no screening is done for 70 percent of personnel assigned to death row,

5   and no formal screening process exists for the other 30 percent.  Pursuant to a contract between

6   the state and the California Correctional Peace Officers Association that post-dates the consent

7   decree, 70 percent of all positions on Death Row are filled by seniority bid.  Under this process,

8   officers and other staff choose which posts to work, and supervisors and managers have no say

9   regarding who works where (Fama Decl. Exh. 1 at 187–89, Exh. 4 at 98, Exh. 3 at 94).

10         Supervisors and managers are unable to screen any of the staff who fill positions

11  through this "post and bid" process (Fama Decl. Exh. 4 at 99, Exh. 3 at 95, Exh. 2 at 189).

12  Former Warden Jeanne Woodford explained that the inability to screen 70 percent of the staff

13  who work on death row inhibited San Quentin's ability to comply with the consent decree and

14  made both East Block and the Adjustment Center more difficult to run (Fama Decl. Exh. 6 at

15  28–30).

16         For the 30 percent of positions over which San Quentin does have control, there is no

17  written policy and procedure for screening staff.  There is no formal survey or application.

18  Supervisors instead use a totality of different factors when selecting personnel for these

19  positions (Fama Decl. Exh. 3 at 92–93).

20         Defendants do not dispute the facts alleged.  Plaintiffs have established that defendants

21  do not screen applicants for the majority of the Death Row personnel positions.  While formal

22  screening procedures are not mandated by the consent decree, some level of screening is

23  required.  Plaintiffs have established that in many cases, no screening takes place.  Plaintiffs

24  have shown by clear and convincing evidence that the staff screening provision of the consent

25  decree has been and continues to be persistently violated.

26

27

28

United States District Court
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### (o)    Group Religious Services.

The consent decree requires:  "Group religious services and counseling will be permitted for Grade A inmates on a reasonable schedule, on the tier during the hours 9:00 a.m. to 3:00 p.m.  Free personnel are not to be allowed on the tier but shall be physically separated from the inmates" (Consent Decree VI.H).  Defendants, however, fail to provide any group religious services for Grade A prisoners who are assigned to exercise in IEYs (Fama Decl. Exh. 4 at 119–20).

Defendants do recognize that prisoners retain protections afforded by the First Amendment, including the right that no law shall prohibit the free exercise of religion.  *See Pell v. Procunier*, 417 U.S. 817, 822 (1974); *Cruz v. Beto*, 405 U.S. 319 (1972).  In opposition, however, defendants do not mention the consent decree's requirement of group religious services.[8]

Plaintiffs have presented evidence that Grade A prisoners who are assigned to exercise in IEYs are not provided with group religious services, in violation of the consent decree. Defendants do not dispute this evidence.  Plaintiffs have shown by clear and convincing evidence that the religious service provisions of the consent decree have been and continue to be persistently violated.

---

[8]  Furthermore, plaintiffs allege that their rights are violated under the Religious Land Use and Institutionalized Persons Acts.  That act provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability," unless the government establishes that the burden furthers "a compelling governmental interest," and does so by "the least restrictive means."  42 U.S.C. 2000cc-1(a)(1)–(2).  Plaintiffs allege that by failing to provide group religious services to Grade A prisoners who are assigned to IEYs, defendants pose a substantial burden on prisoners' religious exercise.

Defendants satisfactorily rebut plaintiffs' RLUIPA claim.  Defendants contend that while the original complaint included a claim that defendants were not allowing inmates to perform in religious services, the complaint has never been amended to include a claim under RLUIPA.  Defendants allege that plaintiffs cannot pursue relief on a claim that was not presented in their complaint.  Moreover, even if plaintiffs could pursue such a claim, defendants allege that RLUIPA does not mandate that San Quentin provide group religious services.  The Act only states that prison officials may not substantially burden a person's religious exercise. *See N. Valley Baptist Church v. McMahon*, 696 F. Supp. 518, 531 (E.D. Cal. 1988).  Defendants maintain that plaintiffs have failed to present any evidence that the failure to provide group religious services has placed a significant restriction or onus upon plaintiffs' religious exercise.  These allegations are well-taken.  Plaintiffs do not address the rebuttal of their RLUIPA claim in their reply.

22

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### (p)   Tier Telephone.

The consent decree provides:  "Defendants will provide a pay telephone, for collect calls, on the tiers for use of Grade A condemned inmates subject to reasonable rules and regulations as to that telephone's use" (Consent Decree X as modified by Sixth Report of the Monitor at 58).  But the tier telephones are frequently out of service for extended periods (Ronald Sanders Decl. ¶ 17; Gutierrez Decl. ¶ 11; Heishman Decl. ¶ 2).  Defendants contend that the problem with the prison's telephones may not be traceable to defendants.  Thus, defendants contend that they are not in contempt because there is no evidence that defendants engaged in any conduct that caused the periodic malfunctions.

Plaintiffs' facts demonstrate that tier telephones are out of service for extended periods. Defendants do not dispute that there have been lengthy periods without phone access.  Plaintiffs have shown by clear and convincing evidence that the telephone provisions of the consent decree have been and continue to be persistently violated.

### PART 2:  CLAIMS NEEDING EVIDENTIARY HEARINGS.

The foregoing are all the violations proven on the papers.  Some other alleged violations are sufficiently in dispute as to require an evidentiary hearing.  Those are now considered.  As to the following provisions, plaintiffs have put forth sufficient facts to suggest that defendants are in violation of the consent decree.  Due to counter evidence submitted by defendants, issues of credibility and weight of the evidence must be considered after an evidentiary hearing.

### (a)   Rodents and Vermin.

The consent decree states:  "Defendants will continue existing efforts to eliminate rodents and vermin from the unit.  Cells will be sprayed on request of the occupant. Condemned inmates will make every effort to eliminate debris in the cells and tier areas which attract such rodents and vermin" (Consent Decree VI.J.5).

Plaintiffs allege that rats, mice, and cockroaches are a common problem in East Block. Ricardo Sanders indicated in his declaration that he sees rats and mice "regularly" on the first tier and the gun rail.  Ronald Sanders stated that he "frequently" has mice in his cell, which

23

United States District Court

For the Northern District of California

leave droppings everywhere.  Govin also indicated in his declaration that he "frequently" has mice in his cell.  Freeman stated that he sees mice "just about every night."  Multiple prisoners cited a problem with roach infestation (Gutierrez Decl. ¶ 9; Ricardo Sanders Decl. ¶ 11; Ronald Sanders Decl. ¶ 13; Freeman Decl. ¶ 2; Van Pelt Decl. ¶ 12; Jurado Decl. ¶¶ 1, 14).

