1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ANDREW LANCASTER, JEFFERY MILLS,
DEXTER WILLIAMS, WILLIAM DENNIS,
STEVE LIVADITIS, JIMMY VAN PELT,
H. LEE HEISHMAN III AND JOHNATON
GEORGE,

        Plaintiffs,

  v.

JAMES E. TILTON, Acting Secretary,
California Department of Corrections and
Rehabilitation, and ROBERT L. AYERS, JR.,
Acting Warden, San Quentin State Prison,

        Defendants.

_____/

No. C 79-01630 WHA

**ORDER GRANTING IN PART
AND DENYING IN PART
MOTION TO TERMINATE
CONSENT DECREE, AND
SETTING EVIDENTIARY
HEARING AND ALLOWING
CERTAIN DISCOVERY**

**INTRODUCTION**

      In this prison-conditions case brought on behalf of Death Row inmates at San Quentin

State Prison, prison officials move to terminate a 27-year-old consent decree. Defendants are

the current warden of San Quentin and the Secretary of the California Department of

Corrections and Rehabilitation. Invoking the Prison Litigation Reform Act, they move to

terminate the consent decree on the grounds that there are no current and ongoing constitutional

violations and the existing decree impermissibly imposes duties and burdens upon defendants

that exceed the constitutional minimum. Plaintiffs respond that they have not had an adequate

opportunity to gather and present evidence in opposition to defendants' motion. They therefore

request a continuance if the motion is not denied outright. For the reasons stated below,

an evidentiary hearing will be held on certain issues and denied on others. The record shows that certain provisions must be terminated now.

Termination of certain consent decree provisions does not mean that prison conditions will deteriorate. Rather, it means that prison professionals, rather than a federal judge, will supervise the prison. If it develops that the professionals fail and violate constitutional standards, then fresh injunctive relief may be sought by prisoners.

**STATEMENT**

This action began as a challenge to administrative segregation procedures and certain conditions of confinement. On October 23, 1980, the Honorable Stanley Weigel signed a consent decree that governed modifications in housing, treatment, and privileges for plaintiffs. After the Prison Litigation Reform Act in 1996, however, defendants moved to terminate the consent decree. The Honorable Charles Legge, who inherited the case after the death of Judge Weigel, granted the motion in 1998. Plaintiffs appealed. The court of appeals vacated and remanded. Since Judge Legge had retired in the interim, the case was reassigned to the undersigned judge.

That was June 2001. Although the court of appeals remanded the case for an evidentiary hearing regarding inmate classifications, no party moved for such a hearing after the remand. In fact, neither side asked for any hearing or any action. No one alleged any unconstitutional conditions. The case simply remained dormant until 2006. Then the parties attempted to modify the decree to require a new proposed facility (which was never built). For reasons previously stated, the modification was rejected. The existing consent decree remained in place. Only then, when the issue was raised whether the decree was still needed, did anyone suggest that defendants were in violation of the decree. In November 2006, the Court invited a motion to enforce the consent decree, a motion for contempt, and/or a motion to amend the complaint. The Court also ordered that access be given to plaintiffs' counsel to tour and to inspect the prison. Plaintiffs subsequently filed two motions — a motion for contempt and order enforcing the consent decree, and a motion to modify the existing decree. Plaintiffs never moved to amend the complaint.

After several hearings, an order dated June 21, 2007, found the entire consent decree to be viable and enforceable. Even though defendants' opposition had argued that the terms of the consent decree were unenforceable to the extent that they exceeded the constitutional minimum, the order noted that no party had made a termination motion since remand, reminding counsel that the PLRA specifically obligated defendants to make a formal motion to terminate (rather than merely oppose enforcement). The order stated (at 6–7; emphasis added):

> It is the Court's experience that institutions sometimes prefer to have a consent decree in place for reasons of obtaining funding, for invoking the supremacy of the federal decree to override state and local regulations, and for other reasons. It is not entirely clear that defendants here truly want to terminate or modify the consent decree. *The statute gives defendants the right to so move, the Court would have to entertain such a motion, and likely such a motion would have to be granted at least in part. In the meantime, no motion having been made, much less granted, the consent decree will be enforced as written . . .* Thus, while the consent decree is still valid and binding, defendants must comply with its terms, and this Court retains the power to hold them in contempt for any violations. In this posture, it is irrelevant whether the consent decree provides protections above the constitutional minimum.

With respect to certain issues that were in material factual dispute, the order called for an evidentiary hearing (which was overtaken by subsequent events as described below). With respect to several provisions found violated (and for which no evidentiary hearing was needed), defendants were ordered to file a detailed plan to cure. The order explicitly stated, "This schedule will not be modified or stayed pending any attempt by defendants to terminate the consent decree. All counsel have gone through massive amounts of work on the instant motions. That work will not be set aside for naught on account of defendants' delay in filing a motion to terminate (even assuming one is eventually filed)" (*id.* at 46). Defendants filed a notice of appeal from this order in July 2007.

While this interlocutory appeal was pending, defendants moved pursuant to 18 U.S.C. 3626(b) to terminate the consent decree. That was in mid-August 2007. In response, plaintiffs argued that jurisdiction was lacking given the appeal. Counsel stated, however, that they had begun the "necessary work required to adequately respond to these factual assertions and declarations, but have been unable to complete it in the time allotted" (Dkt. 1233

at 8–9). On September 26, this Court concluded that there was a serious concern with respect to its jurisdiction. An order then stayed proceedings in district court pending disposition by the Ninth Circuit. During the stay, plaintiffs' counsel had opportunity to and did continue to review inmate files.

Shortly after the stay, however, defendants moved to withdraw the appeal. The Ninth Circuit granted dismissal. This lifted the stay. Defendants then moved to reset the hearing on their motion to terminate the consent decree. On October 25, "[defense counsel] told Plaintiffs' counsel that Defendants would cooperate with discovery if they would reciprocate by making their experts and expert reports available to [defense counsel] sufficiently in advance of the briefing deadlines that [defense counsel] would be able to depose Plaintiffs' expert. Plaintiffs never responded to this offer" (Dkt. 1298 at ¶ 43).

Since the initial filing of defendants' termination motion, plaintiffs' counsel have largely and obstinately refused to fully respond on the merits. After an order to reset the briefing schedule and hearing date, a second opposition was filed on November 15, but it largely ignored the merits of defendants' motion. Rather, it requested a continuance for five months, claiming that the scheduling order did not reasonably permit plaintiffs to investigate and present evidence to oppose the pending motion. For their part, defendants then moved for a protective order to stay formal discovery until a ruling on the motion to terminate, relief sought on the ground that it would be unduly burdensome and expensive to respond to discovery on issues that might be terminated at the hearing. An order then requested declarations from both sides on all the discovery and opportunities for discovery taken to date relating to the issues in the pending motion. On November 20, after considering the submitted declarations, an order granted defendants' motion to stay formal discovery and denied plaintiffs' request to continue the matter for another five months. The order stated in part, "In light of this history, it is hard to believe that further discovery is necessary for plaintiffs' counsel to identify any Eighth Amendment violations that have gone undetected at San Quentin." In the third opposition to the motion to terminate, only two of twenty pages addressed the merits. The rest was devoted to why further discovery was allegedly necessary.

This order now explains why it is entirely appropriate and fair to proceed to hear the motion to terminate, at least in part, despite counsel's request for formal discovery. The short answer is threefold: (i) most of the issues are legal, not factual; (ii) as to other issues, counsel have had ample opportunity to investigate and to take discovery and the time has come to rule based on the uncontradicted facts; and (iii) as to the remaining issues, an evidentiary hearing will be held and counsel will be allowed some discovery.

The long answer amplifies on the second point above, namely the extended opportunities that counsel have had to investigate and to take discovery. Counsel for plaintiffs are the Prison Law Office and lawyers famous for their litigation against San Quentin. They have worked decades on this and other San Quentin cases. One of their recent bills to the prison asked for fees for approximately 750 hours of attorney work on conditions at San Quentin (Dkt. 1298 ¶ 26). Their offices are close by the prison. Furthermore, their own clients know firsthand all of the good and bad prison conditions and ought to be able to tell counsel any details. This needs no further discovery (although discovery has been offered and spurned over the last year).

