1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ANDREW LANCASTER, JEFFERY MILLS,
DEXTER WILLIAMS, WILLIAM DENNIS,
STEVE LIVADITIS, JIMMY VAN PELT,
H. LEE HEISHMAN III AND JOHNATON
GEORGE,

        Plaintiffs,

  v.

JAMES E. TILTON, Acting Secretary,
California Department of Corrections and
Rehabilitation, and ROBERT L. AYERS, JR.,
Acting Warden, San Quentin State Prison,

        Defendants.

_____/

No. C 79-01630 WHA

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW
AFTER BENCH TRIAL ON
MOTION TO TERMINATE
CONSENT DECREE**

**INTRODUCTION**

      This is the second installment in a sequence of orders on a motion to terminate a vintage

prison consent decree. Plaintiffs are Death Row inmates. Defendants are the current warden of

San Quentin State Prison and the Secretary of the California Department of Corrections and

Rehabilitation. Based on evidence received by sworn declarations and exhibits, an earlier order

granted in part defendants' motion to terminate the consent decree, leaving some disputed

issues for further fact development. A six-day evidentiary hearing with over thirty witnesses

was then held to determine whether there were any current and ongoing constitutional

violations with respect to the remaining provisions of the consent decree. With respect to

cleaning supplies, shower cleaning, noise, rodents and vermin, this order now holds that either there are current and ongoing constitutional violations or, at a minimum, defendants have not carried their burden to establish the contrary. Nor have defendants shown that these provisions are broader than necessary to cure any constitutional violation. Those provisions cannot, therefore, be terminated now. Defendants, however, have met their burden of showing that there are no current and ongoing constitutional violations for the rest of the provisions. They will be terminated by this order.

## PROCEDURAL HISTORY

The history of this litigation has been recounted in earlier orders, including the order dated December 21, 2007. In brief, this action was commenced in 1979. The parties settled on a consent decree in 1980. Judge Charles Legge inherited the case from Judge Stanley Wiegel and attempted to terminate the consent decree pursuant to the Prison Litigation Reform Act of 1996. The Ninth Circuit reversed for failure to hold an evidentiary hearing. On remand, however, neither side requested an evidentiary hearing and the case languished. After Judge Legge retired, the case was eventually reassigned to the undersigned.[1]

In August 2007, defendants moved to terminate the decree. Due to an interlocutory appeal that was eventually withdrawn, the hearing had to be renoticed in mid-October 2007. Because of the ninety-day period before the PLRA's automatic stay would take effect, the Court gave priority to the motion and divided it into two phases. The first phase, addressed by the December 21 order, focused on determining which provisions of the consent decree could be dealt with on the basis of sworn declarations without live testimony. The second phase addressed the remaining provisions, which required live testimony.

The December 21 order terminated the following provisions of the consent decree: meals and hot carts, hobbycraft, high-school education, classification, staff screening, interruption of access to exercise yards, weight benches, jump ropes, ping-pong tables,

---

[1] The operative consent decree is part of the record herein, filed at Dkt. No. 1320 (defendants' response to order re operative consent decree). The December 21 order is filed at Dkt. No. 1324 (order granting in part and denying in part motion to terminate consent decree, setting evidentiary hearing, and allowing certain discovery).

yard showers, clothing, number of tier showers, contents of showers, and group religious

services.  Many of these provisions were terminated because they exceeded any "Federal right,"

within the meaning of the PLRA, such termination being required by the PLRA.  Others were

terminated because they were not necessary to correct a current and ongoing violation of a

"Federal right."

The December 21 order, however, found a need for further factual development with

respect to the remaining provisions in dispute, *i.e.*, those regarding outdoor exercise, raincoats,

laundry, cleaning supplies, shower cleaning, rodents and vermin, noise, tier telephones,

visitation, and access to legal materials.  As per the PLRA, the hearing was focused on prison

conditions at the time the termination motion was reset — mid-October 2007 — although

evidence both before and after that critical date has, of course, been considered.[2]

With some exceptions, the parties submitted direct testimony by declaration, subject to

live cross-examination at the evidentiary hearing.  Earlier sworn statements were allowed to be

redesignated.  Both sides were allowed to subpoena witnesses and records for the hearing,

subject to a rule of reason.  Even though the December 21 order allowed only some pre-hearing

discovery, the Court required defendants to allow plaintiffs' noise expert reasonable access to

the prison and to allow plaintiffs' sanitation expert to inspect the facilities.  Both inspections

preceded the hearing.  The demands of due process, however, did not require pre-hearing

discovery because the evidentiary hearing itself, including the right to examine and to subpoena

witnesses and documents, provided all the process that was necessary.

The live evidentiary hearing began on January 14, 2008, and lasted over a week.

More than thirty witnesses testified, including a former warden of San Quentin, a former chief

medical officer, and correctional officers who interacted daily with Death Row inmates.

Exhibits included, among many others, a sample mesh laundry bag, bed sheet, raincoat, shower

_____

[2]  The schedule was set with the goal of completing the evidentiary hearing and making these findings
before the mandatory stay of 18 U.S.C. 3626(e) came into effect on January 20, 2008.  As discussed more
thoroughly in the December 21 order, however, plaintiffs' counsel failed to file an opposition that fully
responded to the merits of defendants' termination motion despite being given *three* opportunities to do so,
and made numerous requests to postpone the termination hearing.  Had counsel promptly responded to the
termination motion, it is likely that all findings would have been made within the ninety-day period.

nozzle, photographs of the facilities, and prison records.  The undersigned and his staff visited

San Quentin to take inmate testimony and to view the premises.  Ten condemned inmates

testified.  The undersigned conducted a view of East Block, the main unit of Death Row,

observing both the bay side and yard side of the housing unit.  The undersigned observed the

tiers, cells, exercise yards, showers, supply rooms, rails, prison law library, holding cells used

for library research and visitation, medical gurneys, wheelchairs, tier telephones, and the

East Block tier that housed mentally ill inmates.  The record finally closed on January 22, 2008,

and both sides then proposed findings and conclusions and responded to each side's offerings.

Oral argument was held on February 11, 2008.[3]

* * *

A party may move to terminate prospective relief two years after the date of enactment

of the PLRA, which was in 1995.  Under 18 U.S.C. 3626(b):

> (2)  Immediate termination of prospective relief — In any civil
> action with respect to prison conditions, a defendant or intervener
> shall be entitled to the immediate termination of any prospective
> relief if the relief was approved or granted in the absence of a
> finding by the court that the relief is narrowly drawn, extends no
> further than necessary to correct the violation of the Federal right,
> and is the least intrusive means necessary to correct the violation
> of the Federal right.

> (3)  Limitation — Prospective relief shall not terminate if the court
> makes written findings based on the record that prospective relief
> remains necessary to correct a current and ongoing violation of the
> Federal right, extends no further than necessary to correct the
> violation of the Federal right, and that the prospective relief is
> narrowly drawn and the least intrusive means to correct the
> violation.

Under the PLRA, courts cannot grant or approve relief that binds prison administrators to do

more than the constitutional minimum.  *Gilmore v. California*, 220 F.3d 987 (9th Cir. 2000).

Moreover, "any 'prospective relief' that exceeds the constitutional minimum must be

---

[3]  Although numerous proposed findings were submitted and considered, this order finds its own way
and makes its own findings rather than picking and choosing between the competing versions.  That a proposed
finding has not been expressly incorporated does not necessarily mean that it has been rejected; rather it means
that this order has found it unnecessary to adopt or reject it per se.  This order also adopts all stipulated facts and
adopts all proposed post-trial findings to the extent (and only to the extent) expressly admitted by the other side
in its response thereto.  It is unnecessary for this order to cite the record and it will not do so except to
particulars that may assist the court of appeals.

terminated regardless of when it was granted." *Id.* at 999. When moving to terminate a consent decree, however, defendants bear the burden of proving that no current and ongoing violation of a constitutional right exists. *Id.* at 1007.

Plaintiffs oppose the motion on the basis that defendants have failed to meet the evidentiary burden set forth in *Gilmore*. With respect to cleaning supplies, shower cleaning, noise, and rodents and vermin, this order holds that defendants have failed to show there are no current and ongoing constitutional violations and failed to show the provisions are broader than necessary. On the other hand, defendants have met their burden for the other provisions in dispute, which are hereby terminated. If conditions degenerate to unconstitutional levels, a new action or motion may address the specific problem.

The Eighth Amendment prohibits cruel and unusual punishment. The Supreme Court has held that a prison official violates the Eighth Amendment only when two requirements are met: (i) "the deprivation alleged must be, objectively, 'sufficiently serious'"; and (ii) the prison official must have a state of mind that is one of "'deliberate indifference' to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). For the first prong, the "prison official's act or omission must result in the denial of 'the minimal civilized measure of life's necessities.' For a claim . . . based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Ibid*. For the second prong, the Supreme Court adopted a subjective standard to assess deliberate indifference: "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. Even if prison officials had the requisite knowledge, they would not be held liable if they responded reasonably to the risk (*Farmer*, 511 U.S. at 844–45):

> [P]rison officials who actually knew of a substantial risk to inmate
> health or safety may be found free from liability if they responded
> reasonably to the risk, even if the harm ultimately was not averted.
> A prison official's duty under the Eighth Amendment is to ensure
> "reasonable safety," a standard that incorporates due regard for
> prison officials' "unenviable task of keeping dangerous men in

safe custody under humane conditions."  Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause.