The prison's vector control position is vacant.  It was filled for a time in June 2006, but within a few months it became vacant again and has remained so, in Warden Ayers' words, for "quite awhile."  The prison does have a vector control person come in on a part-time basis, working overtime, from another prison (Fama Decl. Exh. 1 at 69, 77).

Defendants allege that of the twenty-nine inmates who submitted declarations in support of plaintiffs' motion, only five stated that they had seen mice or rats (Freeman Decl. ¶ 2; Ricardo Sanders Decl. ¶ 11; Ronald Sanders Decl. ¶ 13; Govin Decl. ¶ 6).  Additionally, no defendant complaining of rodents or vermin submitted a grievance about such a concern in the last twelve months (Dull Decl ¶¶ 2–4).  Defendants further argue that complete eradication of birds, rodents, and vermin is not realistic.  But defendants have conducted regular audits regarding sanitation, provide insect spray when requested by inmates, use the services of the private pest-control firm hired by the receiver, and contract with a part-time pest control technician from another prison when the full-time position is vacant (Fama Decl. Exhs. 7, 8; Van Pelt Decl. ¶ 12; Jurado Decl. ¶ 14; Atkinson Decl. ¶¶ 8–9).

The issue is whether defendants' behavior violates the requirement that defendants "continue existing efforts to eliminate rodents and vermin from the unit."  Plaintiffs have put forth evidence suggesting that rodents and vermin persist and that defendants are not putting forth adequate elimination efforts.  Defendants allege that prisoners have not filed grievances about these issues and that they are not in contempt because they are taking reasonable measures to eliminate the rodents and vermin from the housing units.  Additionally, defendants are allegedly taking reasonable measures to manage the sanitary conditions in East Block.  Due to this dispute of fact, an evidentiary hearing shall be held to determine the extent of the rodents and vermin and of defendants' efforts to eliminate these pests.

24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**(b)     Cleaning Supplies.**

Under the consent decree, "[i]nmates shall be responsible for cleaning their own cells" (Consent Decree VI.J.1).  The consent decree further mandates that defendants "will supply inmates with adequate equipment and materials for cleaning their cells" (Consent Decree VI.J.2).

Correctional staff contend that cleaning supplies are regularly given to condemned prisoners.  Plaintiffs, however, allege that such supplies are rarely distributed or available.  Some prisoners clean their cells with items, such as shampoo, that they buy from the canteen (Hines Decl. ¶ 8; Bonilla Decl. ¶ 4; Nakahara Decl. ¶ 6; Ricardo Sanders Decl. ¶ 9; Gutierrez Decl. ¶ 10; Loker Decl. ¶¶ 11, 12; Brady Decl. ¶¶ 7, 8; Graham Decl. ¶ 7; Govin Decl. ¶ 9).  Not all prisoners, however, can afford to buy cleaning supplies from the canteen.  One prisoner explained that he cleans his cell by using one of the bars of bath soap distributed to him, puts it in a bucket with water, and scrubs his shelf, floor, and toilet with a sock he dips in the bucket (Donald Decl. ¶ 11).

Defendants acknowledge that some inmates allege that they are not "regularly" provided cleaning supplies.  Defendants maintain, however, that upon request, condemned inmates have access to cleaning supplies.  But declarations cited by defendants in support do not necessarily support this assertion.  Instead, the declarations show that prisoners have an extremely difficult time obtaining cleaning supplies.  For example, inmate Loker indicated that he only obtained the cleaning powder "by begging and persisting."  Furthermore, while inmate Mills is provided cleaning supplies, he "is not provided enough powdered soap to last an entire month."  Griffin indicated that he received powdered soap only after asking, being told that none was available, and ultimately filing an administrative appeal (Fama Decl. Exh. 2 at 136–39, Exh. 3 at 63–64, Exh. 4 at 88–92; Mills Decl. ¶ 8; Loker Decl. ¶ 10; Griffin Decl. ¶ 10).

Defendants also point out that cleaning supplies are available for purchase in the canteen.  Defendants maintain that they are not in contempt because inmates have access to cleaning supplies.  But the consent decree is not satisfied if inmates are forced to buy supplies.

25

United States District Court

For the Northern District of California

1   The consent decree affirmatively requires defendants to "supply inmates with adequate

2   equipment and materials for cleaning their cells."

3        A dispute of fact exists regarding whether adequate cleaning supplies are available upon

4   request.  An evidentiary hearing shall be held to determine the adequacy of cleaning supplies

5   provided by defendants.

6                              **(c)     Laundry.**

7        The consent decree requires that the exchange of condemned prisoners' towels and

8   "whites," such as t-shirts, socks and underwear, be on the same basis as the general population.

9   Sheets and "blues," such as trousers and outer shirts, should be exchanged once every two

10   weeks (Consent Decree VI.L.1, VI.L.2 as modified by Sixth Report of the Monitor at 45).

11       Plaintiffs allege that defendants are not in compliance with these provisions.  A

12   December 2006 audit found that San Quentin was in violation of the consent decree with

13   respect to laundry exchange.  The audit found that inmates housed in East Block and the

14   Adjustment Center have gone as long as ten weeks without laundry exchange.  North

15   Segregation inmates have gone as long as four weeks (Fama Decl. Exh. 7 at 2072, 2126–27).

16   Furthermore, for those prisoners who are on the "one-for-one" laundry system, rather than the

17   "bag" laundry system, clothing shortages mean that their laundry is not regularly exchanged as

18   required by the consent decree (Fama Decl. Exh. 2 at 151–54).

19       San Quentin sends clothes to the California State Prison at Solano to be cleaned.  The

20   Solano facility regularly loses prisoners' laundry.  Prisoners' laundry bags are sometimes

21   returned with items missing (Fama Decl. Exh. 2 at 155, Exh. 3 at 95, Exh. 7 at 02126–27).

22   Laundry that is sent to Solano also is regularly returned late.  Although there are scheduled days

23   for each unit's pick-up and delivery, there are periods when the state prison does not return the

24   laundry because of, for example, lockdowns, power outages, and equipment breakdowns (Fama

25   Decl. Exh. 7 at 2126–27, Exh. 12 at 5027, Exh. 2 at 159).

26       Problems at San Quentin itself allegedly contribute to untimely processing of prisoners'

27   laundry.  In the last year, laundry would not be timely delivered to East Block because prison

28

                                          26

staff had not appropriately left the laundry out for pick-up to begin with.  Warden Ayers explained that San Quentin conducted an "educational program" with correctional staff to "monitor what goes into the laundry carts and make sure that only the correct laundry goes in there."  This was apparently in response to the fact that the Solano facility had reported that in addition to dirty laundry, San Quentin's laundry bins arrived filled with garbage, trash, and discarded food (Fama Decl. Exh. 1 at 81–83, Exh. 2 at 161–62, Exh. 12 at 5028).