When counsel intimated in opposition that they had not had ready access to the class representatives, an order requested that defense counsel respond with sworn declarations, explaining how difficult or easy it was for plaintiffs' counsel to arrange interview visits with their clients and for them to learn about alleged constitutional violations. San Quentin Litigation Coordinator Denise Dull stated that legal visits were conducted on Mondays through Wednesdays, between 8:00 a.m. and 2:00 p.m. (for ninety minutes). Attorneys could also visit during regular visiting hours on Thursday from 8:00 a.m. to 2:00 p.m. and on Fridays from 10:30 a.m. to 1:30 p.m. "When time is of the essence, arrangements can be made for inmates to discuss legal matters with their counsel over the telephone in a private area" (Dull Decl. at ¶¶ 2–5). Ms. Dull had stated that, as recently as November 2007, plaintiffs' counsel asked to have five attorneys placed on the visiting schedule because they were unsure which one of them would be actually attending — and the prison had accommodated this request (*id.* at ¶ 7). San Quentin Office Assistant Tanya Dixon, who is responsible for scheduling inmate visits,

stated that, although she "prefer[red] to have at least three days advance notice of a planned

visit, [she has] accommodated requests made by attorneys with only one day advance notice.

Visiting space is limited, but [they] have accommodated Plaintiffs' counsels' request to reserve

blocks of visiting time even when they have not identified which inmates they wish to visit,

or which attorneys will be coming in" (Dixon Decl. ¶¶ 2–3).  Ms. Dull attached printouts of the

specific visits made by plaintiffs' counsel.  For example, since the filing of the termination

motion, plaintiffs' counsel Steven Fama has visited the prison about seven times,

Rachel Farbiaz nine times, Zoe Schonfeld three times, Alison Hardy three times,

and Sara Norman once.  Ms. Dixon and Ms. Dull knew of no time when plaintiffs' counsel were

unable to visit with their clients due to lack of space.  From these declarations, this order finds

that plaintiffs' counsel have had ample opportunity to gather more evidence from the prison and

their clients on the conditions of their confinement and to conduct formal discovery to meet the

instant motion.  The brief stay of formal discovery in no way infringed counsel's access to their

client to develop information.

     Viewed liberally, paragraph 19 of plaintiffs' counsel's declaration serves as a

Rule 56(f)-type declaration, *i.e.*, an affidavit explaining why counsel purportedly needs more

discovery or investigation to meet the fact issues raised by the motion.  Paragraph 19 lists

various matters that might be shown to be constitutional violation if plaintiffs' counsel were

given more time to investigate.  This list summarizes what class members have told plaintiffs'

counsel.[1]  Defendants attack this as hearsay.  A Rule 56(f) declaration, however, often relies on

hearsay — for example, on statements made to counsel by prospective third-party witnesses in

order to explain that their depositions are necessary.  So the blanket hearsay objection is

ill-advised.  Nonetheless, it is true that the declaration is largely unavailing.  The vast majority

of the listed items are based solely on what class members have reported to counsel.  This is

---

[1]  According to FRCP 56(f), "If a party opposing the motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:  (1) deny the motion; (2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or (3) issue any other just order."  This is not a Rule 56 proceeding.  Nonetheless, the Court will employ the same principle.  For any material fact issue on the pending motion to terminate, the Court will consider whether fairness requires, in addition to an evidentiary hearing, an opportunity for discovery.

6

insufficient, for the class members are represented by counsel, who could have obtained

firsthand declarations from them (declaration items, e, j, k, l, and p). Others in a similar vein

("class members report . . .") are moot because an evidentiary hearing will be held anyway

(items b, c, d, f, g, h, i, and o). The proposed noise expert will be conditionally allowed as part

of an evidentiary hearing (items m and n). The remaining issues were never part of the consent

decree in the first place and are irrelevant to this motion (items a, q, and r).[2]

## ANALYSIS

In any action where prospective relief was issued before the enactment of the PLRA,

a party may move for termination of prospective relief two years after the date of enactment of

the PLRA. 18 U.S.C. 3626(b)(1)(iii). According to 18 U.S.C. 3626(b):

> (2) Immediate termination of prospective relief — In any
> civil action with respect to prison conditions, a defendant or
> intervener shall be entitled to the immediate termination of
> any prospective relief if the relief was approved or granted
> in the absence of a finding by the court that the relief is
> narrowly drawn, extends no further than necessary to correct
> the violation of the Federal right, and is the least intrusive
> means necessary to correct the violation of the Federal right.

> (3) Limitation — Prospective relief shall not terminate if the
> court makes written findings based on the record that
> prospective relief remains necessary to correct a current and
> ongoing violation of the Federal right, extends no further
> than necessary to correct the violation of the Federal right,
> and that the prospective relief is narrowly drawn and the
> least intrusive means to correct the violation.

Under the PLRA, courts cannot grant or approve relief that binds prison administrators to do

more than the constitutional minimum. *Gilmore v. California*, 220 F.3d 987, 998–99 (9th Cir.

2000). Furthermore, "any 'prospective relief' that exceeds the constitutional minimum must be

terminated regardless of when it was granted." *Id.* at 999. But "nothing in the termination

provisions can be said to shift the burden of proof from the party seeking to terminate the

prospective relief." *Id.* at 1007. We must remember that *defendants* have the burden of proof.[3]

---

[2] This order denies defendants' request that plaintiffs be subject to sanctions under Civil Local
Rule 7-9 for repeating arguments made in previous briefs.

[3] Unless otherwise indicated, internal citations are omitted from all cites.

### 1.   THE MEANING OF "CURRENT."

The Court must inquire into "current conditions." To do this, we need a record reflecting conditions as of the time termination is sought. *Gilmore*, 220 F.3d at 1010. Plaintiffs argue that the discovery and evidence gathered over the last thirteen months and in hundreds of hours of work are not current enough. A five-month wave of new discovery is requested.

This order agrees with plaintiffs that "current" means as of the moment the termination motion was made. But the evidence needed to determine conditions at that moment must necessarily be based on facts close in time, for the type of instantaneous snapshot imagined by plaintiffs' counsel is impossible. In all trial and litigation work, judgment calls must be made to assess the probative value of evidence. After the 2001 remand, years went by with no hint that any constitutional rights were being violated. Change at San Quentin proceeds slowly. Subject to critical analysis on an issue-by-issue basis, we can say with reasonable safety that the conditions over the last thirteen months are very close to the conditions when the termination motion was filed. For the last thirteen months, we have had numerous hearings into the conditions at San Quentin. To prepare for those hearings, many hundreds of hours of work have been done by counsel on both sides. Plaintiffs themselves rely on the evidence recently gathered, stating that "[t]he record herein includes extensive evidence regarding conditions in the San Quentin condemned units of, inter alia, inadequate sanitation, rodents and vermin, laundry and clothing, noise, food service, out-of-cell and exercise time" (Br. at 3). They have made no proffer as to why the recent record is inadequate, except that it has been gathered somewhat before rather than somewhat after the moment the termination motion was filed.[4]

_____

[4] For a more detailed procedural history of the discovery taken in this case, see Dkts. 1297–99, which were the briefs and declarations submitted by both parties in response to the order requesting a summary of the discovery history. The Court specifically agreed with defendant's characterization of the discovery process (Dkt. 1297 at 4): "Plaintiffs argue that the Court is not permitted to base its decision on a record that is 'frozen in time, as of the exact moment termination is sought.' But neither can the Court base its decision on the moving target that Plaintiffs propose. If Plaintiffs are permitted to engage in five months of discovery, the record that the Plaintiffs developed between December 2006 and August 2007 (the allegedly 'frozen moment') and the record that Defendants developed between June and August 2007 will become stale. If that happens, the Court will be required to afford Defendants several more months after Plaintiffs file their opposition to identify and depose the 'hundreds' of class members that Plaintiffs assert they are surveying and

As to those issues that genuinely need it, moreover, an evidentiary hearing *will be* held and plaintiffs *will be* allowed to present new evidence. Many of the challenged provisions of the decree present purely legal questions — *i.e.*, whether the Eighth Amendment requires hobbycraft, such that factual development is unnecessary.