There are, however, two complications.  *First*, plaintiffs seek injunctive relief and not money damages.  According to *Farmer*, 511 U.S. at 845–46:

> In a suit [seeking] injunctive relief to prevent a substantial risk of serious injury from ripening into actual harm, "the subjective factor, deliberate indifference, should be determined in light of the prison authorities' current attitudes and conduct" [*i.e.*,]  their attitudes and conduct at the time suit is brought and persisting thereafter.  An inmate seeking an injunction on the ground that there is "a contemporary violation of a nature likely to continue," must adequately plead such a violation; to survive summary judgment, he must come forward with evidence from which it can be inferred that the defendant-officials were at the time suit was filed, and are at the time of summary judgment, knowingly and unreasonably disregarding an objectively intolerable risk of harm, and that they will continue to do so; and finally to establish eligibility for an injunction, the inmate must demonstrate the continuance of that disregard during the remainder of the litigation and into the future.  In so doing, the inmate may rely, in the district court's discretion, on developments that postdate the pleadings and pretrial motions, as the defendants may rely on such developments to establish that the inmate is not entitled to an injunction.  If the court finds the Eighth Amendment's subjective and objective requirements satisfied, it may grant appropriate injunctive relief.  Of course, a district court should approach issuance of injunctive orders with the usual caution, and may, for example, exercise its discretion if appropriate by giving prison officials time to rectify the situation before issuing an injunction.

Put briefly, in an action for injunctive relief against alleged Eighth Amendment violations, inmates may therefore rely on developments after the pleadings and pretrial motions to demonstrate a continuing disregard for an objectively intolerable risk of harm.

*Second*, given that this is defendants' motion to terminate, *Gilmore* holds that the burden of proof is on defendants.  The main question is thus whether defendants have shown that there is no current and ongoing constitutional violation, taking into account the *Farmer* proviso for injunctive relief.[4]

---

[4]  Defendants assert that plaintiffs are required to demonstrate that defendants' conduct resulted in an actual injury or presents an immediate threat of actual injury.  They cite *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983), and *Rizzo v. Goode*, 423 U.S. 362, 372 (1976), for this proposition.  Neither decision applies because they were not prison cases; *Lyons* and *Rizzo* dealt with Article III standing in civil rights actions against police officers.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

As stated, the PLRA and *Gilmore* set the date of the motion to terminate as the decisive measure for assessing the prison conditions. In making this evaluation, evidence as to earlier and later conditions must be examined, it being impossible to gather evidence exactly on the date in question. The findings below often speak in the present tense but are intended to speak to the critical date here involved — mid-October 2007. If a temporal difference must be drawn, it will be noted below.

1.      Opened in 1852 and currently housing 631 condemned inmates and thousands of other prisoners, San Quentin is the oldest prison in California. Within its sprawling waterfront complex, there are three "Death Rows": North Segregation, East Block, and the Adjustment Center. Sometimes the housing units are referred to as Security Housing Units (or "SHUs"): SHU I is North Segregation, SHU II is East Block, and SHU III is the Adjustment Center.

2.      San Quentin classifies condemned inmates as follows: Grade A (inmates without a high violence or escape potential), Grade B (inmates with a high escape or violence potential or who otherwise constitute a serious disciplinary case), and "walk-alones" (inmates who would otherwise be classified as Grade A but who are disliked by the Grade A population).

3.      East Block, a looming warehouse-like structure constructed in 1930, is home to about five hundred condemned inmates — 440 Grade A inmates and 50 Grade B inmates. East Block is about two football fields long, forty yards wide, and six stories high. It is like a giant empty warehouse into which a smaller five-story concrete structure has been concentrically placed — a structure within a structure. The five-story structure is the cell block. Each floor of the cell block is called a "tier." One long side faces the bay. The other faces the yard. On each long side of each tier, there are about 54 adjacent cells, for a total of over 250 per side and over 500 counting both sides. Each cell is fully enclosed by concrete, with a grated metal door that adjoins a narrow walkway running the length of the tier. "Tier" is also used to refer not only to the floor but to the walkway itself. Inmates can look through the grated cell door into an open separation between the cell block and the exterior wall. They can see the exterior wall and its windows. Each cell measures six feet by eight feet and is occupied by only one inmate. Armed

7

officers patrol along narrow gun rails built into the outer wall. There is an upper and lower gun rail, each making a full rectangular circuit along the four exterior walls. The guards look across the open separation into the cells.

4. Sixty-eight condemned inmates reside in North Segregation, a smaller, quieter cell block that was built in 1934. The number of condemned inmates outpaced the housing capacity of North Segregation, which was the original Death Row. North Segregation currently only houses Grade A inmates.

5. The most violent offenders tend to live in the Adjustment Center. There are 85 Grade B inmates now in the Adjustment Center. Seventeen of them are non-condemned.

6. Enhanced Out Patient ("EOP") inmates include condemned and non-condemned inmates who participate in the prison's mental health system. There are thirteen EOP inmates in East Block, seven of whom are condemned. All thirteen are concentrated in one part of one side of a tier in East Block.

7. About thirty non-condemned prisoners live in Administrative Segregation in East Block. Administrative Segregation is temporary housing for inmates who either have security problems, are switching housing, or are suspected of having violated prison rules. (Unlike the inmates in Administrative Segregation, condemned inmates are disciplined, in part, by being reclassified. Reclassification leads to a restriction in privileges.)

                    *          *          *

This order will now turn to the provisions in dispute: visitation, tier telephones, outdoor exercise, raincoats, access to legal materials, noise, laundry, cleaning supplies, rodents and vermin, and the maintenance of showers and tiers.

### A. VISITATION.

8. The consent decree provides (Consent Decree VII):

> Grade A inmates will be eligible for contact visits Wednesday through Monday in the visiting area now used by inmates housed in SHU III. Visitor eligibility shall be determined on the same basis as exists for the general prison population. Although defendants cannot guarantee a minimum number of visits per inmate per month, defendants agree to make good faith efforts to maximize visiting opportunities. Facilities for such visiting are to be shared equally by the two units. A bassinet will be provided.

8

This decree does not address or decide the question of so-called conjugal/trailer/family visiting. Any positions and/or rights of either plaintiffs or defendants are expressly reserved and are unaffected by this decree. Defendants will provide screens, or a suitable substitute, on two sides of the visiting rooms to be used for contact visiting, between those rooms and the general visiting area. Consideration shall be given, in scheduling visits, to the number of visits an inmate receives and the distance visitors must travel. Visits are by appointment for a minimum of two and one-half hours, subject to space availability. Longer minimum visits may be obtained by prior arrangement in the case of those visitors who must travel over 200 miles. Maximum length of visit is subject to space availability.

9. The prison allows inmates regular non-contact visits. Contact visits are allowed on a limited basis. Visitation privileges are restricted for violations of prison rules or if an emergency arises. Only one inmate testified to having had problems with arranging visits with family members. Other than occasional glitches, as would be inherent in any system, San Quentin's visitation system works smoothly. The details follow.

10. As of October 2007, under prison policy, all condemned inmates are allowed regular visits with friends, family, and legal counsel. Grade A inmates are entitled to contact visits for two-and-a-half hours. They may have longer visits if their visitor travels over 250 miles to San Quentin. Grade B inmates, on the other hand, are not allowed contact visits; they must remain in a booth behind glass and are allotted one hour for visiting. On Thursdays, fifteen Grade A inmates can receive contact visits and six Grade B inmates can receive non-contact visits. Five Grade A inmates and six Grade B inmates can receive contact visits on Fridays. Up to ninety-two condemned inmates can receive visits on Saturdays and Sundays.

11. Violations of prison rules or emergency situations, however, do lead to restrictions on visiting. For example, the prison cancelled visitation between December 28, 2006, and January 16, 2007, to suppress a serious outbreak of norovirus in San Quentin.

12. Violations that result in visiting restrictions include: "visiting related misconduct," such as when an inmate is "overly affectionate" with his visitor (thirty days suspension); a first or second violation of possession of a controlled substance, possession of at least five dollars without authorization, visiting-related violations presenting a threat, or serious or repeated violations of the visiting regulations or procedures (ninety days suspension); third or

9

1    subsequent violation of possession of a controlled substance, or escape attempt (180 days

2    suspension); or trafficking of a controlled substance (one year).

3         13.    There are few complaints about visitation privileges.  Inmate Cleamon Johnson

4    was the only witness who complained about inmates' visiting privileges.  He stated, "The phone

5    is usually busy or unanswered.  Just before I came to the [Adjustment Center] in October 2007,

6    my parents and my son traveled here from Los Angeles after calling and being told that a visit

7    was scheduled.  When they got here they were told a visit was not scheduled, and they were

8    turned away.  This has happened twice in the last two years."  This was an isolated,

9    unfortunate snafu.

10        14.    Turning to the law, while inmates are not entitled to contact or conjugal visits,

11   the withdrawal of all visitation privileges on a permanent basis or for a much longer period, or if

12   it were applied in an arbitrary manner to a particular inmate, "might" lead to an Eighth

13   Amendment violation.  *Overton v. Bazzetta*, 539 U.S. 126, 136–37 (2003).  Assuming *arguendo*

14   that it would lead to an Eighth Amendment violation, this order holds that defendants have met

15   their *Gilmore* burden to show that there are no current and ongoing constitutional violations

16   regarding visitation.  There has been no objectively serious deprivation.  Although the system

17   may not work smoothly all the time, it does so almost all of the time and defendants have shown

18   that they do not withdraw visitation privileges on a permanent or long-term basis.  Nor do they

19   do so in an arbitrary fashion.  As a matter of fact, even though it is not constitutionally required,

20   contact visits are allowed on a limited basis.  This provision is hereby terminated without

21   prejudice to a future motion or action for new injunctive relief if conditions degenerate to

22   unconstitutional levels.