Often the laundry itself is not even clean when it comes back to the prisoners.  One of the more typical problems is that it is returned with holes.  Some inmates even complained that sheets were returned to them with fecal matter, bugs, and hair (Monterroso Decl. ¶ 10; Jurado Decl. ¶ 11).  Many prisoners therefore do not use the institutional laundry and wash their items themselves in their cells (Hines Decl. ¶ 7; Graham Decl. ¶ 6).

Defendants proffered evidence that in most cases, the apparent failure to process laundry in accordance with the schedule is actually a matter of sloppy record-keeping (Fama Decl. Exh. 2 at 40–41, 154–56, Exh. 3 at 82–87).  They further note that none of the inmates who provided declarations concerning lost laundry filed a grievance about the issue within the last twelve months (Dull Decl. ¶¶ 6–7).  An evidentiary hearing shall be held to resolve the factual dispute regarding the regularity and adequacy of laundry services.

**(d)     Noise.**

The consent decree states:

> Defendants shall undertake and continue measures to limit the levels of noise prevailing in five-tier cell blocks used to house condemned prisoners at San Quentin.  The following specific measures shall be undertaken and continued unless and until defendants reduce the noise to acceptable levels by alternate means: (1) Inmates in such five-tier cell blocks shall not be permitted to employ any loudspeaking device, including, for example, those devices included in televisions, radios, and stereophonic equipment, unless the device is incapable of producing sound noticeably audible to any person outside the cell of the person using the device.  (2) Defendants shall install and maintain sound-absorbing wall coverings in all such five-tier cell blocks.  (3) Defendants shall provide each condemned inmate housed in a five-tier cell block with a set of medically approved sound exclusion devices such as, for example, earplugs.  If earplugs are used, they shall be issued monthly.

(Consent Decree XIII as added by Fourth Report of the Monitor at 57).

Plaintiffs allege that the noise level is still high, particularly at night, causing inmates difficulty sleeping.  They further allege that earplugs are not issued regularly, with many inmates not receiving them at all.  The earplugs that are issued are allegedly of poor quality and do not block out the noise (Noguera Decl. ¶ 6; Bonilla Decl. ¶ 6; Henderson Decl. ¶ 10; Hines Decl. ¶ 10; Vieira Decl. ¶ 11; Govin Decl. ¶ 10; Gutierrez Decl. ¶ 12).

Defendants concede that some inmate declarants claim that they are unable to get earplugs or that the earplugs are not regularly handed out.  They point out, however, that four inmates assert that they have been able to obtain earplugs.  But of these four inmates, three allege the earplugs are of poor quality, and one was able to obtain earplugs only upon filing an administrative appeal (Govin Decl. ¶ 10; Noguera Decl. ¶ 6; Gutierrez Decl. ¶ 12; Bonilla Decl. ¶ 6).

Plaintiffs also allege that housing non-condemned AdSeg prisoners in East Block violates the decree's requirement to "undertake and continue measures to limit the levels of noise prevailing in five-tier cell blocks used to house condemned prisoners at San Quentin." Non-condemned prisoners are placed in AdSeg because they would be a threat to inmates or

28

staff if allowed to remain in other housing units.  At present, 45 to 50, or approximately 10 percent, of all inmates in East Block are AdSeg inmates (Fama Decl. Exh. 2 at 43, 50, Exh. 15 at 3322).

Condemned prisoners point to the AdSeg population as the source of much of the noise in the unit.  Lieutenant Samuel Robinson admitted that some of the AdSeg inmates housed in East Block make a lot of noise.  Ms. Woodford testified that noise in the areas of East Block that housed both condemned and AdSeg prisoners was challenging because such prisoners would be "screaming and yelling and making all sorts of racket" during the day and night (Fama Decl. Exh. 4 at 102, Exh. 6 at 14).  Defendants disagree that there is any basis to conclude that AdSeg prisoners are particularly noisy or that their removal would have any appreciable effect on the noise level in East Block.

Plaintiffs have set forth evidence suggesting that defendants have not enacted measures to limit the levels of noise.  There are disputes of fact, however, on material issues.  An evidentiary hearing shall be held to determine whether defendants are taking adequate measures to limit the noise, the extent of the noise level, the availability of earplugs, and whether the housing of AdSeg prisoners is a primary source of the noise.

    **(e)**  **Inadequacy of the Grade A Individual Exercise Yards.**

The consent decree states:  "Grade A inmates in East Block shall be allowed access to *adequate* exercise areas, which are equipped with a covering for protection from inclement weather, between the hours of 7:30 a.m. and 1:30 p.m.  Exercise yard access will be offered to the Grade A inmates in East Block seven (7) days per week, regardless of weather conditions, except during dense fog" (Consent Decree V.B.2 as added by Sixth Report of the Monitor at 24, emphasis added).

Plaintiffs allege that the IEYs for Grade A prisoners in East Block do not constitute "adequate" exercise areas, which are required by the consent decree.  There are three small cages for use by approximately 45 prisoners.  There are no exercise supplies or equipment in the cages, nor is there any place to sit.  An inmate must sit on the floor of the cage, regardless of the

**United States District Court**
For the Northern District of California

weather or the moisture on the floor.  The IEYs are not equipped with a shower, sink, or toilet.
Prison officials acknowledge that leaving inmates out on the yard for extended periods without
a toilet is problematic (Fama Decl. Exh. 2 at 31, 33–38, 92–97).  Defendants do not address this
allegation.

It is an open question whether forcing an inmate to sit on a wet floor or having no toilets
in the yard constitutes an "adequate" exercise area.  The Court declines to resolve this issue on
the declarations alone.  The extent of these conditions and their effect on the inmates' ability to
use the exercise space must be resolved at an evidentiary hearing.

### (f)      Inadequacy of the Grade A Group Yards.

The consent decree requirement of "adequate" exercise areas also applies to group
yards.  The Grade A group yards cannot accommodate the large numbers of prisoners assigned
to them.  Ms. Woodford explained that because of overcrowding on the yards, prisoners would
work out deals among themselves "where they would go to yard every other day so that they
wouldn't have the numbers out there."  Ms. Woodford stated that during her tenure, San
Quentin was likely "technically" in compliance with the consent decree's requirements with
respect to yard time, but officials did know that "inmates were on their own trying to figure out
how to keep the numbers down in the yard" (Fama Decl. Exh. 6 at 12–13).  Plaintiffs allege that
this overcrowding violates the consent decree's requirement of adequate exercise areas.