Contrary to plaintiffs, *Benjamin v. Jacobson*, 172 F.3d 144, 155 (2d Cir. 1999), holds nothing more than "the district court must allow the plaintiffs an opportunity to show current and ongoing violations of their federal rights." There, the district court had refused to "postpone a decision on the termination motion pending an opportunity to create a factual record of the current conditions." *Benjamin v. Jacobson*, 935 F. Supp. 332, 357 (S.D.N.Y. 1996). No such opportunity had been provided, the main issue having been the constitutionality of the PLRA; once the PLRA had been found constitutional, the district court proceeded directly to terminate all prospective relief without pausing to allow the plaintiffs a chance to prove violations were continuing.

In sharp contrast, the record on the present motion shows that our plaintiffs have been given multiple opportunities to show the conditions at San Quentin. And, the last thirteen months have been devoted largely to inquiry into prison conditions there. With certain exceptions called out below, for which an evidentiary hearing will be held, plaintiffs have had ample opportunity to show the current and ongoing conditions at San Quentin.

It is true that the record in *Benjamin* included a quarterly report of the New York Office of Compliance Consultants and that the quarterly report was only five-months old at the time of termination. 935 F. Supp. At 342. It does not follow from this circumstance, however, that *Benjamin* held that a record fresher than five months was essential under the PLRA. Save for the passing reference to the report earlier in the lengthy district court order, no mention was made of it in the analysis whether the plaintiffs should be given an opportunity to show there were ongoing constitutional violations. There was no holding that "current," as used in the PLRA, excludes evidence only five months old. The paramount consideration in

update their record. At the conclusion of that process, Plaintiffs will no doubt assert that their own record is no longer current and demand yet more time to supplement the record. Plaintiffs' proposal will result in an endless process of updating and supplementing the record without any means to the end."

*Benjamin* was that plaintiffs (on whom the Second Circuit placed the burden of proof) should be allowed an opportunity to show current and ongoing violations — exactly what we have and are doing in the instant motion.

It is also true that the Second Circuit opinion stated that "[e]vidence presented at a prior time . . . could not show a violation that is 'current and ongoing.'" 172 F.3d at 166. Contrary to plaintiffs, this sentence did not hold that the recent past was irrelevant to define the present. Rather, this sentence was merely in service of a larger explanation of the phrase "immediate termination" in Section 3626(b)(2) and the holding that "the word 'immediate' was not intended to mean without any time intervening between motion and termination." *Id.* at 165. The Second Circuit observed that the written findings contemplated by the PLRA could not be made instantaneously and that Congress must have intended some interval during which the requisite findings could be made. Against this context, it is plain that the Second Circuit meant nothing more than an automatic presumption of lawful condition merely because of some earlier lawful condition was not intended by Congress.

For the same reason, *Lloyd v. Alabama Dept. of Corrections*, 176 F.3d 1336, 1342 (11th Cir. 1999), is off point. There, the Eleventh Circuit held that it was an abuse of discretion for the district court to refuse to conduct an evidentiary hearing concerning the current conditions at the prison and the scope of the prospective relief to be terminated. Even though the court-appointed monitor provided reports up to two months prior to the motion to terminate, the Eleventh Circuit held that the record was still insufficient because a report alone could not be cross-examined or disputed. Here, we are allowing ample opportunity to prove current conditions.

Again, this Court agrees that it must inquire into current conditions — and specifically the conditions that exist *at the time termination is sought*. And, of course, plaintiffs must be (and have been) given an opportunity to show current and ongoing violations. In all litigation involving a decisive point in time, however, facts in close temporal proximity are probative. Instantaneous snapshots are impossible. The extent to which recent evidence may have been superseded by intervening events must be critically assessed, issue by issue. But the automatic

1  assumption that yet another wave of discovery is statutorily required is ill-founded, after so

2  much recent inquiry into conditions.

3  **2.  CONSENT DECREE PROVISIONS.**

4  At last, we come to the substance of the motion to terminate.  This order finds that some

5  provisions of the consent decree exceed any Federal right.  They must be terminated.

6  With respect to other provisions of the consent decree, defendants have demonstrated that there

7  are no current and ongoing violations of the decree.  These requirements must also be

8  terminated.  As to the remaining provisions of the consent decree, an evidentiary hearing is

9  necessary before a decision can be made (with allowance for some discovery).[5]

10  **A.  Meals and Hot Carts.**

11  The consent decree requires that "[m]eals shall continue to consist of two hot meals and

12  a bag lunch" (Consent Decree VI.D.1).  The decree also provides:  "There are, for the use of

13  SHU II, three working hot carts and a hot cabinet, which shall be maintained.  Every effort shall

14  be made to ensure serving of foods as hot as possible" (Consent Decree VI.D.2).[6]

15  "The Eighth Amendment requires only that prisoners receive food that is adequate to

16  maintain health; it need not be tasty or aesthetically pleasing.  The fact that the food

17  occasionally contains foreign objects or sometimes is served cold, while unpleasant, does not

18  amount to a constitutional deprivation." *LeMaire v. Maass*, 12 F.3d 1444, 1456 (9th Cir. 1993).

19  *See also Lunsford v. Bennett*, 17 F.3d 1574, 1580 (7th Cir. 1994) (complaint about "cold and

20  poorly-prepared food" did not state Eighth Amendment claim when prisoners received three

21  square meals a day in compliance with nutritional guidelines).  The purpose of food is

22  nourishment.  Healthy food served at room temperature can have all the vitamins, minerals and

23  nourishment required to keep inmates healthy.  There is a constitutional right to healthy food

24  but not to hot food.

25

26

27  [5] The operative consent decree is part of the record herein, filed at Dkt. No. 1320 (defendants'
response to order re operative consent decree).

28  [6] "SHU II" stands for Security Housing II, which constitutes the top floor of the structure at
San Quentin known as North Block (Consent Decree II).

For years after the consent decree went into effect, defendants used hot carts to serve breakfast and dinner to condemned prisoners in their cells. Hot carts are no longer used for delivery and the food is not served as hot as possible. The consent decree clearly goes well beyond what the Eighth Amendment requires. Class members' food is prepared, stored, and served in accordance with the guidelines set forth in the ServSafe Program and with the California Uniform Retail Food Facilities Law, California Health and Safety Code Section 113700 *et seq*. The prison kitchen uses steam pots, which heat food from 180–210 degrees Fahrenheit. Plaintiffs receive their trays at least thirty minutes before bacteria begins to form (Flores Decl. ¶¶ 3–8). This order finds that, with respect to the meals and hot carts provision, there is no current and ongoing violation of a Federal right because there is no Federal right to have hot food. This consent decree provision is now terminated.

### B. Hobbycraft.

The consent decree requires that "Grade A inmates shall be afforded art hobbycraft, including oils. Other inmates shall be afforded art hobbycraft, excluding oils. Requests for other hobbycraft items and programs by Grade A inmates shall be in the discretion of the institution staff and shall be evaluated on a case by case basis" (Consent Decree VI.G.1–3). "Idleness and the lack of programs are not Eighth Amendment violations. The lack of these programs simply does not amount to the infliction of pain." *Hoptowit v. Ray*, 682 F.2d 1237, 1254–55 (9th Cir. 1982). This order finds that there is no current and ongoing violation of a Federal right concerning hobbycraft because there is no Federal right to have hobbycraft. The provision is terminated.

### C. High School Education.

Currently, no high school programs are provided. The consent decree provides that "[d]efendants shall continue the availability of present high school education programs. Any tutoring on a one to one basis shall occur during hours when inmates are not out of their cells. Inmates may continue, at their own expense, to obtain correspondence courses" (Consent Decree VI.I.1–3). "If the plaintiff's due process claim hinges on a property interest in the vocational instruction course, his claim similarly lacks substance in law and fact because

there is no constitutional right to rehabilitation." *Rizzo v. Dawson*, 778 F.2d 527, 531 (9th Cir. 1985). Perhaps sadly, the Constitution does not require San Quentin to provide inmates with a high school program. This order finds that, with respect to high school education, there is no current and ongoing violation of a Federal right; there is no Federal right to high school education. This provision is therefore also terminated.