23                       **B.    TIER TELEPHONES.**

24        15.    The consent decree requires that "[d]efendants will provide a pay telephone,

25   for collect calls, on the tiers for use by Grade A condemned inmates subject to reasonable rules

26   and regulations as to that telephone's use" (Consent Decree X as modified by Sixth Report of the

27   Monitor at 58).

28

16.     By way of summary, inmates have complained that tier telephones are occasionally broken.  Telephone privileges, however, may be restricted to strike a reasonable balance between providing inmates access to telephones and maintaining prison security, remembering that all on Death Row have committed at least one first-degree murder.  Furthermore, when telephones are reported broken, the prison calls a technician to repair the phone within a few days.  The details now follow.

17.     Grade A inmates are allowed to make collect, non-confidential calls to people outside of the facility.  Grade A inmates in East Block can sign up for fifteen-minute sessions between the times of 7:30 a.m. and 9:00 p.m.  In East Block, the tier telephones are on carts with wheels.  Prisoners operate them through an opening in the metal grated door.

18.     In Summer 2007, San Quentin upgraded its phone system.  As part of the upgrade, an additional telephone was added to each tier in East Block, doubling the number of phones available to class members in East Block.  During the two months after the upgrade, the second tier telephone would sometimes not work for a few days at a time.  Since then, the problem has been corrected.  Since October 2007, all of the tier telephones in East Block are and have been fully operational.

19.     Global*Tel Link owns and maintains the tier telephones.  It makes monthly inspections.  If a tier telephone does not work during a phone call, the inmate reports the problem to an East Block housing officer, who then reports the problem to Global*Tel Link.  Global*Tel Link sends a technician to the prison to make repairs.

20.     Global *Tel Link generates a "trouble ticket" each time a call is received from San Quentin and each time a technician inspects the tier telephones.  The trouble ticket includes the following information:  the tracking of the trouble ticket number, the date the ticket was opened, the date the ticket was closed, the trouble reported, and the actions taken by the technician.  Trouble tickets generated for the East Block tier telephones covering January 4, 2007, through January 4, 2008, show that a technician was on site and made repairs within one to three days from the date the ticket was opened.

21.     Tier telephones are available every day of the week except when they are out of order. If both tier telephones are out of service and an inmate has a verifiable emergency (*e.g.*, a death in the family), the inmate may make a collect call from the lieutenant's office. This rarely occurs, however.

22.     The inmates in North Segregation can sign up for telephone use between 7:30 a.m. and 1:30 p.m. There, the tier telephones are fixed to the wall along the tier.

23.     Adjustment Center inmates, who have the highest propensity for violence, do not have regular access to tier telephones. Even after the phone upgrade in Summer 2007, the Adjustment Center still has only one tier telephone per tier. The Adjustment Center is comprised entirely of Grade B inmates, who are only allowed to use telephones in exceptional circumstances, such as a family emergency.

24.     Tier telephones are heavily used. Sometimes inmates misuse them in ways that may sabotage other inmates' access. Some inmates complain about tier telephones often being broken. Inmate Steve Crittenden, for example, testified that the telephone on his tier "has been broken for at least three weeks. [He] and other inmates have asked at least every other day to get the phone fixed. On January 2, 2008, [he] asked the Unit Sergeant about getting the phone fixed. [The Unit Sergeant] said that he called 'them' and they will come fix it whenever they come." Inmate Louis Zaragoza stated that "[o]ften you call and you can hear the person but they can't hear you. Many times there is a short in the cord and the call is interrupted. When the phones are broken it usually takes three weeks to a month to get them fixed again."

25.     Turning to the law, prisoners have a First Amendment right to telephone access. This right, however, is "subject to reasonable limitations arising from the legitimate penological and administrative interests of the prison system." *Johnson v. California*, 207 F.3d 650, 655 (9th Cir. 2000). The reasonableness of the limitation is determined by four factors. *First*, is there a valid rational connection between the restriction and the legitimate governmental interest put forth to justify it? *Second*, are there alternative means of exercising the right? *Third*, would accommodating the asserted constitutional right have a significant negative impact on prison guards and other inmates? *Fourth*, are there any obvious easy alternatives to the restriction

1   showing that it was an exaggerated response to prison concerns? *Valdez v. Rosenbaum*, 302 F.3d

2   1039, 1048–49 (9th Cir. 2002).

3        26.     All four factors are satisfied. *First,* there is a valid rational connection between

4   restricting telephone access and the legitimate governmental interest of security to justify the

5   restriction. Although inmates must sign up for fifteen-minute sessions between certain time

6   periods, telephones are still available every day of the week (unless they are broken). Signing up

7   is necessary, given the fact that telephones are heavily used. Furthermore, the prison responds

8   reasonably to inmate complaints about broken phones; the prison reports the problem to

9   Global*Tel Link, which sends a technician to repair the phone within one to three days.

10  Phones inevitably will be out of order due to frequent use and, in some cases, inmate abuse.

11  *Second*, inmates have alternative means of exercising their right to communicate with persons

12  outside of the prison. They can receive visitors at the prison and send and receive mail.

13  *Third*, allowing inmates unrestricted telephone access would require defendants to allocate

14  additional resources to monitor inmates, provide phones, and ensure that phones were not being

15  misused. *Fourth*, there are no obvious, easy alternatives to the security restriction.

16       27.     This order concludes, as of the date of the motion to terminate, that no current and

17  ongoing constitutional violations of telephone access existed. There has been no objectively

18  serious deprivation within the meaning of *Farmer*. A security interest arises from the fact that

19  Death Row inmates have all been convicted of severe crimes. Communications with associates

20  on the outside present a risk that telephones would be used to plan additional crimes, such as the

21  elimination or intimidation of witnesses. This means that all phone calls (except those with

22  counsel) must be monitored. This taxes resources. Inmates do not seem to complain about

23  monitoring or limited windows for calls. Rather, the main complaint is that the telephones are

24  occasionally broken and require time to repair. Defendants have shown, however, that they have

25  adopted a reasonable response to this problem. There is no unreasonable restriction of telephone

26  access. The prison provides tier telephones to all housing units with condemned inmates. It has

27  also explained how the telephone system works, how it is repaired, and why repairs may have

28  been delayed following the phone upgrade. No system is ever perfect, and the occasional

13

problems discussed above do not rise to the level of a constitutional violation. This provision is no longer necessary and is therefore terminated hereby without prejudice to a future motion or action for new injunctive relief if conditions degenerate to unconstitutional levels.

### C.    ACCESS TO LEGAL MATERIALS.

28.    The consent decree states: "Solely because inmates condemned to death have an immediate and continuous need for legal research materials, the following basic legal materials will be made available within the unit, and kept current: a. California Jurisprudence, 3rd Series, . . . b. West's California Digest, . . . c. West's Federal Practice Digest, . . . d. U.S.C.A., Title 28, . . . e. U.S.C.A., Title 42, . . . f. West's California Penal Code, Annotated, 7 volumes. Such material will be available to condemned inmates on a check-out basis" (Consent Decree VIII).

29.    Although inmates complain of some missing items and outdated legal resources, the prison law library and pocket libraries contain all legal materials required by the Ninth Circuit. Moreover, Death Row inmates have outside counsel to aid in their appeals and federal habeas actions. The prison has not unconstitutionally impeded inmates' access to the courts.

30.    As of October 2007, condemned inmates could access legal materials through the main law library or the smaller "pocket" libraries in their respective housing units. The law library and pocket libraries in North Segregation, East Block, and the Adjustment Center contain all legal reference materials required by the Ninth Circuit in *Gilmore*. The San Quentin main law library has five terminals with Westlaw Premise Access, software that gives the user the ability to access West CD-ROM libraries or Westlaw's online legal research. Materials from these databases can be delivered to condemned inmates usually within one day when requested. The undersigned conducted a view of the main law library. Librarian Douglas Jeffrey testified to its operation at trial.

31.    After filling out the "segregation legal library access application form," inmates can visit the main law library Monday through Friday, 2:30 p.m. to 4:30 p.m. (afternoon session) and 6:00 p.m. to 8:00 p.m. (evening session). Inmates with "verifiable legal deadlines" have

priority. Up to twelve condemned inmates can visit the law library for up to two hours each. Inmates stay in separate holding cells somewhat like a library carrel, each with a work table, and may request legal reference materials from the librarian.

32. Inmates' access to the main law library is rarely interrupted. In the past year, Librarian Jeffrey could only recall five to ten cancellations (when the inmates were unable to access the library). During these cancellations, he was still available for "paging" — *i.e.*, he would go back and forth between the housing units and the law library to make copies of legal reference materials for inmates.

33. All Death Row inmates have counsel for their appeals and federal habeas proceedings. No inmate herein has complained that the prison obstructed their access to counsel.

34. A few class members have complained about the library system. Inmate Johnson testified about the access (or lack thereof) to legal materials. He stated, "Legal books are outdated. We do not have access to current law." Inmate Richard Phillips stated that there was no paging system in the Adjustment Center or access to the law library. He also said that materials in the law library were "limited, out of date or unavailable." They also complain that all seven volumes of West's Penal Code, which are required by the consent decree, could not be found in June 2007. Whether this meant that only six could be found or that all seven had vanished is unclear. In October 2007, however, when defendants sought to terminate the consent decree, Librarian Jeffrey stated under oath that all seven volumes were available in the library. This order credits his testimony fully and finds that all seven copies were available in October 2007.