Yards that are not big enough to accommodate all prisoners who qualify for yard time
are likely not adequate.  Forcing inmates to forego a substantial amount of time in the yard due
to overcrowding may not constitute adequate exercise space.  There appears to be a violation
due to the inadequacy of the Grade A Group Yards, but an evidentiary hearing must be held to
determine its extent.

### (g)      Raincoats and Inclement Weather.

The consent decree requires that "[r]aincoats, for use during yard exercise, will be
available in the unit" (Consent Decree VI.E.16).

**United States District Court**
For the Northern District of California

1  Lieutenant Robinson did not recall raincoats being made available to prisoners in East

2  Block, and was only aware of a requirement that raincoats be made available to prisoners in the

3  Adjustment Center.  Moreover, for the inmates who are able to get access to raincoats, the

4  raincoats are sometimes in disrepair (Fama Decl. Exh. 4 at 70; Butler Decl. ¶ 4).

5  Defendants contend that plaintiffs' evidence demonstrates that raincoats are generally

6  available to condemned inmates in the yard.  Defendants' view of the evidence is that out of the

7  nine inmates who provided declarations regarding raincoats, five stated that they own or are

8  able to get raincoats (Griffen Decl. ¶ 3; Butler Decl. ¶ 4; Vieira Decl. ¶ 4; Ronald Sanders Decl.

9  ¶ 14; Govin Decl. ¶ 7).  Defendants also allege that the remaining inmates claim that they are

10  not "offered" a raincoat when it rains but that none of the inmates actually allege that they were

11  refused raincoats.  Defendants seem to misconstrue the evidence.  Ricardo Sanders indicated in

12  his declaration that in addition to not being offered a raincoat, when he asked for one several

13  years ago, the officer "looked at [him] like [he] was crazy."  Inmate Mickey stated that he was

14  unaware raincoats were available and has not observed anyone wearing a poncho for two to

15  three years (Ricardo Sanders Decl. ¶ 3; Mickey Decl. ¶ 4).

16  Plaintiffs have put forth evidence indicating that raincoats are not always available, and

17  when available, are not always in good condition.  Defendants, however, have also pointed to

18  evidence establishing that some inmates have successfully obtained raincoats.  Due to this

19  factual dispute, an evidentiary hearing shall be held to determine the availability of raincoats.

20  **(h)     Access to Legal Materials.**

21  The consent decree states:  "Solely because inmates condemned to death have an

22  immediate and continuous need for legal research materials, the following basic legal materials

23  will be made available within the unit, and kept current:  a. California Jurisprudence, 3rd

24  Series, . . . b. West's California Digest, . . . c. West's Federal Practice Digest, . . . d. USCA,

25  Title 28, . . . e. USCA, Title 42, . . . f. West's California Penal Code, Annotated, 7 volumes"

26  (Consent Decree VIII.1).  Furthermore, "[s]uch materials will be available to condemned

27  inmates on a check-out basis" (Consent Decree VIII.2).

28

Prisoners' declarations state that not all units have legal materials available for condemned prisoners. Prisoners in the Adjustment Center indicated a lack of such materials (Butler Decl. ¶ 8, Monterroso Decl. ¶ 12). Defendants allege that plaintiffs incorrectly assert that prisoners do not have access to legal materials. The Adjustment Center has a law library available for the inmates housed there. If the Adjustment Center is on modified movement, inmates can sign up to go to the law library on Mondays, Wednesdays, and Fridays from 2:30 p.m. to 4:30 p.m. When the Adjustment Center is on a modified program, inmates have access to library materials using the paging system (Fox Decl. ¶¶ 3–4).

Plaintiffs' evidence supports the allegation that Adjustment Center inmates are not provided with access to legal materials. Defendants put forth some evidence that inmates in the Adjustment Center do have access to legal materials. This presents a factual question. An evidentiary hearing shall be held to determine inmate access to legal materials in the Adjustment Center.

### PART 3:  CLAIMS LACKING PROOF OF A CONSENT DECREE VIOLATION.

For the following provisions, even fully crediting plaintiffs' evidence and ignoring the defense response, plaintiffs have not proven by clear and convincing evidence that defendants are in violation of the consent decree.

#### (a)  General Sanitation.

As previously mentioned, rodents and vermin are specifically mentioned in the consent decree. *General* sanitation standards, however, are not. Defendants cannot be held in contempt for generally unsanitary conditions because there is no consent decree provision guaranteeing a sanitary environment. Nevertheless, plaintiffs' alternative motion to modify the consent decree addresses these issues, and is addressed below. For present purposes, this order must hold that there is no violation with respect to general sanitation.

#### (b)  Food Sanitation.

Above, this order found a violation of the hot-cart provision of the consent decree. Plaintiffs also allege further issues with respect to food handling and sanitation. Although

32

**United States District Court**
For the Northern District of California

plaintiffs put forth serious facts, there are no consent decree provisions relating to food storage, cleanliness of trays, and the contents of the sack lunches.  Accordingly, there is no violation regarding food storage and handling.

### (c)     Yard Closures due to Staff Shortages and Maintenance Problems.

Condemned prisoners' access to yard time is limited due to staff shortages.  Indeed, defendants recognize that opportunities for outdoor exercise in the condemned unit have been periodically interrupted as the result of staffing shortages, maintenance, and repairs.   Plaintiffs do not, however, cite any portion of the consent decree that is violated by closures due specifically to staff shortages.  Plaintiffs have already established that inmates do not receive adequate exercise, but have not explained how the closure of the exercise yards due to staffing shortages violates the consent decree.  Consequently, there is no violation based on closures due to staff shortages and maintenance problems.

### (d)     Classification.

Plaintiffs allege that, from a security-risk perspective, at least some members of the condemned population are not materially different from members of the general population. The condemned prisoners, however, are treated differently from the general population.  While plaintiffs have provided uncontradicted evidence that Grade A condemned inmates are treated differently from the general population, plaintiffs have not pointed to any provision of the consent decree that is violated by this treatment.  Accordingly, there is no violation with respect to classification.

### (e)     Alleged Equal Protection Violation.

Plaintiffs briefly allege that defendants are violating plaintiffs' rights guaranteed by the Equal Protection Clause of the Fourteenth Amendment.  To demonstrate an equal protection violation, plaintiffs must prove that (1) they have been intentionally treated differently from others similarly situated, and (2) there is no rational basis for the difference in treatment.  *See Thornton v. City of St. Helens*, 425 F.3d 1158, 1167 (9th Cir. 2005).