### D. Administrative Classification.

The consent decree provides for classification procedures. Condemned inmates are generally classified as Grade A (without a high violence or escape potential), Grade B (with a high escape or violence potential or who are serious disciplinary cases), and walk-alones (those who would otherwise be classified as Grade A but who are unacceptable to the Grade A population) (Consent Decree IV). According to the June 21 order (at 33), "[t]he condemned prisoners . . . are treated differently from the general population. While plaintiffs have provided uncontradicted evidence that Grade A condemned inmates are treated differently from the general population, plaintiffs have not pointed to any provision of the consent decree that is violated by this treatment. Accordingly, there is no violation with respect to classification."

Even if there were a consent decree violation, plaintiffs still could not receive relief on this point because it exceeds the constitutional minimum. According to *Myron v. Terhune*, 476 F.3d 716, 719 (9th Cir. 2007), "[b]ecause the mere act of classification 'does not amount to an infliction of pain,' it 'is not condemned by the Eighth Amendment.'" This order finds that there is no current and ongoing violation of a Federal right regarding administrative classification, so this provision is now terminated.

### E. Staff Screening.

According to the consent decree, "[d]efendants agree that personnel assigned to the condemned unit should be carefully screened for suitability. Complaints by inmates concerning unit staff will be promptly investigated. Unit staff should understand that Grade A inmates are assigned to the unit because of their sentence" (Consent Decree IX.1–3). The Ninth Circuit has a different requirement regarding staff screening. "The district court may find excess physical force an Eighth Amendment violation, may order guards to refrain from using such force,

and may order prison officials to take steps to prevent guards from such activities. But to require prisons to have adequate recruiting, screening, and training programs is an impermissible judicial involvement with the minutiae of prison administration." *Hoptowit*, 682 F.2d at 1251. Because there is no Federal right to screen staff, this order finds that there is no current and ongoing violation of a Federal right with respect to this provision. It is now terminated.

### F.     Out-of-Cell Exercise.

Defendants argue that provisions regarding out-of-cell time and outdoor exercise exceed the constitutional limit. The consent decree provides the following provisions concerning out-of-cell exercise: "Inmates will be provided with outdoor exercise at least 3 days per week. The outdoor exercise time will be apportioned among the inmates in SHU II so as to provide as much out-door exercise as possible to each inmate. So long as non-condemned inmates are housed in SHU II, the following shall be the minimum weekly yard exercise periods: Grade A yard: 9 hours; Grade B yard: 9 hours; Walk-alone yard: 3 hours. When only condemned inmates are housed in SHU II, the following shall be the minimum weekly yard exercise periods: Grade A yard: 12 hours; Grade B yard: 12 hours; Walk-alone yard: 12 hours" (Consent Decree V.A.1–4). The decree further provides, "Grade A inmates in East Block shall be allowed access to adequate exercise areas, which are equipped with a covering for protection from inclement weather, between the hours of 7:30 a.m. and 1:30 p.m. Exercise yard access will be offered to the Grade A inmates in East Block seven (7) days per week, regardless of weather conditions, except during dense fog" (Consent Decree V.B.2 as added by Sixth Report of the Monitor at 24).

Inmates are constitutionally entitled to outdoor exercise. "Deprivation of outdoor exercise violates the Eighth Amendment rights of inmates confined to continuous and long-term segregation." *Keenan*, 83 F.3d at 1090. "There is substantial agreement among the cases in this area that some form of regular outdoor exercise is extremely important to the psychological and physical well being of the inmates." *Spain v. Procunier*, 600 F.2d 189, 199 (9th Cir. 1979). In *Spain*, the Ninth Circuit held that "it was cruel and unusual punishment for a prisoner to be

confined for a period of years without opportunity to go outside except for occasional court appearances, attorney interviews, and hospital appointments." *Id.* at 200. *See also Lopez v. Smith*, 203 F.2d 1122, 1133 (9th Cir. 2000) (holding that denying all access to outdoor exercise for six-and-one-half weeks was enough to meet Eighth Amendment's objective requirement that the prison official's acts or omissions deprived inmate of the minimal civilized measure of life's necessities); *Allen v. Sakai*, 48 F.3d 1082 (9th Cir. 1994).

Defendants claim that the Ninth Circuit held in *LeMaire* that the denial of outdoor exercise does not violate the Constitution when the inmate is able to exercise in his cell. *LeMaire*, 12 F.3d at 1458. Not so. The inmate in *LeMaire* was denied outdoor exercise privileges because he both abused these privileges and represented a grave security risk when outside his cell. Physical threats posed by the inmate to staff and other inmates were well documented, particularly the inmate's armed attack on two correctional officers, which he vowed to repeat. *Ibid.* Moreover, the Ninth Circuit specifically stated, "At the outset, we agree that ordinarily the lack of outside exercise for extended periods is a sufficiently serious deprivation and thus meets the requisite harm necessary to satisfy *Wilson's* objective test. Exercise has been determined to be one of the basic human necessities protected by the Eighth Amendment. As the *Wilson* Court stated, to satisfy the objective test, the Eighth Amendment violation must include 'the deprivation of a single, identifiable human need such as food, warmth, or *exercise*.'" *Id.* at 1457–58 (emphasis in original).

Defendants have the burden of proof to show that prospective relief exceeds the constitutional minimum in a termination motion. *Gilmore*, 220 F.3d at 1007. Plaintiffs have alleged that they are not afforded adequate exercise, with respect to the number of days or hours per week as required by the consent decree. Because defendants have provided no evidence that there are no current and ongoing constitutional violations with respect to out-of-cell exercise, this provision shall not be terminated. An evidentiary hearing shall be held to determine whether defendants have violated this right.

### G.    Interruption of Access to the Exercise Yard.

The consent decree requires:  "The provision of exercise may be suspended for a period not to exceed ten (10) days as to any prisoner if the suspension is based upon genuine reasons of inmate safety or prison security.  The limitation on suspension of exercise pertains to calendar days, not non-consecutive 'yard' days, *i.e.*, days when the prisoner normally would be allowed on the exercise yard, skipping other days in between.  When outdoor exercise is suspended under this provision for all or any discrete part of an exercise yard group due to misbehavior occurring on the yard, defendants shall:  (1) Begin the investigation into the cause and extent of the misbehavior promptly upon the suspension of the exercise; (2) Identify as quickly as possible the prisoners involved in the misconduct; and (3) Restore exercise privileges on the next scheduled yard day for all inmates identified as non-involved following investigation" (Consent Decree V.D. as added by Sixth Report of the Monitor at 26).

Plaintiffs have alleged that the exercise program has been cancelled for more than ten consecutive days without a written declaration of emergency from either the warden or the secretary.  While defendants cannot revoke all exercise privileges, there is nothing in the Constitution that requires defendants to issue declarations of emergency before suspending outdoor exercise.  Possibly, the Constitution would prohibit long suspensions without cause, so long as to be unhealthy, but ten days seems to be an arbitrary threshold written years ago before the PLRA.  This order finds that there is no current and ongoing violation of a Federal right because there is no Federal right to have a written declaration of emergency in these situations.  This provision of the consent decree is now terminated.

### H.    Weight Benches, Jump Ropes, Ping Pong Tables, Raincoats, and Showers.

The consent decree contains the following provisions with respect to equipment and showers on the yard:  "All inmates will continue to have available use of the yard shower during exercise periods on the yard.  All yard showers shall be plumbed with hot and cold running water, adjustable by the showering inmate" (Consent Decree VI.C.2 as modified by Sixth Report of the Monitor at 41).  With respect to Grade A Yard Equipment, "Good faith efforts have been and will be made to provide sufficient free weights to adequately accommodate the

16

needs of the current and any future increased or decreased condemned population, in tonnage, reasonable increments and benches. Defendants, through their recreation supervisor(s), will review the weight needs twice yearly and order replacements or make adjustments as necessary. In doing so, condemned prisoners may suggest needed equipment, which requests shall be considered by the recreation supervisor" (Consent Decree VI.A.11 as modified by Sixth Report of the Monitor at 40). Furthermore, "[j]ump ropes will be provided upon request" (Consent Decree VI.A.8 as modified by Sixth Report of the Monitor at 39). The decree also states: "There will be provided, for the use of Grade A inmates in the North Segregation Unit, on the tier: Two ping pong tables" (Consent Decree VI.B.2 as modified by Sixth Report of the Monitor at 40). Finally, the decree requires that "[r]aincoats, for use during yard exercise, will be available in the unit" (Consent Decree VI.E.16).