35. The Supreme Court has held that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries *or* adequate assistance from persons trained in the law." *Bounds v. Smith*, 430 U.S. 817, 828 (1977) (emphasis added). "A prisoner contending that his right of access to the courts was violated because of inadequate access to a law library must establish two things: *First*, he must show that the access was so limited as to be unreasonable. *Second*, he must show that the inadequate

15

access caused his actual injury, *i.e.*, show a specific instance in which [he] was actually denied access to the courts." *Vandelft v. Moses,* 31 F.3d 794, 796–97 (9th Cir. 1994).

36. Defendants have carried their burden to show that there are no current and ongoing constitutional violations with respect to class members' access to adequate law libraries or adequate assistance from persons trained in the law. The deprivation alleged was minor. Defendants have shown that the law library and pocket libraries contain all materials required under the Constitution. Defendants have also shown a library system whereby inmates may request legal reference materials from the prison librarian. Although some law books may have been outdated or missing earlier, access was not so limited as to be unreasonable. By October 2007, all necessary materials were available in the prison library. The electronic database, moreover, allows prisoners to access copies of the California Penal Code and many other resources. (The electronic database was not available when the decree was framed decades ago.) The foregoing is sufficient but it is important to remember that all Death Row inmates have attorneys for their direct review and federal habeas cases and have access to their counsel in this case as to prison conditions. In turn, their counsel have access to law libraries of their own. The legal-materials provision of the consent decree is now terminated without prejudice to a future motion or action for new injunctive relief if conditions degenerate to unconstitutional levels.

### D. OUTDOOR EXERCISE.

37. The consent decree provides:

> Inmates will be provided with outdoor exercise at least 3 days per week. The outdoor exercise time will be apportioned among the inmates in SHU II [East Block] so as to provide as much outdoor exercise as possible to each inmate. So long as non-condemned inmates are housed in SHU II [East Block], the following shall be the minimum weekly yard exercise periods: Grade A yard: 9 hours; Grade B yard: 9 hours; Walk-alone yard: 3 hours. When only condemned inmates are housed in SHU II [East Block], the following shall be the minimum weekly yard exercise periods: Grade A yard: 12 hours; Grade B yard: 12 hours; Walk-alone yard: 12 hours (Consent Decree V.A.1–4).

38. The decree further requires: "Grade A inmates in East Block shall be allowed access to adequate exercise areas, which are equipped with a covering for protection from inclement weather, between the hours of 7:30 a.m. and 1:30 p.m. Exercise yard access will be

offered to the Grade A inmates in East Block seven (7) days per week, regardless of weather conditions, except during dense fog" (Consent Decree V.B.2 as added by Sixth Report of the Monitor at 24).

39.     As of October 2007, North Segregation condemned inmates (who are all Grade A) are normally offered at least twelve hours per week of outdoor exercise.  They can also access the tier area in front of their cells between 9:00 a.m. and 2:30 p.m. every day.  East Block Grade A inmates are offered about six hours of outdoor exercise every day.  East Block Grade B inmates get three hours of outdoor exercise, three days per week (nine hours total). Adjustment Center inmates (who are all Grade B) are offered approximately three hours of outdoor exercise three days per week (nine hours total).

40.     Exercise privileges are subject to safety and security concerns.  Violence or inclement weather like thick fog may restrict exercise periods.  For example, on August 27, 2006, yard time was suspended in the Adjustment Center due to an attempted murder.  Most of the inmates were allowed to return to the exercise yard by September 6, 2006, but a few Adjustment Center inmates were denied outdoor exercise for up to forty days because they refused to comply with orders to exit their cells during the investigation following the attempted murder.  Over the last two years, exercise has never been suspended in East Block for more than four days or in North Segregation for more than one day.

41.     As stated in the December 21 order, inmates are constitutionally entitled to outdoor exercise.  "Deprivation of outdoor exercise violates the Eighth Amendment rights of inmates confined to continuous and long-term segregation." *Keenan v. Hall*, 83 F.3d 1083, 1090 (9th Cir. 1996).  In *Lopez v. Smith*, 203 F.3d 1122, 1133 (9th Cir. 2000), the Ninth Circuit held that the plaintiff inmate met the Eighth Amendment's objective requirement when he was denied all access to outdoor exercise for six-and-a-half weeks.

42.     This order concludes that defendants have met their burden:  there are no current and ongoing constitutional violations with respect to outdoor exercise.  There was no objectively serious deprivation of prisoners' access to outdoor exercise within the meaning of *Farmer*. Inmates from all housing units are afforded regular outdoor exercise every week.  Rarely is

outdoor exercise suspended.  When exercise is suspended, there is a legitimate security

(or weather) issue — such as the attempted murder in summer 2006.  This provision is hereby

terminated without prejudice to a future motion or action for new injunctive relief if conditions

degenerate to unconstitutional levels.

### E.  RAINCOATS.

43.    Another provision of the consent decree states that "[r]aincoats, for use during

yard exercise, will be available in the unit" (Consent Decree VI.E.16).

44.    The prison must provide inmates with raincoats in inclement weather.

San Quentin did not have raincoats at the time defendants' motion to terminate was filed,

but that was before the rainy season.  By the time the rainy season arrived in December 2007,

the prison had acquired and provided inmates with a sufficient supply of raincoats as needed.

45.    There are currently 320 raincoats stored in East Block's local supply, 70 raincoats

stored in North Segregation's local supply, and 36 raincoats stored in the Adjustment Center's

local supply.  Raincoats are made available to all inmates before they enter their respective

exercise yards during inclement weather.

46.    The raincoats provided to inmates are ponchos.  They are made of clear,

thick plastic, with a hood for the head, and cover the inmates' upper body.

47.    About 50 percent of each East Block exercise yard is covered by a roof (with

open sides) and about 75 percent of each North Segregation exercise yard is covered.  Raincoats

are not needed where exercise yards are covered.  The Adjustment Center exercise yards do not

have inclement-weather roofs.  Because the Adjustment Center exercise yards do not have

covers, raincoats are needed there (but are available anyway).  Raincoats are, however,

available for outdoor use during rain.

48.    For all condemned inmates, going to the main law library means that they must go

outside.  If they get rained on, they may have to sit in wet clothes for two-and-a-half hours

before they return to their cells.  They therefore need raincoats during the rainy season.

49.    This order takes judicial notice of the fact that there were only about two inches

of rain for all of October 2007 in the San Quentin area.  Raincoats were not yet necessary at the

1  time.  The rainy season did not start until after defendants had filed their motion to terminate.

2  The prison provided raincoats when they were needed — *i.e.*, when the rainy season started in

3  December 2007.

4        50.    San Quentin did not have an adequate supply of raincoats for the previous rainy

5  season.  This was cured by December 2007 and remains cured at the time of this order.

6        51.    Under the law, prison officials must provide humane conditions of

7  confinement — they must "ensure that inmates receive adequate food, clothing, shelter, and

8  medical care." *Farmer*, 511 U.S. at 832.  For example, the Ninth Circuit suggested that

9  depriving an inmate of a jacket could violate the Eighth Amendment under extreme weather

10  conditions. *Johnson v. Lewis*, 217 F.3d 726, 731–32 (9th Cir. 2000).

11        52.    This order concludes that, as of October 2007, there was an adequate supply of

12  raincoats (because raincoats were not needed at the time).  When the rainy season began,

13  prisoners were provided with raincoats.  Defendants have met their burden in showing that no

14  current and ongoing constitutional violation exists with respect to raincoats.  This provision is

15  terminated without prejudice to a future motion or action for new injunctive relief if conditions

16  degenerate to unconstitutional levels.

17                **F.**    **NOISE.**

18        53.    The consent decree provides (Consent Decree XIII as added by Fourth Report of

19  the Monitor at 57):

> Defendants shall undertake and continue measures to limit the
> levels of noise prevailing in five-tier cell blocks used to house
> condemned prisoners at San Quentin.  The following specific
> measures shall be undertaken and continued unless and until
> defendants reduce the noise to acceptable levels by alternate
> means:  (1) Inmates in such five-tier cell blocks shall not be
> permitted to employ any loudspeaking device, including, for
> example, those devices included in televisions, radios, and
> stereophonic equipment, unless the device is incapable of
> producing sound noticeably audible to any person outside the cell
> of the person using the device.  (2) Defendants shall install and
> maintain sound-absorbing wall coverings in all such five-tier cell
> blocks.  (3) Defendants shall provide each condemned inmate
> housed in a five-tier cell block with a set of medically approved
> sound exclusion devices such as, for example, earplugs.
> If earplugs are used, they shall be issued monthly.

19

54.     Prisoners complain about what they consider to be "excessive noise" in East Block, the main housing unit of Death Row.  The noise emanates from mentally ill inmates (*i.e.*, the Enhanced Out Patients), alarms, the public address system, and renovation.  Although a bustling facility, East Block is not excessively noisy, except in the immediate area where mentally ill prisoners are concentrated, as now detailed.

55.     In East Block, Grade A prisoners spend approximately eighteen hours in their cells per day.  Grade B prisoners spend about 159 hours in their cells per week.  Almost every cell has cable and a television.  All prisoners must listen to their televisions or audio devices, if at all, via earphones, and this rule is widely honored in practice.

56.     All of the EOP inmates are housed in a concentrated subsection on the first tier, yard side, where the offices of mental health staff are located.  EOP inmates occasionally yell and scream during the day and night.  They bang on the bars and on items in their cells. This provokes other EOP inmates to start ranting and prison staff to shout down the loud inmates.  Like all cells in East Block, their cell doors face into the open separation.  Racket within the EOP cells easily fills the adjoining areas and bounces off the exterior wall.

57.     Noise also comes from alarms that sometimes go off, construction, mechanical equipment, the public address system, chains, lead-removal renovation, and occasional inmates violating noise restrictions when using their television or radio.