33

1    Plaintiffs contend that condemned inmates, even with the same low security-risk levels

2    as other general population inmates, are granted fewer privileges.  Plaintiffs point to a statement

3    in a deposition by Ms. Woodford that there is no reason that condemned and general population

4    inmates could not be treated similarly.  Plaintiffs contend that this differential treatment of

5    similarly-situated inmates is an equal protection violation (Fama Decl. Exh. 6 at 31).

6    Defendants correctly point out, however, that plaintiffs have not identified a protected

7    class.  Moreover, the privileges plaintiffs are allegedly being denied are not identified.  It is thus

8    difficult to assess whether there is an equal protection violation here.  In their reply brief,

9    plaintiffs did not clarify what privileges were being denied to lower security-risk condemned

10   prisoners (Reply Br. 20).  It is impossible to tell whether there is any rational basis for

11   defendants' alleged conduct.  On this record, this argument by plaintiffs must be rejected.  As a

12   result, there is no violation with respect to plaintiffs' equal protection rights.

13                **D.    Conclusion.**

14   Plaintiffs have satisfied their burden of showing that as to several provisions of the

15   consent decree, defendants are in violation.  A district court has discretion to impose sanctions

16   and enforce its own orders.  *Stone v. City and County of San Francisco*, 968 F.2d 850, 863 (9th

17   Cir. 1992).  Here, because these are the first instances of noncompliance with the consent

18   decree since the remand in 2001, defendants should be allowed an opportunity to cure each of

19   the violations.  Defendants will be allowed to "formulate [their] own plan," in consideration of

20   "comity and institutional competence concerns that delimit the exercise of the court's equitable

21   discretion."  *Ibid.*  By AUGUST 6, 2007, defendants must file a detailed plan to cure the

22   violations as to those provisions this order has found that they have violated.  The plan must be

23   calculated to bring the prison into conformity with the consent decree by SEPTEMBER 20, 2007.

24   These provisions relate to:

25        •    Clothing

26        •    Hot carts

27        •    Adjustment Center Individual Exercise Yards

28
                                34

**United States District Court**
For the Northern District of California

1    •     East Block Grade B Individual Exercise Yards

2    •     East Block Grade A Individual Exercise Yards

3    •     East Block Grade B Group Exercise Yards

4    •     East Block Grade A Group Exercise Yards

5    •     Equipment and showers

6    •     Suspension of yard time

7    •     Hobbycraft

8    •     High school education

9    •     Visiting

10   •     Contents of cells and showers

11   •     Staff screening

12   •     Group religious services

13   •     Tier telephone

14         The August 6 deadline will not be extended on account of the necessary evidentiary

15   hearings.  The claims requiring an evidentiary hearing relate to those consent decree provisions

16   on:

17   •     Rodents and vermin

18   •     Cleaning supplies

19   •     Laundry

20   •     Noise

21   •     Adequacy of Grade A Individual Exercise Yards

22   •     Adequacy of Grade A Group Yards

23   •     Raincoats and inclement weather

24   •     Access to legal materials

25                 *            *            *

26

27

28

35

II.     **PLAINTIFFS' MOTION TO MODIFY THE CONSENT DECREE.**

Plaintiffs move for modification of the consent decree.  Plaintiffs request that the Court order defendants to create a plan that modifies the consent decree so as to address:  (1) adequate sanitation in the East Block, including measures to eliminate birds and clean bird waste, eradicate rodents and vermin, eliminate water overflow, and provide adequate ventilation; and (2) linens and towels provided to inmates, to ensure that the items provided are sanitary, appropriately fitting, and in good repair.

A.     **Whether Modification is Necessary to Correct Current and Ongoing Violations of Class Members' Constitutional Rights.**

Plaintiffs concede that, under the PLRA, prospective relief "shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." 18 U.S.C. 3626(a)(1)(A).  Plaintiffs allege that the PLRA requirements are satisfied because the current conditions and treatment violate the Eighth Amendment.

Defendants argue that there is no such ongoing violation.  Defendants cite *Lewis v. Casey*, 518 U.S. 343, 357 (1996), for the proposition that in a class action, before a judge can impose an injunction based on conditions of confinement, "named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'"  This argument has limited application here.  In a prison-conditions context, the Supreme Court has held that direct proof of injury is not required where the factually-supported allegations demonstrate an inhumane condition or risk of harm.  In *Helling v. McKinney*, 509 U.S. 25, 33 (1993), the Supreme Court explained:

> We have great difficulty agreeing that prison authorities may not be deliberately indifferent to an inmate's current health problems but may ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year.  In *Hutto v. Finney*, 437 U.S. 678, 682 (1978), we noted that inmates in punitive isolation were crowded into cells and that some of them had infectious maladies such as hepatitis and venereal disease.  This was one of the prison conditions for which the Eighth Amendment required a remedy, even though it was not alleged that the likely harm would occur immediately and

36

1
2
3
4

> even though the possible infection might not affect all of those exposed.  We would think that a prison inmate also could successfully complain about demonstrably unsafe drinking water without waiting for an attack of dysentery.  Nor can we hold that prison officials may be deliberately indifferent to the exposure of inmates to a serious, communicable disease on the ground that the complaining inmate shows no serious current symptoms.

5   Thus, if the record supports plaintiffs' allegations of sufficiently unsafe conditions, they do not

6   necessarily need to show that they have yet been harmed.

7              **B.       Modification Under the Federal Rules of Civil Procedure.**

8          Plaintiffs allege that modification of the consent decree is permitted under Rule

9   60(b)(5).  The Supreme Court has held that the power to "modify a decree of injunctive relief is

10  long-established, broad, and flexible."  *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367,

11  381 n.6 (1992).  It is necessary to show a "significant change in circumstances," either legal or

12  factual, that was not anticipated when the original decree was enacted.  *Id.* at 383.[9]

13         Plaintiffs allege that since the original decree, conditions have changed significantly.

14  The condemned prisoner population was approximately forty when this lawsuit was originally

15  filed.  *Thompson v. Enomoto*, 542 F. Supp. 768, 770 (N.D. Cal. 1982).  It has since increased to

16  over six hundred (Fama Decl. Exh. 1 at 14).  Based primarily on an increase from 1,759 to

17  19,500 prisoners, the Ninth Circuit has previously permitted the modification of a consent

18  decree.  *Hook v. State of Arizona*, 120 F.3d 921, 924 (9th Cir. 1997).  In addition to the increase

19  in population, plaintiffs point to the movement of prisoners from North Segregation to the East

20  Block as a significant change.  When the suit was filed, plaintiffs were entirely in North

21  Segregation (Docket No. 947 Fama Decl. Exh A ¶ 22).  Now, the vast majority of the class is

22  housed in East Block (Fama Decl. Exh. 2 at 44–48).  Plaintiffs allege that this is a significant

23  change because of the unsanitary and unsafe conditions in East Block.  Importantly, some of the

24  plain language of the consent decree does not apply to conditions at East Block.  Plaintiffs

25

26

27         [9]  Defendants argue that the Court has no authority to modify previously terminated provisions of the consent decree.  This argument is rejected on the ground that the Ninth Circuit reversed Judge Legge's order terminating the consent decree, as discussed above.