This order finds that there is no current and ongoing violation of a Federal right because no Federal right exists with respect to weight benches, jump ropes, ping pong tables, or showers for use during yard exercise. These provisions of the consent degree are now terminated. This order will not yet, however, terminate the provision regarding raincoats. If inmates are outside during inclement weather, they will need appropriate clothing, as will be discussed below. Plaintiffs have put forth evidence indicating that raincoats are not always available, and when available, are not always in good condition. Defendants, on the other hand, have introduced evidence establishing that inmates have successfully obtained raincoats. Due to this factual dispute, an evidentiary hearing will be held to determine the availability of raincoats.

## I.     Clothing.

The consent decree provides that "[c]lothing will be of good repair and of appropriate size" (Consent Decree VI.L.5). "The Eighth Amendment also imposes duties on these [prison] officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care." *Farmer v. Brennan*, 511 U.S. 825, 832 (1970). "The more basic the need, the shorter the time it can be withheld." *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000). In *Johnson*, the Ninth Circuit suggested

that depriving an inmate of a jacket could violate the Eighth Amendment under some weather conditions (particularly extreme ones). The court of appeals cited to an Eighth Circuit decision where the Eighth Amendment was found violated when prison officials required inmates to remain outdoors in sub-freezing temperatures for less than two hours, even though the inmates were provided with hip-length, lined denim coats and allowed to move freely. *Id.* at 732.

The Court has dug through the record to find plaintiffs' complaints on this matter. In response to a December 2006 audit, San Quentin's warehouse manager explained that there were regular shortages of tee-shirts, boxers, and sheets. Lieutenants on the East Block have testified that appropriately fitting clothing has been unavailable at times and cannot be immediately replenished. Inmates are regularly unable to exchange old, worn-out or ill-fitting clothing and linens for supplies that are in good repair and that fit appropriately. Many condemned prisoners do not have full sets of state-issued whites and/or blues. This order finds that these inconveniences do not rise to the level of constitutional violations.

*First*, inmates are given clothing appropriate for the weather conditions in temperature-controlled housing units — three boxer shorts, three tee-shirts, two blue denim pants, three blue chambray shirts, one pair of shoes, one jacket, and three pairs of socks. Grade A inmates also receive a belt. Family or friends may send condemned inmates additional clothing items. Inmates are allowed to buy extra clothing from approved vendors. They are never forced to go outside, except during emergencies (Bormann Decl. ¶¶ 18, 20; Fox Decl. ¶ 22, 26).

*Second*, defendants provide justification for why there are occasional clothing shortfalls. Orders for replacement clothing are processed on Thursday afternoons and the items are received in the housing units on Fridays. While waiting for replacement clothing, inmates may continue to keep their old clothing or exchange it for an alternative clothing item. Some inmates refuse to accept replacement clothing that is not new, even though it is clean and serviceable. In addition, the younger inmates prefer to wear baggy clothing and will not accept replacement clothing that is not baggy enough. Certain clothing items are therefore in short supply (Fox Decl. ¶¶ 23–25).

18

This order finds that there are no current and ongoing constitutional violations regarding clothing because prison procedures used to supply clothing satisfy the constitutional standard. While the Constitution may entitle inmates to raincoats in inclement weather, it does not entitle them to a full issue of white and blue clothing. The prison provides enough clothing for the prisoners in temperature-controlled housing units. The occasional dearth of clothing that is more to the inmates' liking is constitutional. This provision of the consent decree is terminated.

### J. Laundry.

The consent decree requires that the exchange of condemned prisoners' towels and "whites," such as tee-shirts, socks, and underwear, be on the same basis as the general population. Sheets and "blues," such as trousers and outer shirts, should be exchanged once every two weeks (Consent Decree VI.L.1–2 as modified by Sixth Report of the Monitor at 45).

According to the Ninth Circuit, depriving inmates of the basic elements of hygiene can amount to cruel and unusual punishment under the Eighth Amendment. *Hoptowit*, 753 F.2d at 783. The Ninth Circuit has also cited a district court decision holding that the Eighth Amendment guarantees personal hygiene. *Keenan*, 83 F.3d at 1091 (citing *Toussaint v. McCarthy*, 597 F. Supp. 1388, 1411 (N.D. Cal. 1984) (Weigel, J.), overruled on other grounds, 801 F.2d 1080 (9th Cir. 1986)). The Fifth Circuit has held that a prison laundry condition that required inmates to wash their own clothes with bar soap was not sufficiently serious to implicate the Eighth Amendment. *Gates v. Cook*, 376 F.3d 323, 342 (5th Cir. 2004). Going further, the Third Circuit has held that an inmate's complaints about food, unnecessary isolation, the physical conditions of his cell, the lack of clothing and laundry service, and the limitations on recreation and shower time did not amount to violations of the Eighth Amendment. *Gibson v. Lynch*, 652 F.2d 348, 352 (3d Cir. 1981).

With little help from plaintiffs' counsel, the Court has examined the evidence provided on past motions on this issue. Plaintiffs allege that the laundry system at San Quentin is problematic. San Quentin sends clothes to the California State Prison at Solano to be cleaned. Prisoners' laundry bags are sometimes returned with items missing and/or they are returned late. There are periods when the state prison does not return the laundry because of, for

example, lockdowns, power outages, and equipment breakdowns. Sometimes the laundry is not even clean when returned to the prisoners. Two inmates, Christhian Monterroso and Robert Jurado, complained that sheets were returned with fecal matter, bugs, and hair. A December 2006 audit had found that inmates housed in East Block and the Adjustment Center have gone as long as ten weeks without laundry exchange. North Segregation inmates have gone as long as four weeks. The laundry services (or alleged lack thereof) result in inmates washing their clothes themselves or wearing dirty clothes.

The prison laundry system is more than adequate, defendants say. Each week, the prison sends condemned inmate laundry to the Solano facility, which operates according to the sanitation and laundering requirements for acute psychiatric hospitals set forth in Title 22, Section 71529 of the California Code of Regulations. The Solano facility employs a cleaning process that exceeds the standards set out for hospital laundry. Clothing and linens are washed at 160–165 degrees Fahrenheit for thirty minutes. A product called "break" and liquid detergent are added to carry away soil from the clothing. White laundry is given 12.5 percent bleach solution, which is the strongest available. At the end of the wash cycle, a product called "sour" is added to bring the pH level down to neutral. Fresh water is flushed through the system each hour while the laundry is in operation, and the entire system is completely drained twice a week. All clothing and linens are placed in tumble dryers set at 180 degrees Fahrenheit. After being placed in the dryer, sheets and pillowcases are further sanitized by being passed through a flatwork iron set at 330–330 degrees Fahrenheit. If a worker believes that an item has not been properly cleaned, he will call a supervisor over to authorize a re-wash (Arnold Decl. ¶¶ 1, 18–20, 23–24).

Blue laundry is washed separately from white laundry. If, however, an inmate places blue and white laundry items in the same bag, the entire bag will be washed with blue laundry items. Laundry that is not intended to touch the body (*e.g.*, mop heads and kitchen towels) are washed separately from clothing and linens. The Solano facility also sanitizes the interior of the trucks that haul the laundry carts and the carts themselves by power washing with hot water and

disinfectant  (*id.* at ¶¶ 13, 17, 25).  Defendants have also prepared and submitted with this motion a videotape tour of the Solano facility (Maxwell-Jolly Exh. A).

Defendants argue that problems cited by inmates Monterroso and Jurado might form the basis of an individual claim for damages against a particular correctional officer.  But because there are no similar allegations from other inmates, these incidents are so isolated as to conclude that there is no class injury.  Furthermore, laundry problems arise from errors committed by defendants *and* plaintiffs.  Solano often receives laundry bags that have been improperly tied or over-filled by prisoners.  Consequently, laundry items may not be properly cleaned or dried (Fox Decl. ¶ 18, Arnold Decl ¶ 15).