58.     There are no clear standards for noise exposure in adult correctional facilities. The American Conference of Governmental Industrial Hygienists established a Threshold Limit Value ("TLV") guideline for exposure to noise over a twenty-four hour period of 80 dBA. The TLV refers to sound pressure levels and durations that represent conditions under which workers may be exposed without permanent adverse effects to their hearing abilities. This, however, is a standard for *workers*, not inmates in a prison.

59.     The United States Environmental Protection Agency also published noise guidelines entitled "Information on Levels of Environmental Noise Requisite to Protect Public Health and Welfare with an Adequate Margin of Safety."  The EPA views 70 dBA as the upper noise threshold for environments to prevent a serious risk of hearing loss.  It also views 45 dBA

as the upper noise threshold for interior environments during the day and 35 dBA during the night to permit adequate communication by speech and cognitive activity and to prevent interference with sleep. These levels, however, specifically apply to *private dwellings* and not to prison housing units.

60.     Within East Block, the average noise level ranged from approximately 66–75 dBA during the day and 55–64 dBA during the night (10:00 p.m. to 5:00 a.m.). Experts from both parties agree on the range of noise levels. The noise is noticeably concentrated on the first-tier, yard side of East Block, where EOP inmates are housed. The noise level is lower in the rest of East Block, but noise is an issue throughout the facility.

61.     There are sound-dampening acoustic panels that extend from the lower gun rail to the ceiling in East Block. Three panels exist between each window in East Block. Extra insulation was added to the ceiling to reduce noise levels there. Temporarily, however, the ceiling is blocked by scaffolding and a facility-wide platform needed for a lead-removal renovation. Noise levels may be higher than normal as a result. The renovation itself adds to the noise.

62.     Each housing unit is supposed to provide ear plugs for any inmate who requests them. Ear plugs, however, are not always readily available to prisoners upon request. Prison records show that out of 65,000 prisoner days, prisoners were issued earplugs on only 108 occasions. The ear plugs used by the prison are supposed to reduce noise by 33 dBA (in testing conditions). In the "real world," however, the reduction is between 9–10 dBA. Because the ear plugs are intended to be disposable, multiple usage further reduces their effectiveness.

63.     The noise levels in East Block are unlikely to result in permanent hearing loss or impairment for the majority of inmates. Nonetheless, excessive noise can still cause psychological and physiological stress and disrupt sleep in the EOP area of East Block. The noise can also provoke EOP inmates and negatively affect their mental health. Seven of the EOP inmates in East Block are class members.

64. According to the law, "public conceptions of decency inherent in the Eighth Amendment require that [inmates] be housed in an environment that, if not quiet, is at least reasonably free of excess noise." *Keenan*, 83 F.3d at 1090. The level of noise is considered extreme when it "adversely affects their hearing and mental processes. Constant exposure to such a level of noise inflicts pain without penological justification." *Toussaint v. McCarthy*, 597 F. Supp. 1388, 1397–98 (C.D. Cal. 1984), *affirmed in part* (including the parts regarding noise) *and reversed in part*, 801 F.2d 1080, 1114 (9th Cir. 1986), *cert denied*, 481 U.S. 1069 (1987).

65. The impression urged by plaintiffs' counsel is that East Block is bedlam. That is not true. Overall, it is an active and bustling facility. But problems do persist. Excessive levels of noise predominate in the EOP section and ear plugs are not sufficiently available. Given these problems and the robust sound readings, this order concludes that defendants have not carried their burden of proof. Defendants have failed to show there is no current and ongoing constitutional violation and they have failed to show that the provision is broader than necessary to address the violation. This provision will remain in effect throughout Death Row.

### G. LAUNDRY.

66. Under the consent decree, "[i]nmates shall be permitted exchange of towels and whites on the same basis as the general population. Inmates will be offered an exchange of blues and sheets once every two weeks. Incoming inmates will be provided with a clean pillow and mattress. All pillows, mattresses and blankets issued to inmates shall be clean. Jackets and blankets will be cleaned, on request, not to exceed once every six months" (Consent Decree VI.L.1–4 as modified by Sixth Report of the Monitor at 45).

67. The "exchange" system no longer exists and has been largely replaced by a laundry-bag system. At issue is the efficacy of the new system. This order finds that although some prisoners complain about missing items of laundry or unclean returns on occasion, the laundry system at San Quentin is professional and hygienic. The main problem results from inmates' closing their bags incorrectly. These problems are sporadic and do not rise to an unconstitutional level, as now detailed.

68.     All condemned inmates now use a mesh-bag system.  North Segregation and East Block inmates (but not Adjustment Center inmates) are issued their own mesh bags.  The mesh bags are about forty inches by twenty-four inches with an open top.  An exemplar is Exhibit 504.  Inmates place their laundry in mesh bags, tie off the top, and turn them over to the unit laundry officer for processing.  Each bag has a tag with the inmate's housing information written on it.

69.     Officers collect inmate laundry on Monday afternoons.  Laundry includes blues and whites.  Laundry is picked up and delivered to California State Prison-Solano on Tuesday mornings.  Clean laundry is returned to San Quentin and distributed to inmates on Thursdays.[5]

70.     Condemned inmates' laundry arrives at Solano in large plastic carts with locking steel tops.  Some of the laundry is contained in large mesh bags either knotted at the top or closed with a rubber tie.

71.     After the carts are rolled off the truck, they are weighed.  The "dirty" weights are recorded in a log.  After the items are laundered, the clean laundry is reloaded into the carts and re-weighed.  The "clean" weights are recorded alongside the "dirty" weights in the aforementioned log.  Because dirty laundry weighs more than clean laundry, "dirty" and "clean" weights are not expected to be identical; they must, however, be within ten to fifteen percent of each other.  This is done as a means of ensuring that the same laundry that comes into Solano is returned to the inmates.

72.     After the laundry carts are weighed, they are unlocked and unloaded.  Carts with loose, dirty clothing items are taken to an area for counting.  The total number of each different type of clothing item is recorded in a log.

73.     Mesh bags of laundry are sorted according to color (blue or white) and washed separately.  Mesh bags are never opened.  If an inmate accidentally puts blue and white clothing together in the same mesh bag, the laundry is washed with the blue clothing items.

74.     The Solano facility operates in accordance with the sanitation and laundering requirements for acute psychiatric hospitals set forth in Title 22, California Code of Regulations

---

[5] Defendants have manually filed a videotape tour of the Solano laundry facility (Dkt. No. 1434), authenticated in the declaration of Christopher Gong (Dkt. No. 1437).

§ 71629. The Solano facility actually exceeds these sanitation requirements. For example, the provision requires that linens be washed at a minimum temperature of 160 Fahrenheit for twenty-four minutes if they are not subsequently passed through a flatwork iron or tumble dryer. At Solano, the clothing and linens are washed at 160–65 degrees Fahrenheit for thirty minutes. The laundry is then placed in tumble dryers set at 180 degrees Fahrenheit. Items in mesh bags are dried for forty-five minutes to one hour.

75.     The laundry is washed with liquid detergent and a product called "break." The "break" attaches itself to the soil and suspends it so the detergent can carry the soil away. A 12.5 percent bleach solution, the strongest available, is used with white items (but not blue ones). After the wash cycle, another product called "sour" is added to bring the pH level down to neutral. Fresh water is flushed through the system each hour during the laundering process. The entire system is completely drained twice a week.

76.     To keep the Solano facility as sterile as possible, inmate-workers wear masks, gloves, and smocks. Lint traps in the dryers are cleaned twice a day. Laundry that is not intended to touch the body (*e.g.*, laundry from prison kitchens) is not washed with clothing, linens, or towels.

77.     If a laundry worker believes that an item has not been properly cleaned, he will ask his supervisor to authorize a re-wash.

78.     The interior of the trucks that haul the laundry carts and the carts themselves are sanitized by power washing with hot water and disinfectant each time they are unloaded.

79.     The Solano laundry facility cleans about twenty-thousand pounds of laundry each work day. The facility accepts and processes laundry from five institutions. Staff members try to complete each load within twenty-four hours.

80.     Laundry is occasionally returned to inmates still dirty or damp due to the improper closing of mesh bags. Crediting fully Superintendent John Arnold's testimony, this order finds that some inmates tie the bag so far down that the clothes are compressed into a ball in the bottom of the bag. Sometimes inmates over-load their bags with excessive amounts of clothing. Clothes that are bagged like this cannot properly agitate in the wash, and will not get

24

1    clean because the mesh bags are never opened and are tossed into the washer whole. In addition,

2    it is difficult to thoroughly dry clothing in compressed or over-loaded bags. If there are foreign

3    objects, feces, hair, or bugs on clothing bagged in this manner, they may still be there at the end

4    of the laundry process.

5         81.    The proper way of closing the mesh bags is obvious. When asked about how he

6    learned the proper way to tie the mesh bags, Inmate William Noguera testified that he knew by

7    "common sense" (Noguera Tr. 790). Inmate Douglas Dworak washed his clothes himself but

8    sent sheets out in the mesh bag. He was asked how he learned the proper way to tie off the top

9    of the mesh bag, and he answered, "It's pretty self-explanatory, I think." He stated that he

10   usually did not have a problem with the laundry when it was returned, even if it was slightly

11   damp (Dworak Tr. 809–12).

12        82.    In the past, Adjustment Center inmates were not on the bag system. Instead, they

13   used the one-for-one exchange system. An inmate would place his dirty laundry in the cuff port

14   security box on the front of his cell door. The tier officers collected the dirty laundry from the

15   security box and replaced it with the same number of clean items.