28

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

1    further cite the "deteriorating conditions" of the East Block as a substantial change in

2    circumstances necessitating a modification.  Bird infestation, not mentioned in the previous

3    consent decree, is now a problem.  Additionally, the condition of laundry has become worse.

4    Defendants do not respond to the allegation that there has been a significant change in

5    circumstances.

6         This order holds that there have been changed circumstances that are undisputed by

7    defendants.  Based on the above-cited changed conditions, especially the increased population

8    and the movement of prisoners to the deteriorating East Block, plaintiffs' burden under *Rufo* is

9    met.

10                    **C.    Modification under the PLRA.**

11        Defendants argue that this Court cannot grant relief absent a current constitutional

12   violation, which they allege does not exist here.  The defendants' position that no relief may be

13   granted absent a constitutional violation is supported by the Prison Litigation Reform Act.  The

14   PLRA is intended to "provid[e] reasonable limits on the remedies available in" lawsuits

15   concerning prison conditions.  *See* H.R. Rep. No. 21, 104th Cong., 1st Sess. 7 (1995).  A

16   previous order in this case recognized:  "The purpose of the PLRA was . . . to limit federal-court

17   supervision of prisons.  Courts may do so only where necessary to correct a violation of a

18   federal right."  *Lancaster v. Tilton*, 2006 WL 2850015, at *12 (N.D. Cal. Oct. 4, 2006).

19        Under the Act, a court may not "enter or approve a consent decree unless it complies

20   with the limitations set forth in 18 U.S.C. 3626(a)."  18 U.S.C. 3626(c).  In turn, Section

21   3626(a) provides:

22              Prospective relief in any civil action with respect to prison
               conditions shall extend no further than necessary to correct the
23              violation of the Federal right of a particular plaintiff or plaintiffs.
               The court shall not grant or approve any prospective relief unless
24              the court finds that such relief is narrowly drawn, extends no
               further than necessary to correct the violation of the Federal right,
25              and is the least intrusive means necessary to correct the violation
               of the Federal right.
26
     18 U.S.C. 3626(a)(1)(A).
27

28
                                        38

United States District Court

For the Northern District of California

1    The Ninth Circuit has held that "[a] district court is bound to maintain or modify any

2   form of relief necessary to correct a current and ongoing violation of a federal right, so long as

3   that relief is limited to enforcing the constitutional minimum." *Gilmore*, 220 F.3d at 999–1000;

4   *see also Hallet*, 296 F.3d at 743 (reviewing grant of motion to terminate in Section 1983 action

5   involving prisoners confined at a women's state prison and holding that the PLRA requires

6   prisoners to prove a "current and ongoing" violation of their constitutional rights to obtain

7   prospective relief).  As a result, this Court may only impose a remedy that does not exceed the

8   constitutional minimum.  Moreover, relief can only be granted if there is a current and ongoing

9   constitutional violation.

10                    **D.    Alleged Constitutional Violations.**

11    This order now considers whether plaintiffs have demonstrated a "current and ongoing"

12   violation of any federal rights.  Here, plaintiffs allege violations of the Eighth Amendment.  To

13   show an Eighth Amendment violation, a party must demonstrate:  (1) that there was a

14   sufficiently serious deprivation, and (2) that prison officials acted with indifference to this

15   deprivation.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

16    A sufficiently serious deprivation can be either conditions of confinement that cause

17   unnecessary or wanton infliction of pain or conditions that are contrary to the contemporary

18   standard of decency.  *See Hutto v. Finney*, 437 U.S. 678, 685 (1978); *Gregg v. Georgia*, 428 U.S.

19   153, 173 (1976); *Estelle v. Gamble*, 429 U.S. 97, 102–03 (1976).  The Ninth Circuit has held that

20   "[a]n institution's obligation under the Eighth Amendment is at an end if it furnishes sentenced

21   prisoners with adequate food, clothing, shelter, sanitation, medical care, and personal safety."

22   *Hoptowit v. Ray*, 682 F.2d 1237, 1246 (9th Cir. 1982).

23    Once a deprivation is shown, plaintiffs must then demonstrate that the prison officials

24   acted with deliberate indifference.  Deliberate indifference exists when a prison official "knows

25

26

27

28

United States District Court

For the Northern District of California

1    that the inmates face a substantial risk of serious harm and disregards that risk by failing to take

2    reasonable measures to abate it." *Farmer*, 511 U.S. at 847.[10]

3                              **(1)    *Unsanitary Conditions.***

4           Plaintiffs request that the consent decree be modified to require adequate sanitation in

5    East Block, including taking adequate efforts to eliminate birds, making adequate efforts to clean

6    bird waste, establishing a means to eradicate rodents and vermin, eliminating water overflow,

7    and providing adequate ventilation.  Under *Hoptowit*, the prison must provide "adequate"

8    shelter.  *Hoptowit*, 682 F.2d at 1246.  Further, "minimum standards of decency require that

9    lockup inmates without hot running water in their cells be accorded showers three times per

10   week in facilities reasonably free of standing water, fungus, mold and mildew."  *Toussaint v.*

11   *McCarthy*, 597 F. Supp. 1388, 1411 (N. D. Cal. 1984).  The Ninth Circuit has also held that

12   inadequate ventilation could violate the Eighth Amendment "if it 'undermines the health of

13   inmates and the sanitation of the penitentiary.'"  *Keenan v. Hall*, 83 F.3d 1083, 1090 (9th Cir.

14   1996) (quoting *Hoptowit v. Spellman*, 753 F.2d 779, 784 (9th Cir. 1985)).