The Court is inclined to hold that the Eighth Amendment does not require laundry service so long as inmates are provided with sinks or buckets and sufficient water and soap to wash their own laundry and are allowed to let it dry in their cells.  There are declarations from March 2007 by four inmates, most of which suggest that the inmates are allowed to wash laundry in their cells and in fact prefer to do so because of the alleged uncleanliness of laundry sent through the prison-laundry system (Graham Decl. ¶ 6; Jurado Decl. ¶ 11; Monterroso Decl. ¶ 10; Hines Decl. ¶ 7).  If this were the uniform record, the Court would be inclined to hold that self-washing is sufficient under the Eighth Amendment.  The difficulty is that at least one of the inmates stated, "I used to wash my laundry in my bucket, but my bucket was taken away from me.  Now I wash my laundry on my floor but I have been threatened with disciplinary write-ups for this.  Also, sometimes, water floods out of my cell" (Hines Decl. ¶ 7).  The frequency of this problem is not sufficiently developed in the record.  To the extent that the prison relies upon outside laundry service, the record is too contradictory considering its efficacy.  An evidentiary hearing shall be held on this issue.

### K.    Cleaning Supplies.

Under the consent decree, "[i]nmates shall be responsible for cleaning their own cells" (Consent Decree VI.J.1).  It further mandates that defendants "will supply inmates with adequate equipment and materials for cleaning their cells" (Consent Decree VI.J.2).

"Failure to provide adequate cell cleaning supplies, under circumstances such as these [referring to the overall squalor of the penitentiary], deprives inmates of tools necessary to maintain minimally sanitary cells, seriously threatens their health, and amounts to a violation of the Eighth Amendment." *Hoptowit v. Spellman*, 753 F.2d 779, 784 (9th Cir. 1985).

According to plaintiffs' evidence found by the Court, cleaning supplies are rarely distributed or available. Some prisoners clean their cells with items such as shampoo that they buy from the canteen. Not all prisoners, however, can afford to buy these cleaning supplies. Moreover, their declarations show that the inmates have an extremely difficult time in obtaining cleaning supplies (and of a sufficient amount), even upon request.

Defendants state that cleaning supplies are available to condemned inmates upon request. Inmates in North Segregation and East Block have access to a disinfectant cleaning agent, scrub pad, whisk broom, dust pan, toilet brush, and a bucket. Inmates in the Adjustment Center have access to a disinfectant cleaning agent, sponge, and scrub pad (Fox Decl. ¶ 15).

A dispute of fact exists regarding whether adequate cleaning supplies are available. An evidentiary hearing shall be held to determine the adequacy of cleaning supplies provided by defendants.

### L.    Tier Showers.

The consent decree requires that "[a]ll inmates will continue to be provided with at least two showers, on the tier, per week, on days when no yard exercise for such inmates is scheduled" (Consent Decree VI.C.1).

The Ninth Circuit has stated that "[m]any other practices, falling within the broad discretion required by prison officials in maintaining order and discipline, have been upheld against constitutional challenge, *e.g.,* . . . *Landman v. Royster, supra*, (denial of showers where no evidence of sanitary items necessary for washing in cells)." *Shapley v. Wolff*, 568 F.2d 1310, 1312 (9th Cir. 1978). Furthermore, "minimum standards of decency require that lockup inmates without hot running water in their cells be accorded showers three times per week in facilities reasonably free of standing water, fungus, mold and mildew." *Toussaint*, 597 F. Supp. at 1411.

Plaintiffs' declarations from earlier motions herein show sanitation problems with the showers and inadequate cleaning procedures. East Block's showers regularly rain out onto the tier. Shower-water spills over the tier fronts down to the cell block's first tier, at ground level. The showers smell of mold and mildew. Inmates have complained that the areas immediately outside the showers are filthy with dirty water, scum, and hair.

Defendants do not dispute these facts. They have conceded that showers in East Block overflow onto the tiers. They are trying to alleviate the condition by installing a large gutter system to channel the water. They are also hiring janitors to clean the showers and keep the drains free of debris.

Defendants do state, however, that all condemned prisoners have access to showers inside their housing units three times a week (Fox Decl. ¶ 28). The consent decree does not address sanitation conditions in the showers; it addresses the *number of times* plaintiffs can shower. The consent decree provision is therefore unnecessary. This order finds that there is no current and ongoing violation of a Federal right because the prison has already satisfied the constitutional standard by allowing prisoners access to showers three times a week. This provision of the consent decree is now terminated.

### M. Contents of Cells and Showers.

The consent decree requires the following for the contents of cells and showers: "A bench or stool and clothing hooks will be provided in the tier shower areas. Provided, this section VI.C.5 does not apply to Grade B condemned prisoners assigned to Security Housing Unit I (the Adjustment Center at San Quentin)" (Consent Degree VI.C.5 as modified by the Sixth Report of the Monitor at 41). Additionally, "[c]ells for Grade A inmates shall be provided with wooden clothing hooks" (Consent Decree VI.E.2 as modified by the Sixth Report of the Monitor at 42). Moreover, "[a] writing board will be provided to Grade A inmates" (Consent Decree VI.E.9 as modified by the Sixth Report of the Monitor at 42). Finally, "[a] fixed, fold-out stool or bucket shall be provided" (Consent Decree VI.E.8 as modified by the Sixth Report of the Monitor at 42).

Plaintiffs allege that not all showers outside the Adjustment Center are equipped with a

bench and clothing hook.  Some Grade A prisoners do not have clothing hooks in their cells and/or are unable to secure a writing board.  Not all cells are equipped with a stool or a bucket.

Defendants do not dispute these facts.  The Constitution, however, does not require prisons to provide the aforementioned amenities to inmates for their cells and showers.  This order finds that there is no current and ongoing violation of a Federal right because there is no Federal right to benches, stools, clothing hooks, or writing boards.  This provision of the consent decree is terminated, with the exception that a bench must be provided for any wheelchair-bound class member, if any.

**N.     Birds, Rodents, and Vermin.**

The consent decree states:  "Defendants will continue existing efforts to eliminate rodents and vermin from the unit.  Cells will be sprayed on request of the occupant.  Condemned inmates will make every effort to eliminate debris in the cells and tier areas which attract such rodents and vermin" (Consent Decree VI.J.5).

According to the Ninth Circuit, "The Eighth Amendment standards for conditions in isolation, segregation, and protective custody cells are no different from standards applying to the general population . . .  Prison officials must provide all prisoners with adequate food, clothing, shelter, sanitation, medical care, and personal safety." *Hoptowit*, 682 F.2d at 1258.

In the evidence supporting their earlier motions, sanitation problems are attributed to the presence of birds, rodents, and vermin.  Inmates have reported bird droppings on the cell block's tier bars, floors, and other places.  Work orders requesting that the bird problem be addressed have been submitted but not acted upon by prison officials.  Similarly, a "Corrective Action Plan" adopted by San Quentin stated that an officer would submit a bi-weekly report to the condemned custody captain regarding a contractor's alleged efforts to eradicate birds in East Block.  Inmates also allege that rodents and vermin are common problems.  They indicated in their declarations that they have seen rats and mice regularly in East Block.

Defendants' expert found little evidence of birds, rodents, and vermin.  Transient birds enter East Block through broken windows and open doors, but they do not typically nest in the building.  Bird droppings were primarily found on the sixth tier, an area that was not accessible

to inmates.  There were some bird droppings on the fifth-tier rails and walkway, but inmates had little skin contact with them because they are cuffed when they leave their cells. Correctional staff or inmate janitors clean surfaces on the fifth tier.  There was little evidence of bird, rodent, or vermin infestation inside the ductwork of the ventilation system (Bormann Decl. ¶¶ 27–29).

From the record, the Court has found evidence (without, it must be added, any assistance from plaintiffs' counsel) suggesting that rodents and vermin persist and that defendants have not put forth adequate elimination efforts.  Defendants respond that there is little evidence of an infestation.  Due to the factual dispute, an evidentiary hearing shall be held to determine the extent of the birds, rodents, and vermin and of defendants' efforts to eliminate these pests.