16        83.    Since Summer 2007, Adjustment Center inmates now use a form of the bag

17   system to exchange dirty laundry. Inmates are not issued laundry bags; prison staff hold onto the

18   bags assigned to these inmates. On Mondays, prison staff collect clothing and linen from each

19   inmate using the cuff port security box. Inmates first place their laundry in the cuff port security

20   box. Staff members then remove the laundry from the box and place it in the inmates'

21   designated laundry bag in view of the inmate. The staff then secures the laundry bag with the

22   appropriate fastener and records it on a CDC 114-A form, an important record used to track

23   important daily events for each prisoner. When the clothing is returned to Adjustment Center

24   inmates on Thursdays, the cuff port security box is used again.

25        84.    It is true that items of laundry are occasionally lost in the process. This is

26   unusual, however. In any event, when items are lost, San Quentin will eventually replace the

27   lost items for inmates.

28

85.     Although this order finds that the laundry system is constitutional and adequate in and of itself, it is worth adding that there is an alternative:  some inmates choose to wash their own laundry in their cells.  Each cell has a sink with hot and cold running water.  The sink is approximately five inches deep and twelve inches by seven inches at the top.  The prison provides inmates with soap (which inmates can also purchase from the canteen).  Grade A inmates have a bucket in their cells that they can use to wash laundry.  Grade B inmates do not have buckets but can use sinks to wash laundry.  Inmates dry their laundry by hanging it on string spanning their cells.  They press shirts by placing them between cardboard under their mattresses.  The end result looks professionally dry-cleaned and pressed.  Several of the testifying inmates appeared so dressed and testified to their prison ingenuity.

86.     Turning to the law, the December 21 order noted that other circuits have held that leaving inmates to wash their own clothes in their cell is constitutional.  In *Gates v. Cook*, 376 F.3d 323, 342 (5th Cir. 2004), the Fifth Circuit held that a prison laundry condition that required inmates to wash their own clothes with bar soap do not violate the Eighth Amendment.  The Third Circuit has gone further and held that an inmate's complaints about food, unnecessary isolation, the physical conditions of his cell, the lack of clothing and laundry service, and the limitations on recreation and shower time does not violate the Eighth Amendment.  *Gibson v. Lynch*, 652 F.2d 348, 352 (3d Cir. 1981).

87.     This order assumes *arguendo*, however, that the Eighth Amendment entitles inmates to either access to a laundry facility or to in-cell means to launder clothes and sheets.  Defendants have met this standard, and there is no objectively serious deprivation within the meaning of *Farmer*.  The laundry system used at San Quentin is modern, professional, and hygienic.  There will be occasional dampness, dirtiness, and pilfering.  The occasional glitches are almost always the fault of the inmate who ties the bag improperly.  Sometimes they tie the bag too far down or they over-load the bags with dirty items so that the laundry cannot properly agitate in the wash, and sometimes they do not tie the bag tightly enough and it comes open in the wash.  Missing items are eventually replaced.  No system can be perfect but the San Quentin system comes as close as is reasonably possible.  Rather than be criticized for deliberate

indifference to inmate health or safety, defendants should be commended for their excellent laundry system. The laundry provision of the consent decree is now terminated without prejudice to a future motion or action for new injunctive relief if the prison conditions degenerate to unconstitutional levels.

**H.    CLEANING SUPPLIES.**

88.    According to the consent decree, "[i]nmates shall be responsible for cleaning their own cells. Defendants will supply inmates with adequate equipment and materials for cleaning their cells" (Consent Decree VI.J.1–2).

89.    By way of summary, the prison policy is to provide cleaning supplies upon request to Death Row inmates. Cleaning supplies, however, are frequently unavailable when Death Row inmates ask for them. Often, these supplies are not replaced when they run out or become unserviceable. As a result, inmates are unable at times to keep their cells clean, resulting in health hazards. A separate but related problem involves those inmates who are unwilling to keep their cells clean, even when given adequate cleaning supplies. For such inmates, the prison staff should proactively clean their cells if the recalcitrant inmate refuses to do so. For the health of everybody in the facility, prison officials have wide latitude, including vigorous withdrawal of privileges, to encourage regular clean-up and maintenance of cells. The details now follow.

90.    The first problem concerns the availability of cleaning supplies. Cleaning supplies (for cleaning cells) are ordered from outside vendors and stored in the prison warehouse. Whenever a housing unit needs certain items, it requests them from the warehouse using a storeroom-supplies order form. It takes up to 24 hours after the time of the request for the goods to be delivered. The prison's minimum supply for cleaning items used by condemned inmates to clean their cells are:  100 green scrub pads, 100 sponges, 50 toilet brushes, 200 gallons of disinfectant, 1,835 pounds of Cleaner-Just Clean, 59 whisk brooms, and 25 dust pans. Currently, the prison has the following number of cleaning items in the warehouse:  151 green scrub pads, 225 sponges, 129 toilet brushes, 3,745 gallons of disinfectant, 2,580 pounds of Cleaner-Just Clean, 225 whisk brooms, and 81 dust pans.

91.     According to prison policy, each tier in East Block and the Adjustment Center should have one bucket or jug of cleaning supplies.  Upon request, Grade A inmates are supposed to be issued (temporarily) disinfectant, sponge, scrub pad, whisk brook, dust pan, and toilet brush.  Adjustment Center inmates, who have the greatest propensity for violence, however, are not given a five-gallon bucket, whisk broom, dust pan, or toilet brush because these items could be made into weapons.  Inmates in North Segregation are supposed to be able to access cleaning supplies whenever they are out on the tier.

92.     Contrary to prison policy, however, this order finds that inmates are not always given adequate or appropriate cleaning supplies upon request and, in fact, cleaning supplies are often unavailable to hand out.  Buckets with cleaning supplies are supposed to be on every tier in East Block.  The buckets do not always contain the full complement of a small broom, dust pan, sponge, spray bottle with disinfectant, and a toilet brush.

93.     Examples of this problem are as follows.  Inmate Zaragoza cleaned his cell with shampoo purchased from the canteen.  He scrubbed his cell with a rag.  Although he requests cleaning supplies about every two weeks, he rarely receives them; the last time he received cleaner was approximately two months ago.  Inmate Bonilla used his towel to clean his cell. He had a whisk broom that was confiscated.  About three years ago, he stopped receiving laundry detergent or scrub brushes.  When he requested more cleaning supplies, prison staff told him that there were none to pass out.  He has not recently requested a mop, bucket or brush because he knew that "it would be pointless to do so."  Inmate Dworak swept his cell with crumpled newspaper and used rolled-up newspaper to clean his toilet.

94.     Even more troubling was the experience of Inmate Jimmy Van Pelt.  Despite asking for cleaning supplies three or four times a month, he was told that there were none available or that the officer would try to find some.  He has resorted to cleaning his toilet with his bare hands, which presents a health hazard because he is diabetic and must have his fingers pricked for blood checks twice a day (resulting in open wounds on his hands).  In July 2007, he filed an inmate grievance 602 form to request cleaning supplies (appeal #07-03147).  He was given one pair of disposable latex gloves.  In a First Level Response dated August 8, 2007,

1   Inmate Van Pelt was told that cleaning supplies would be available to him upon request,

2   provided that supplies were readily available in the unit.  Since the August response, however, he

3   has continued to ask for cleaning supplies but he received only a small amount of disinfectant a

4   few weeks ago.

5       95.     Tier officers testified that sometimes there were not enough cleaning supplies

6   even when inmates requested them.  For example, inmates usually ask for disinfectant to clean

7   their cells.  When asked how frequently disinfectant was unavailable on her tier, Tier Officer

8   Gina Thompson stated, "Maybe a half a dozen times [over the year]" (Thompson Tr. 578).

9       96.     Significantly, numerous CDC 114-A forms, which were specifically supposed to

10  record the distribution of cleaning supplies, show that cleaning supplies have gone *undistributed*

11  (except for bath soap) in all three housing units.  The form includes blank spaces for the inmate's

12  name, cell, and date.  Under "Record of Daily Activity," the instructions state that "Unit Staff

13  must record all services and activities offered to segregated inmates and all significant activity."

14  Prison staff are also instructed to maintain a record of cell inspections, exercise, showers,

15  supplies, clothing/linen, meals, and trash disposal.  There is a blank space for staff comments and

16  the staff name.  Under "supplies," the CDC 114-A form states, "*Cleaning and personal hygiene*

17  *supplies shall be offered on a weekly basis to all inmates and provided on an as-needed basis.*

18  *Record what was provided*" (TX 10).  Despite prison policy clearly stating that prisoners must

19  be provided with cleaning supplies on a weekly basis and upon request, there were only

20  229 individual distributions of any sort of cleaning supply for the 520 prisoners over a period of

21  at least four months.  (The four months were the two before and after the motion filing date.)

22      97.     Some tier officers claimed that they supplied inmates without recording the

23  distributions on the CDC 114-A forms.  Officers were, however, *supposed* to document

24  distributions as the CDC 114-A form instructs.  Nearly all other check-offs (including the

25  provision of other supplies) are routinely recorded on these same forms, as required by prison

26  policy.  This order expressly rejects defendants' theory that inmates were provided with adequate

27  supplies but that tier officers failed to record it.

28

98.     This order finds that, on the motion date in question, cleaning supplies were not made available.  It is possible that the prison warehouse or storerooms had enough cleaning supplies.  Nonetheless, inmates were not provided with adequate supplies, including disinfectant, cleaning utensils, and rubber gloves, contrary to prison policy.  Sometimes prison staff did not respond to inmates' requests, or there simply were not enough supplies to go around.  Inmates must be provided with cleaning supplies to maintain minimally sanitary cells.