15          Plaintiffs have presented substantial evidence suggesting a serious deprivation based on

16   circumstances contrary to the contemporary standard of decency.  Ms. Woodford testified that

17   sanitation was a "difficult problem."  Lieutenant Dennis Schlosser acknowledged that sanitation

18   in East Block is "below standard" (Fama Decl. Ex. 6 at 4–6, 9, Exh. 3 at 12–13, 97 ).  Plaintiffs

19   allege general sanitation problems, sanitation problems with the showers, and inadequate

20   cleaning procedures.

21          With respect to plaintiffs' general sanitation concerns, current Warden Ayers admitted

22   that there is a "problem with sanitation in East Block," explaining that it is dusty and dirty with

---

24          [10] Plaintiffs allege a number of constitutional violations.  They allege Eighth Amendment violations
     with respect to inadequate housing, inadequate food, inadequate clothing, insufficient exercise, and excessive
25   noise.  They also allege a violation of the prisoners' right to free exercise of religion under the Religious Land
     Use and Institutionalized Persons Act of 2000, as well as a violation of equal protection rights.  Plaintiffs do not
26   allege, however, that these violations all warrant modifications of the consent decree.  Accordingly, this order
     addresses only the allegations related specifically to the modifications actually requested by plaintiffs,
27   specifically those to remedy unsanitary conditions and inadequate linens and towels.  The remaining allegations
     are irrelevant to this analysis.

28

United States District Court

For the Northern District of California

garbage laying around.  He also described scum and filth caked on bars and other areas (Fama Decl. Exh. 1 at 71–73).  Inmates described the situation in East Block as "extremely nasty" with dust and filth, as well as accumulated trash on the first tier (Sanders Decl. ¶ 10; Van Pelt Decl. ¶ 13; Hines Decl. ¶ 9; Gutierrez Decl. ¶ 9; Jurado Decl. ¶ 13).  In addition to the generally dirty conditions, inmates complain of the smell and ventilation in East Block.  East Block allegedly smells of excrement and filth, and air allegedly runs through a dirty ventilation system (Debose Decl. ¶ 11; Henderson Decl. ¶ 8; Vieira Decl. ¶ 12).

Defendants respond by asserting that the inmates' declarations range from describing East Block as "relatively clean" to complaining about "dust accumulation" (Opp. 12).  This misrepresents the inmates' statements.  Defendants attribute the "relatively clean" assertion to inmates Debose and Vieira.  While Debose acknowledged that his tier is kept "relatively clean," he went on to comment that the tier below him smells like excrement and filth.  The cited section of Vieira's statement does not imply "relatively clean" conditions.  It describes dust, bird droppings, and grime.  Defendants attribute the seemingly benign "dust accumulation" assertion to inmates Van Pelt, Loker, Jurado, and Vieira.  While these inmates cited dust accumulation, they also described filth, bird feces, and grime (Debose Decl. ¶ 11; Vieira Decl. ¶ 12; Van Pelt Decl. ¶ 13; Loker Decl. ¶ 11; Jurado Decl. ¶ 13).

Sanitation is a problem in the unit showers.  East Block's showers regularly rain out onto the tier.  The shower water spills over the tier fronts down to the cell block's first tier, at ground level.  The shower also allegedly smells of mold and mildew.  Furthermore, inmates complain that the areas immediately outside the showers are filthy with dirty water, scum, and hair (Fama Decl. Exh. 3 at 97, Exh. 1 at 73, Exh. 6 at 9; Noguera Decl. ¶ 5; Loker Decl. ¶ 14; Nakahara Decl. ¶ 53; Graham Decl. ¶ 9).  Defendants concede that showers in East Block overflow onto the tiers.  Defendants maintain that they are reviewing options to alleviate this condition, including by installing a large gutter system to channel the water.  Additionally, defendants are hiring janitors who will be responsible for cleaning the showers and keeping the drains free of debris (Atkinson Decl. ¶ 3).

41

1    Plaintiffs maintain that defendants do not adequately clean the prison. Correctional

2   officers are responsible for cleaning the East Block tier areas. The captain of East Block,

3   however, was not aware of any regularly scheduled cleaning in the unit. Lieutenant Robinson,

4   who worked in East Block from 2005 to 2006, stated that there was no regular cleaning schedule

5   for the security screens affixed to the exterior of all East Block cell fronts (Fama Decl. Exh. 2 at

6   136–40, Exh. 4 at 74, 15–16). Additionally, although some inmates describe the tiers as "filthy"

7   and "rarely cleaned," others admit that correctional staff sweep the tiers up to five times per

8   week and mop the tiers up to twice per week (Van Pelt Decl. ¶ 13; Loker Decl. ¶ 11).

9   Additionally, defendants have hired inmate janitors to work in East Block (Atkinson Decl. ¶ 3).

10    Sanitation problems are also attributed to the presence of birds in East Block. Birds, their

11   nests, and their droppings have been identified by CDCR auditors as a problem throughout the

12   unit. Condemned prisoners report bird droppings on the cell block's tier bars, floors, and other

13   places (Fama Decl. Exh. 4 at 71, 115–16, Exh. 8 at 1276, Exh. 7 at 2126; Loker Decl. ¶ 13; Van

14   Pelt Decl. ¶ 13; Ronald Sanders Decl. ¶ 14; Govin Decl. ¶ 17 ).

15    Work orders requesting that the bird problem be addressed have been submitted but not

16   acted upon by prison officials. Similarly, a "Corrective Action Plan" adopted by San Quentin

17   stated that an officer would submit a bi-weekly report to the condemned custody captain

18   regarding a contractor's alleged efforts to eradicate birds in East Block (Fama Decl. Exh. 9 at

19   2064, Exh. 2 at 31–34).

20    In opposition, defendants dispute the severity of the situation. Defendants point to the

21   fact that of the 29 inmates who submitted declarations in support of plaintiffs' motion, only

22   seven declarants mentioned the presence of bird feces in East Block, and none filed a grievance

23   regarding birds or bird feces in their housing units during the last twelve months. Defendants

24   further point to evidence showing that the prison is routinely cleaned, that inmates do have

25   access to cleaning supplies, and that reasonable steps are being taken to address the problem with

26   birds, rodents, and vermin (Fama Decl. Exhs. 7, 8; Van Pelt Decl. ¶ 12; Jurado Decl. ¶ 14;

27

28

42

United States District Court

For the Northern District of California

**United States District Court**
For the Northern District of California

1    Atkinson Decl. ¶¶ 8–9).  Defendants do not dispute that showers in East Block overflow onto the

2    tiers, but allege that they are reviewing options to alleviate this situation.