### O.    Noise.

The consent decree states:

> Defendants shall undertake and continue measures to limit the levels of noise prevailing in five-tier cell blocks used to house condemned prisoners at San Quentin.  The following specific measures shall be undertaken and continued unless and until defendants reduce the noise to acceptable levels by alternate means: (1) Inmates in such five-tier cell blocks shall not be permitted to employ any loudspeaking devices, including, for example, those devices included in televisions, radios, and stereophonic equipment, unless the device is incapable of producing sound noticeably audible to any person outside the cell of the person using the device.  (2) Defendants shall install and maintain sound-absorbing wall coverings in all such five-tier cell blocks.  (3) Defendants shall provide each condemned inmate housed in a five-tier cell block with a set of medically approved sound exclusion devices such as, for example, earplugs.  If earplugs are used, they shall be issued monthly.

(Consent Decree XIII as added by Fourth Report of the Monitor at 57).

"[P]ublic conceptions of decency inherent in the Eighth Amendment require that [inmates] be housed in an environment that, if not quiet, is at least reasonably free of excess noise."  *Keenan v. Hall*, 83 F.3d 1083, 1090 (9th Cir. 1996).  The level of noise is considered extreme when "it adversely affects [prisoners' hearing and mental processes.  Constant exposure to such a level of noise inflicts pain without penological justification."  *Toussaint*, 597 F. Supp. at 1410.

In support of their motion for contempt, plaintiffs testified that there have been many

nights when they have been unable to sleep because of the noise in East Block. They further allege that earplugs are not issued regularly, and the ones issued are of such poor quality that they do not block out the noise. Inmates also point to the non-condemned Administrative Segregation population as the source of much noise in the unit.

Defendants have provided evidence from the American Conference of Governmental Industrial Hygienists, which set guidelines for noise hazards. The guidelines stated that repeated exposure to noise over a twenty-four hour period of eighty decibels or more could result in adverse effects to one's hearing. The guidelines also recommended seventy decibels as the background noise exposure for sleeping and relaxation for situations in which the work time extended beyond twenty-four hours. Although these guidelines were intended specifically for workers, it could reasonably apply to noise conditions such as those found in a prison housing unit (Bormann Decl. ¶¶ 11–12).

Defense expert Timothy Bormann tested the noise levels in East Block. The average daytime noise level readings were all below eighty decibels. Nighttime noise levels (between 10:00 p.m. and 5:00 a.m.) were generally below or at sixty decibels (*id.* at ¶ 17). The average daytime and nighttime noise levels do not cross the threshold for which noise would result in adverse hearing effects. Furthermore, even if plaintiffs were not at risk for hearing problems, defendants have mitigated discomfort by installing sound dampening materials on the walls, providing earplugs, and disciplining noisy prisoners. The sound-dampening materials consist of two-inch thick acoustic panels that extend from the lower gun rail to the ceiling (Fox Decl. ¶¶3–7).

Although plaintiffs' counsel have not responded with counter evidence, the undersigned has gone back to review evidence from recent proceedings suggesting that defendants have not enacted measures to limit the levels of noise. Defendants offer evidence to the contrary. Because there are disputes of material fact, an evidentiary hearing shall be held to determine whether defendants are taking adequate measures to limit the noise, the extent of the noise level, the availability of earplugs, and whether the housing of non-condemned Administrative Segregation prisoners in East Block is a primary source of the noise.

### P.    Tier Telephone.

The consent decree provides:  "Defendants will provide a pay telephone, for collect calls, on the tiers for use of Grade A condemned inmates subject to reasonable rules and regulations as to that telephone's use" (Consent Decree X as modified by Sixth Report of the Monitor at 58).  Plaintiffs complain that tier telephones are frequently out of service for extended periods.

"Although prisoners have a First Amendment right to telephone access, this right is subject to reasonable limitations arising from the legitimate penological and administrative interests of the prison system." *Johnson v. California*, 207 F.3d 650, 655 (9th Cir. 2000). Four factors are considered under the "reasonableness" inquiry:  (i) whether there is a valid, rational connection between the restriction and the legitimate governmental interest put forward to justify it; (ii) whether there are alternative means of exercising the right; (iii) whether accommodating the asserted constitutional right will have a significant negative impact on prison guards and other inmates, and on the allocation of prison resources generally; and (iv) whether there are obvious easy alternatives to the restriction showing that it is an exaggerated response to prison concerns. *Valdez v. Rosenbaum*, 302 F.3d 1039, 1048–49 (9th Cir. 2002).

Defendants do not dispute that tier telephones are often out of service for long periods of time.  They provide no evidence as to how reasonable the restriction has been.  From this record, it is unclear whether or not telephone access exceeds the constitutional minimum.  It is also unclear whether or not there is a current and ongoing constitutional violation.  An evidentiary hearing shall be held.

### Q.    Visiting.

The consent decree states, "Visits are by appointment for a minimum of two-and-one half hours, subject to space availability.  Longer minimum visits may be obtained by prior arrangement in the case of those visitors who must travel over 200 miles.  Maximum length of visit is subject to space availability" (Consent Decree VII.7).

Moving parties rest their entire motion on the proposition that there is no constitutional right to visitation. That is incorrect. It is true that the Supreme Court has held that *contact* visits are not required: "That there is a valid rational connection between a ban on contact visits and internal security of a detention facility is too obvious to warrant extended discussion . . . We hold only that the Constitution does not require that detainees be allowed contact visits when responsible, experienced administrators have determined, in their sound discretion, that such visits will jeopardize the security of the facility." *Block v. Rutherford*, 468 U.S. 576, 586–89 (1984). The Ninth Circuit has stated, "[I]t is well-settled that prisoners have no constitutional right while incarcerated to contact visits or conjugal visits." *Gerber v. Hickman*, 291 F.3d 617, 621 (9th Cir. 2002).

These holdings, however, do not necessarily mean that a ban on *all* visits — including non-contact ones — would be constitutional. When inmates complained that the restriction on visitation for inmates was a cruel and unusual condition of confinement in violation of the Eighth Amendment, the Supreme Court held, "The restriction undoubtedly makes the prisoner's confinement more difficult to bear. But it does not, in the circumstances of this case, fall below the standards mandated by the Eighth Amendment . . . *If the withdrawal of all visitation privileges were permanent or for a much longer period, or if it were applied in an arbitrary manner to a particular inmate, the case would present different considerations.* An individual claim based on indefinite withdrawal of visitation or denial of procedural safeguards, however, would not support the ruling of the Court of Appeals that the entire regulation is invalid." *Overton v. Bazzetta*, 539 U.S. 126, 136–37 (2003) (emphasis added).

Given the case law, if all visitation privileges were permanently withdrawn or withdrawn for a long period of time, there might be a constitutional problem. Plaintiffs, however, complain only that visits can be scheduled with considerable difficulty. Moreover, the personal visits do not last the two-and-a-half hours as required by the consent decree. Although the Constitution does not require visitations of a particular duration, defendants have not yet carried their burden of proof regarding current and ongoing constitutional violations; it

is unclear from the record whether or not visitation privileges have been withdrawn for a long period of time.  The parties will be given an opportunity to present evidence on this matter at an evidentiary hearing.

### R.      Group Religious Services.

The consent decree requires:  "Group religious services and counseling will be permitted for Grade A inmates on a reasonable schedule, on the tier during the hours 9:00 a.m. to 3:00 p.m.  Free personnel are not to be allowed on the tier but shall be physically separated from the inmates" (Consent Decree VI.H).  The consent decree does not specify whether or not group religious services should be permitted every day.

The Constitution does not require group religious services for inmates.  The Court sees compelling security justification in prohibiting *group* religious services amongst Death Row inmates.  Defendants state that they have never been informed by any of the condemned inmates that their religious practices require group services — at least within the last two years (Fox Decl. ¶ 14).  Because nobody has asked for group religious services, no rights have been violated.  This order finds that there is no current and ongoing violation of a Federal right with respect to this provision because no inmate in the last two years has ever requested group religious services, much less demonstrated that group religious services are a mandatory feature of his faith.  This provision is hereby terminated.

### S.      Access to Legal Materials.

The consent decree states:  "Solely because inmates condemned to death have an immediate and continuous need for legal research materials, the following basic legal materials will be made available within the unit, and kept current: a. California Jurisprudence, 3rd Series, . . . b. West's California Digest, . . . c. West's Federal Practice Digest, . . . d. USCA, Title 28, . . . e. USCA, Title 42, . . . f. West's California Penal Code, Annotated, 7 volumes" (Consent Decree VIII.1).  Furthermore, "[s]uch materials will be available to condemned inmates on a check-out basis" (Consent Decree VIII.2).