99.     A related but separate problem involves those inmates who refuse to keep their cells clean.  Whether or not they receive cleaning supplies, some inmates simply refuse to clean their cells, which they allow to become filthy and downright repulsive.  Inmate Gomez is one such inmate.  The walls of his cell, especially around the toilet, were stained with a dark, streaked substance.  Greyish liquid was pooled on the floor.  The bedding was stained and filthy. Food was strewn throughout the cell.  Papers and wrappers were scattered about. Disgusting cells like Inmate Gomez's cell constitute a health hazard to all in the vicinity. The majority of inmates maintain their cells in reasonable order.  Inmate Gomez is an aberration (Rice Decl. Exh. I).

100.     Prisoners are at significant risk from the constantly-circulating pathogens that are present when hundreds of individuals live together.  For example, norovirus is spread person-to-person or through contact with contaminated surroundings.  Norovirus affected a high number of prisoners in East Block in December 2006 and January 2007, even though they were locked down for weeks and had very limited person-to-person contact.  Death Row prisoners represent a more vulnerable population; they are "biologically older" and suffer from more chronic diseases than their non-prisoner counterparts.  Even compared with other prisoners, East Block prisoners are older and suffer from a higher prevalence of chronic diseases. Filthy cells present a health hazard.

101.     Turning to the law, the December 21 order stated:  "Failure to provide adequate cell cleaning supplies, under circumstances such as these [referring to the overall squalor of the penitentiary], deprives inmates of tools necessary to maintain minimally sanitary cells, seriously

threatens their health, and amounts to a violation of the Eighth Amendment," citing *Hoptowit v. Spellman*, 753 F.2d 779, 784 (9th Cir. 1985).

102.     In *Blake v. Hall*, 668 F.2d 52, 59 (1st Cir. 1981), the First Circuit described the duties of a prison with respect to cleaning inmates' cells:

> We do not mean to suggest that prison officials cannot require inmates to keep their cells and living space clean. This can be done by any combination of discipline and reward that is appropriate and does not violate the eighth amendment. What we hold is that the prison administration must see to it that unsanitary conditions do not continue unabated because the conditions were first caused by the inmates themselves. Cleanups must be conducted regularly, although they benefit those who made the mess as well as those who did not . . . This is not to say that identifiable inmates who create unconstitutional conditions, or thwart the efforts of prison administrators to keep prison conditions up to constitutional standards, are necessarily entitled to relief from the very conditions they themselves create. Depending on the circumstances, such individuals might well be estopped from relief against self-imposed conditions. The administrators, however, owe a duty to the other inmates to see that the conditions in which they live are up to standard, and if constitutional conditions cannot be maintained in one location because of the misconduct of certain unruly inmates, then those inmates who are not responsible must be moved to a location where their rights can be secured, or the unruly inmates must themselves be relocated. This is much the same as the duty owed to protect inmates from the violence of other prisoners.

103.     Under the consent decree, inmates must keep their cells clean. Deliberate failure to do so can and should result in loss of material privileges. When all else fails, prison staff must clean these cells by taking out the trash, pouring disinfectant into toilets, changing sheets, scrubbing surfaces with scrub brushes and soap powder, and sweeping and mopping cell floors. Sometimes volunteer inmate-workers do this under guard supervision. This order finds that defendants have not been proactive enough about cleaning up unsanitary cells and in providing cleaning supplies on request. Because defendants have failed to prove that there is no current and ongoing constitutional violation with respect to cleaning supplies or that the provision is broader than necessary to address the violation, this provision remains in effect.

## I.     RODENTS AND VERMIN.

104.     The consent decree provides: "Defendants will continue existing efforts to eliminate rodents and vermin from the unit. Cells will be sprayed on request of the occupant.

31

Condemned inmates will make every effort to eliminate debris in the cells and tier areas which attract such rodents and vermin" (Consent Decree VI.J.5). There is a dispute as to whether birds should be treated as vermin. This order includes birds in the definition of "vermin." In this regard, a powerful fact is that San Quentin's own compliance reports have treated birds as vermin for purposes of complying with the consent decree. For example, in response to this particular provision, the report found "partial compliance" because "bird nests within East Block remain and bird droppings can be found throughout the unit" (TX 8).

105.    Prison policy requires that prison staff try to eliminate rodents and vermin. There are, however, rodents and vermin in East Block. For example, Desk Officer Albert Lewis Gross said that he told another tier officer that "they had a severe mouse problem, and that mice was jumping around like popcorn out on the floor, you know, and so she contacted vector control, they put traps out, and basically [the mice] disappeared. Every now and then you see one or two run across the floor. But it's not as much as they used to be" (Gross Tr. 452). Cockroaches have been spotted in East Block. There are also drain flies and fly larvae in the shower drains. Dead mice have been found in laundry carts (Rice Decl. Exh. PP).

106.    Prison staff have been aware of the rodent and bird problem for a long time and as recently as December 15, 2007. In regular memoranda to Associate Warden Fox entitled "Birds and Rodents in East Block," Sanitation Officer Judith Zaragoza wrote (TX 6):[6]

> The issue of the birds in East Block has been reported. To date, numerous birds are still noted in the unit. In addition, the 1st Watch staff has also reported issues with numerous rodents running around the unit.

These memos had the identical message and were issued every two weeks — they are dated August 6, August 20, September 1, September 15, October 1, October 15, November 1, November 15, December 1, and December 15, all in 2007. This order finds that there are numerous rodents present in East Block.

107.    The Program Compliance Unit, Office of Audits and Compliance inspected San Quentin on multiple occasions. According to the compliance report for

---

[6] This order refers to two different Zaragozas — there is Inmate Zaragoza and Sanitation Officer Zaragoza.

1   November 28–December 2, 2005, entitled "Formal Review in re:  United States District Court

2   *Thompson vs. Enomoto* Consent Decree" (TX 7):

> The audit revealed that ongoing efforts are being made to keep
> cells and tiers clean.  A review of unit documentation indicated
> that vector control services are being provided.  However, the
> general condition of areas within East Block is poor.  Specifically,
> East Block Bay Side showers have been cleaned, however due to
> water run off, all five tiers have scum and mold.  In addition, there
> are numerous bird nests within East Block which results in bird
> droppings throughout the unit.

The compliance report dated June 5–9, 2006, and draft compliance reports dated

December 11–15, 2006, and June 4–8, 2007, have substantially the same findings regarding

birds and shower areas (TX 1, 8–9).  (*Thompson v. Enomoto* is the instant case, as it was earlier

known.  The consent decree is the same one here at issue.)

108.   The Court was favorably impressed by the dedication and good intentions of

Officer Zaragoza (as well as other prison officers).  Despite these good intentions, the rodent

(and bird) problems remain serious and the resources being devoted to the problem are

inadequate.

109.   San Quentin employs a full-time pest control technician who sprays pesticide in

East Block, North Segregation and the Adjustment Center on a bi-monthly basis (if a work order

is issued).  The pest control technician is also responsible for setting and inspecting rodent and

vermin traps in these areas but this is not effective to solve the overall problem.

110.   Turning to a related problem, finches and sparrows enter East Block through open

or broken windows and doors.  Some nest in the building.  This has been a longstanding

problem.  As stated, San Quentin's compliance report stated that "there are numerous bird nests

within East Block which results in bird droppings throughout the unit" (TX 7).

111.   Bird droppings are abundant in East Block and are caked on or have been recently

caked on all open areas, the tiers, the gun rails, the floors, a wheeled medical gurney, the tops of

laundry carts, and the boxes (near the showers) in which prisoners' razors are stored (Rice Decl.

Exh. E, BB, OO, and QQ).

112.    Birds sometimes come in contact with food trays.  Inmates have seen birds contaminate food on food trays left unattended prior to passing out the food.  One inmate reported having to "literally pull[] feathers from my tray in East Block."

113.    Class members, of course, never touch the gun rails.  But they too are caked with bird feces.  Bird feces can become aerosolized and inhaled.  The gun rails are within sight of and close by the living quarters of the inmates.

114.    The bird problem is decades old and well known to prison officials.  Since June 2007, San Quentin has installed bird netting around East Block to reduce the number of birds entering the facility.  No mesh was installed on the upper gun rail door, which Officer Zaragoza stated was left open on hot days by guards.  The prison has installed screens on the outside of the East Block windows to prevent birds from entering the building.  No efforts have been made to keep birds from entering doors that remain open throughout East Block.

115.    Inmate workers are engaged in ongoing efforts to clean East Block.  There are not enough of these workers, however, and their work moves at a snail's pace.  Although there have been some recent efforts to clean bird feces from surfaces, prison staff and inmate-worker teams have not cleaned the bird feces from gun railings nor certain other locations.  There have been inadequate efforts to eliminate the birds themselves.  Officer Zaragoza's memos chronicled the presence of "numerous birds" in East Block.  This order finds that there were and still are numerous birds in East Block.  The undersigned himself saw many during the view on January 17, 2008.

116.    Turning to the law, defendants argue that plaintiffs have failed to trace a single incident of inmate illness due to rodents, vermin, bird feces, or some other unsanitary condition.  This argument is unpersuasive.  "That the Eighth Amendment protects against future harm to inmates is not a novel proposition.  The Amendment, as we have said, requires that inmates be furnished with the basic human needs, one of which is 'reasonable safety.'  It is 'cruel and unusual punishment to hold convicted criminals in unsafe conditions.'  It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them."  *Helling v. McKinney*, 509 U.S. 25, 33–34

(1993). In *Helling*, the Supreme Court refused to rule that it would be impossible for a prisoner to prove an Eighth Amendment violation based on exposure to secondhand smoke.