3         Plaintiffs' allegations, if true, suggest a severe deprivation.  The alleged conditions,

4    including birds and bird waste, rodents, vermin, water overflow, and inadequate ventilation, are

5    beyond the contemporary standard of decency.  Defendants do, however, contest the severity of

6    the allegations.  Whether the situation is sufficiently severe to constitute an Eighth Amendment

7    violation is unclear from the record and requires further factual inquiry.

8         Furthermore, deliberate indifference by officials is not clear from the record and requires

9    further factual inquiry.  Presumably, the conditions as alleged by plaintiffs would be hard to

10   miss.  Defendants contend in their opposition to the motion to enforce that they cannot be

11   charged with knowledge of a substantial risk of serious harm because inmates did not file reports

12   regarding the unsanitary situation.  The warden, however, is aware of the rodents in condemned

13   housing units.  Furthermore, the prison's vector control position is vacant.  If the situations is as

14   extreme as described by plaintiffs, it is apparent that defendants could do more in terms of

15   cleaning, providing cleaning supplies, and pest control (Fama Decl. Exh. 1 at 69, 77).

16        With respect to the motion for contempt and enforcement, this order found that no

17   consent decree violation existed regarding general sanitation, based on the fact that no particular

18   consent decree provision addressed the issue.  The sanitation situation does, however, present a

19   potential Eighth Amendment violation that would justify modifying the consent decree to

20   include such a provision.  Further factual inquiry is necessary to determine the severity of the

21   sanitation problems, as well as to assess the state of mind of defendants.  The Court will include

22   a view of the affected facilities in tandem with the evidentiary hearing.

23              **(2)**    *Failure to Provide Adequate Linens and Towels*

24        Plaintiffs request that the consent decree be modified to address the inadequacy of the

25   linens and towels provided to inmates.  The consent decree already has provision guaranteeing

26   adequate clothing, requiring that the clothing provided be of good repair and appropriately sized.

27   Plaintiffs wish to apply a similar provision to linens and towels.  Defendants do not dispute that

28

43

United States District Court

For the Northern District of California

"[r]easonably clean, sanitary bedding" is a "basic human need" under the Eighth Amendment. *Toussaint*, 597 F. Supp. at 1411.

The alleged Eighth Amendment violation stems from shortages of linens at the prison, as well as laundry that is late, lost, or returned in poor condition. San Quentin sends its laundry to the California State Prison at Solano to be cleaned. Plaintiffs allege that laundry is sometimes lost or not returned in a timely manner (Fama Decl. Exh. 2 at 155, 159, Exh. 3 at 95, Exh. 7 at 02126–27, Exh. 12 at 5027). Inmates describe linens and towels being returned from laundry service filthy and in disrepair. Specific examples cited by inmates include a filthy blanket that was last exchanged three to four years ago, sheets that came out of the trash and are old and thin, and the inability to obtain new towels for the past six months following a number of requests (Van Pelt Decl. ¶¶ 6, 7; Ronald Sanders Decl. ¶¶ 6, 9; Graham Decl. ¶¶ 4–6; Monterroso Decl. ¶ 10).

Defendants note that none of the inmates who submitted declarations regarding lost laundry items filed an inmate grievance about the issue in the last twelve months. Further, defendants argue that only two inmates described issues that could be construed as "sufficiently serious," specifically, those declarations describing sheets being returned filthy and covered in fecal matter or hair. Defendants point out that neither of those two inmates filed grievances relating to laundry in the past twelve months (Monterroso Decl. ¶ 10; Jurado Decl. ¶ 11; Dull Decl. ¶ 7).

As already discussed, a sanitary environment is required by the Eighth Amendment. Accordingly, at a constitutional minimum, the towels and linens provided to the inmates should be sanitary. Plaintiffs have put forth evidence that towels and linens are not being replaced for extremely long periods of time and that those items are returned unwashed. Plaintiffs' evidence does suggest that a sufficiently serious deprivation is current and ongoing. Defendants do, however, dispute the factual allegations. These factual issues should be resolved at an evidentiary hearing.

A factual question also exists regarding defendants' state of mind.  Defendants contend that there is no evidence that the sporadic loss of laundry items has been the result of wantonness by defendants.  Defendants maintain that there is no Eighth Amendment violation here if they had no knowledge that a substantial risk of harm existed.  Without explicitly saying that officials had no knowledge of the situation, they suggest a lack of knowledge by pointing to the lack of inmate grievances in the past twelve months relating to laundry.  Plaintiffs argue, however, that the continued failure over a substantial period of time to provide adequate laundry indicates deliberate indifference.  An evidentiary hearing should be held in order to allow for factual findings regarding defendants' state of mind.

This order found that a consent decree violation existed regarding clothing and that a potential violation existed with respect to laundry as it relates to the exchange of clothing and linens.  Here, plaintiffs propose a modification regarding the condition of linens and towels that parallels the provision requiring that clothes be of good repair and adequately sized.  Further factual inquiry is necessary to determine the severity of the sanitation problems with towels and linens, as well as to assess defendants' state of mind.

**E.      Conclusion.**

Plaintiffs have submitted evidence supporting the allegation that current and ongoing prison conditions violate the Eighth Amendment.  Defendants, however, have offered some evidence to the contrary.  Modifications of the consent decree may be warranted.  An evidentiary hearing and view shall be held to determine the severity of general sanitation problems, the adequacy of the towels and linens, and whether defendants have possessed a culpable state of mind.

**CONCLUSION**

For the above-stated reasons, plaintiffs' motion for contempt and enforcement is **GRANTED IN PART AND DENIED IN PART**, and will require an evidentiary hearing as to certain issues.  Plaintiffs' motion to modify the consent decree requires further factual findings and will be resolved after an evidentiary hearing.

45

United States District Court

For the Northern District of California

1   　　　As discussed above, on or before **AUGUST 6, 2007**, defendants must file a detailed plan to

2   cure, by **SEPTEMBER 20, 2007**, the persistent consent decree violations found herein.  This

3   schedule will not be modified or stayed pending any attempt by defendants to terminate the

4   consent decree.  All counsel have gone through massive amounts of work on the instant motions.

5   That work will not be set aside for naught on account of defendants' delay in filing a motion to

6   terminate (even assuming one is eventually filed).

7   　　　Defendants filed a motion to strike declarations submitted in support of plaintiffs' reply

8   briefs.  This order did not rely on those declarations, so the motion is moot.

9

10   　　　**IT IS SO ORDERED.**

11

12   Dated:  June 21, 2007.

13   　　　　　　　　　　　　　　　　　　WILLIAM ALSUP
　　　　　　　　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

46