"A prisoner contending that his right of access to the courts was violated because of inadequate access to a law library must establish two things:  First, he must show that the access

29

was so limited as to be unreasonable. Second, he must show that the inadequate access caused him actual injury, *i.e.*, show a specific instance in which [he] was actually denied access to the courts.'" *Vandelft v. Moses*, 31 F.3d 794, 796–97 (9th Cir. 1994). In an action under the PLRA to terminate a consent decree, however, defendants must carry the burden of proof. The Ninth Circuit has held that the district court should have placed the burden on the state to prove its compliance with inmates' right of access to courts. It also should have held an evidentiary hearing to determine whether a memorandum directing the law library staff to stop renewing books would have a concrete effect on inmates' access to courts. *Gilmore*, 220 F.3d at 1008–09.

Here, two prisoners state that not all units have legal materials available for condemned prisoners (Butler Decl. ¶ 8; Monterroso Decl. ¶ 12). Defendants argue otherwise. Associate Warden Robert Fox, who supervises the custodial and security aspects of condemned inmate housing units at San Quentin, describes the library program as follows. Unless the condemned units are on a modified program restricting inmate movement, condemned inmates can sign up to go to the law library. Inmates from units on modified programs have access to library materials by using a paging system. Sometimes condemned inmates cannot physically go to the law library when there are staff shortages in the law library. Nonetheless, the inmates always have access to the pocket libraries that are in place and maintained in each of the housing units (Fox Decl. ¶¶ 11–12). Defendants do not discuss whether or not the materials required by the consent decree are all provided in the prison law library.

Although plaintiffs have not established that the access was so limited as to be unreasonable or that the inadequate access caused actual injury, they will be given an opportunity to do so. An evidentiary hearing shall be held on this issue.

### T.    Ventilation.

Defendants request that the consent-decree provision regarding ventilation be terminated. Plaintiffs' earlier motion to modify the consent decree requested that defendants provide adequate ventilation to inmates, but the request was never ruled on. The consent decree does not address measures for providing adequate ventilation. There is no prospective relief

1    regarding ventilation to terminate, and the issue is irrelevant to the instant motion.

2               **U.    Equal Protection.**

3         Plaintiffs allege that defendants are violating plaintiffs' rights guaranteed by the Equal

4    Protection Clause of the Fourteenth Amendment.  They claim that low-security condemned

5    inmates receive fewer privileges than low-security non-condemned inmates.  In order to prove

6    an equal protection violation, plaintiffs must show that (i) they have been intentionally treated

7    differently from others similarly situated, and (ii) there is no rational basis for the difference in

8    treatment.  *See Thornton v. City of St. Helens*, 425 F.3d 1158, 1167 (9th Cir. 2005).

9         The June 21 order stated (at 34), "Defendants correctly point out, however, that

10   plaintiffs have not identified a protected class.  Moreover, the privileges plaintiffs are allegedly

11   being denied are not identified . . .  It is impossible to tell whether there is any rational basis for

12   defendants' alleged conduct.  On this record, this argument by plaintiffs must be rejected.  As a

13   result, there is no violation with respect to plaintiffs' equal protection rights."  Accordingly, this

14   order adopts the earlier ruling.

15               **CONCLUSION**

16        Defendants' motion to terminate the consent decree is **GRANTED IN PART AND DENIED**

17   **IN PART**.  The following provisions of the consent decree are terminated, effective immediately:

18               (i)      Meals and hot carts (Consent Decree VI.D.1–2);

19               (ii)     Hobbycraft (Consent Decree VI.G);

20               (iii)    High school education (Consent Decree VI.I);

21               (iv)     Classification (Consent Decree IV);

22               (v)      Staff screening (Consent Decree XI);

23               (vi)     Interruption of access to exercise yards (Consent Decree V.D as

24   modified by Sixth Report of the Monitor);

25               (vii)    Weight benches (Consent Decree VI.A.11 as modified by Sixth

26   Report of the Monitor), jump ropes (Consent Decree VI.A.8 as modified by Sixth

27   Report of the Monitor), ping pong tables (Consent Decree VI.B.2 as modified by

28   Sixth Report of the Monitor), and yard showers (Consent Decree VI.C.2 as

1 modified by Sixth Report of the Monitor);

2        (viii)   Clothing (Consent Decree VI.L.5);

3        (ix)    Number of tier showers (Consent Decree VI.C.1);

4        (x)     Contents of showers (Consent Decree VI.C.5, VI.E.2, and

5 VI.E.8–9 as modified by the Sixth Report of the Monitor45); and

6        (xi)    Group religious services (Consent Decree VI.H).

7 The following provision **SHALL NOT** be terminated:

8        (i)      Out-of-cell exercise (Consent Decree V.A, Consent Decree V.B.2

9 as added by Sixth Report of the Monitor);

10 The following provisions shall be decided following an evidentiary hearing:

11        (i)      Raincoats (Consent Decree VI.E.16).

12        (ii)    Laundry (Consent Decree VI.L.1–2 as modified by Sixth Report of

13 the Monitor);

14        (iii)   Cleaning supplies (Consent Decree VI.J.1–2);

15        (iv)   Birds, rodents, and vermin (Consent Decree VI.J.5);

16        (v)     Noise (Consent Decree XIII as added by Fourth Report of the

17 Monitor);

18        (vi)    Tier telephone (Consent Decree X as modified by Sixth Report of

19 the Monitor);

20        (vii)   Visitation (Consent Decree VII); and

21        (viii)   Access to legal materials (Consent Decree VIII).

22 Ventilation does not need to be addressed because it has never been in the consent decree in the

23 first place; there is no prospective relief to be terminated. This order also finds that there were

24 no equal protection violations.

25      With respect to all issues for which an evidentiary hearing has been ordered, the hearing

26 shall commence at **7:30 A.M.** on **JANUARY 14, 2008**, and continue day to day until completed.

27 All direct testimony shall be submitted by declaration, subject to cross-examination at the

28 evidentiary hearing. Defendants shall file their declarations on **JANUARY 7, 2008, AT NOON**.

1    Any earlier sworn statement may be re-designated but defendants must give notice of each

2    declaration they intend to rely on (doing so by January 17, 2008). Plaintiffs shall file their

3    declarations by **JANUARY 11, 2008, AT NOON.** Defendants shall allow plaintiffs' noise expert(s)

4    reasonable access to the prison to conduct tests on or before **JANUARY 11, 2008.**

5    Plaintiffs' counsel shall depose defendants' noise expert on **JANUARY 8, 2008,** for one day.

6    Any inmates who gave declarations must be brought to the hearing to be available for

7    cross-examination. Please file trial briefs one court day before the evidentiary hearing at noon.

8    Both sides may subpoena witnesses and records to be produced at the hearing, subject to a rule

9    of reason. Declarations need not be filed as to adverse witnesses to be presented by subpoena

10   but a proffer shall be provided stating the evidence expected through the witness.

11            Admittedly, as stated at yesterday's hearing, this schedule will require work over the

12   year-end holidays. This schedule, however, is necessary if the evidentiary hearing is to be done

13   before the mandatory statutory stay becomes effective on January 20, 2008 (18 U.S.C. 3626).

14   If plaintiffs' counsel had filed their opposition addressing the merits of the termination motion

15   on time and had not, at the last minute, unsuccessfully sought a long postponement, oral

16   argument would have occurred on December 6 rather than on December 20. The delay was

17   occasioned to give plaintiffs' counsel one last opportunity to oppose the motion on the merits.

18   Nonetheless, there are ample counsel on both sides. The necessary work can be done on time

19   even if some holiday plans are compromised. All hearings shall be at the federal courthouse.

20            Finally, it is important to advise class members of this order. Please submit an

21   agreed-upon notice before the evidentiary hearing begins. It should make clear that the

22   termination of prospective relief, as ordered above, does not necessarily mean that prison

23   conditions will deteriorate; it only means that prison officials, rather than a federal judge,

24   will supervise the matters in question.

25            **IT IS SO ORDERED.**

26

27   Dated:  December 21, 2007.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

28

33