117.    This order recognizes that there will be times when dirt, mold, and grime accumulate on a temporary basis. A prison does not have to be as clean as a hospital. The burden of proof is still on defendants, and they have not yet convinced the Court that there is no substantial rodent and vermin problem. The excessive levels of rodents, vermin, birds, and filth increase the health risk for an already-vulnerable population. Rodents have been observed in the housing units and bird feces are found near food and other areas that come in contact with inmates. Even though San Quentin does take steps to eliminate rodents and vermin, the steps are known to be inadequate to meet the severity of the known problem. Defendants have failed to carry their burden of showing a lack of a current and ongoing constitutional violation or that the provision is broader than necessary to address the violation here. This provision is not terminated and will continue to be enforced throughout Death Row.

### J.    MAINTENANCE OF SHOWERS.

118.    "Defendants shall provide two pay numbers for Grade A inmates who shall be responsible for cleaning the tier and shower areas of the unit on a daily basis and shall perform cleaning of vacated cells. Cleaning activity by designated Grade A inmates, with pay numbers, shall be between the hours of 9:00 a.m. and 3:00 p.m." (Consent Decree VII.J.3–4).

119.    By way of summary, the sad fact is that the shower-cleaning provision in the consent decree has been used as an excuse for a long time to sweep the filth from showers into the common areas immediately outside the showers and adjacent to the cell tiers, creating an ever-accumulating cascade of muck. This is a clear health hazard. The shower-cleaning provision in the decree should not have been abused in this way. The details follow.

120.    There are two showers per tier, made from converted cells, for a total of twenty showers in East Block. The showers are located in the middle of each tier, side by side. The two showers on the fifth tier, for example, are immediately above the two on the fourth tier, and so on. Each shower has two compartments: the shower proper, and a crude foyer between the shower proper and the tier walkway. The foyer is just large enough for a chair and an inmate.

It is used to dress and undress. The shower proper has a drain but the foyer does not. In the shower proper, the shower nozzle is on the back wall pointing downward toward the door at a 45-degree angle. There are no doors.

121. Most of the dirty shower water goes down the drain but some collects in the foyer. Again, there is no drain in the foyer (except, possibly for two units). Inmates shave in the shower. The runoff thus contains shaving cream, as well as soap scum, shampoo, body hair, shaved skin and detritus, blood particles from open sores and cuts, saliva, mucus, and pus.

122. At the end of each day, prison staff and/or inmate-workers sweep the pooled filthy water and detritus out of the entryway and onto the tier. This includes not only the pooled water in the foyer but also clean-up water used by the inmate workers. The outflow then spills across the tier and drips from one tier to the next, some of it lodging in the infrastructure of the tier and some dripping down to the next tier and so on. Some of it reaches the ground floor, close to the medical clinics and holding cages where prisoners wait for medical appointments, and in front of the first-tier (yard side) wheelchair-accessible shower. The constant dripping corrodes and degrades the infrastructure. Congealed stalactites of muck and slime, composed of soap scum, hair, and bodily detritus dangle from the infrastructure (Rice Decl. Exh. T, V). The buildup and water is so disgusting that the prison hangs plastic sheets over the tiers to shelter people working in the medical clinics on the ground floor. During his view of East Block, the undersigned observed large accumulations of hair, grime, and dirt dangling from the tier infrastructure shower area.

123. The ever-collecting filth is not cleaned or removed. Years of accumulated muck cover the walkway infrastructure. Very recently, however, some minor effort has been launched to address the problem.

124. The filthy shower effluent poses a health and safety risk to inmates because it spreads viral and bacterial pathogens. The effluent falls over the tiers and aerosolizes into a micro-mist that circulates throughout East Block. Furthermore, airborne mold spores from the shower areas contribute to inmates' hard-to-control respiratory problems. Mold is also growing in the infrastructure, which is dampened by the runoff.

125.     Defendants have been aware of the shower problem for a long time; former warden Jeanne Woodford had informed defendant James Tilton of the problem years ago. San Quentin's own compliance reports reveal problems with showers: "[T]he general condition of areas within East Block is poor.  Specifically, East Block Bay Side showers have been cleaned, however due to water run off, all five tiers have scum and mold" (TX 7).

126.     Most regrettably, the requirement in the consent decree for cleaning the showers has been used as an occasion to sweep the filth from the showers over the walkways and onto the open area and infrastructure.  Such a derangement of the consent decree was never intended.  A proper way of cleaning would be to force the effluent down the drain of the shower proper. Dirty water in the foyer should be manually moved to the shower drain using a hand shovel, dustpan, rags, or mop.  Even better would be to install a drain in the foyer.  This provision was not meant as a cover for sweeping the filth "under the rug."  So too with the clean-up water run by the clean-up crew.  It should go down the drain, not launched into the rest of East Block.

127.     Under the Constitution, inmates have the right to be housed in a reasonably clean environment.  "Prison officials must provide all prisoners with adequate food, clothing, shelter, sanitation, medical care, and personal safety."  *Hoptowit v. Ray*, 682 F.2d 1237, 1258 (9th Cir. 1982).  They also are entitled to a basic level of hygiene.  *See Keenan*, 83 F.3d at 109; *Toussaint*, 597 F. Supp. at 1411.  Under *Gilmore*, 220 F.3d at 2000, "[a] district court is bound to maintain or modify any form of relief necessary to correct a current and ongoing violation of a federal right, so long as that relief is limited to enforcing the constitutional minimum."  Here, the provisions at issue *are* necessary to correct a current and ongoing violation of inmates' constitutional right to a minimum level of sanitation.

128.     The stalactites of muck, mold, and filth from the shower effluent constitute an objectively serious deprivation well known to prison officials, spreading viral and bacterial pathogens.  Defendants certainly have not responded reasonably to the known risk; indeed, their "remedy" of shoving the filthy water over the tiers is the very source of the problem.  Simply put, the shower provision has been misused.  The consent decree requires not only that the showers be cleaned but that the tiers themselves be cleaned.  Instead, the tiers and their

1    infrastructure have been turned into a health hazard.  Not only have defendants not carried their

2    burden, but a positive constitutional violation has been shown.  The Court further holds that the

3    provision is narrowly tailored to address the constitutional violation.  This provision must remain

4    in effect and will henceforth be enforced as stated above.

5                                              **CONCLUSION**

6            For the foregoing reasons, defendants' motion to terminate the consent decree is

7    **GRANTED IN PART AND DENIED IN PART**.  The following provisions are terminated,

8    effective immediately:

9                    (i)      Visitation (Consent Decree VII);

10                   (ii)     Tier telephones (Consent Decree X as modified by Sixth Report

11   of the Monitor);

12                   (iii)    Access to legal materials (Consent Decree VIII);

13                   (iv)    Outdoor exercise (Consent Decree V.A., Consent Decree V.B.2

14   as added by Sixth Report of the Monitor);

15                   (v)     Raincoats (Consent Decree VI.E.16); and

16                   (vi)    Laundry (Consent Decree VI.L.1–4 as modified by Sixth Report

17   of the Monitor).

18   This termination is without prejudice to future relief herein or in some other action if conditions

19   degenerate to unconstitutional levels.

20           Because defendants have not carried their burden, the following provisions are not

21   terminated:

22                   (i)      Noise (Consent Decree XIII as added by Fourth Report of the

23   Monitor);

24                   (ii)     Cleaning supplies (Consent Decree VI.J.1–2);

25                   (iii)    Rodents and vermin (Consent Decree VI.J.5); and

26                   (iv)    Maintenance of showers (Consent Decree VII.J.3–4).

27           With respect to the showers, effective *immediately*, sweeping (or otherwise moving)

28   shower water and debris out of the showers and onto the tiers, walkways, or broadway is

**ENJOINED**.  Instead, effective immediately, all shower debris and shower water in the foyer must be moved back into the shower proper so that it may drain.  How defendants arrange this is up to them, but dust pans, mops and towels may be needed.  In addition, within **45 CALENDAR DAYS**, defendants must clean away all of the accumulated muck and mold alongside the shower areas, including the walkways and walkway infrastructure.  Please remember that the consent decree also requires that the "tiers" be cleaned.  At a minimum, this means that the tiers and their infrastructure (*i.e.*, the walkway and the infrastructure for the walkways) must be cleaned rather than be used as a trash heap for shower filth.

The Court recommends that drains be placed in the foyer section of each shower as well as a low-level stop between the foyer and the shower proper to better block shower water.  Whether or not defendants do so is their decision but, at all events, the shower-cleaning provision in the consent decree shall no longer be used as an excuse to sweep shower debris into East Block.  That must cease now.  Cleaning the showers under the consent decree means *proper* cleaning — all of the shower debris and dirty shower water must go down the drain or be dispatched properly.  There is no need to submit a cure plan as to this violation because the foregoing order is calculated immediately to end the violation.

All class members should learn the outcome of these proceedings, including the December 21 order.  Within **FOURTEEN CALENDAR DAYS**, counsel shall please submit for approval in plain English a notice to be circulated to all condemned inmates.[7]

---

[7]  These proceedings have provoked condemned inmates to write directly to the Court, bypassing their counsel.  Most of their complaints about the Prison Law Office are complaints about its litigation strategy.  The Court has considered all of the letters.  In most instances, the Court forwarded the letter to counsel for response.  In all cases, the Court is satisfied that the PLO has adequately represented class members.

A further case management conference will be held on **FEBRUARY 28, 2008, AT**

**11:00 A.M.** to address the future of this case. Please do not use it as an occasion for re-argument.


      **IT IS SO ORDERED.**


Dated: February 15, 2008.

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE